IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALEJANDRO BENAVIDEZ | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION 3:07-CV-00105 |
| | § | [JURY] |
| BURLINGTON NORTHERN SANTA FE | § | |
| CORP., ET AL | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW ALEJANDRO BENAVIDEZ, Plaintiff herein, and, for his Response to the two Rule 12(b)(1) Motions to Dismiss (Docs. 25, 26) filed by Defendants Deer Park Rail Terminal, L.L.C. ("DPRT-LLC"), Deer Park Rail Terminal, Inc. ("DPRT-INC"), U.S. Development Group, Inc. ("USDG"), USD, LLC ("USD"), USD Terminals, LLC (USDT-LLC), and U.S. Development Group, LLC ("USDG-LLC"), as well as by Defendant Railserve, Inc. ("Defendants" or "Several Defendants").

Several defendants have moved to dismiss under Rule 12(b)(1) for lack of subject mater jurisdiction, claiming Plaintiff cannot establish liability under the Federal Employers' Liability Act, 45 U.S.C. §§51 *et seq*., with respect to them as a matter of law.  In brief, defendants deny they are Plaintiff's employers, and also claim they are not "common carriers by railroad" as that term is used by FELA.  Defendants argue that Plaintiff cannot establish FELA liability against any defendant, thus destroying federal jurisdiction. Defendants further request that the Court decline to exercise pendent jurisdiction over Plaintiff's state law negligence claims.

## I. Rule 12(b)(1) Standards

When a party files a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, the Court may not dismiss the claims "unless it appears certain that the plaintiff cannot prove any set of facts in support of [his] claim which would entitle [him] to relief." *See Benton v. United States*, 960 F.2d 19, 21 (5th Cir.1992); *Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998). In considering the motion under Rule 12(b)(1), the Court may find lack of subject matter jurisdiction "on three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996).  Motions filed under Rule 12(b)(1) allow a party to challenge the subject matter jurisdiction of the district court, based on the allegations on the face of the complaint. *Id.*

The standard for reviewing a motion under Rule 12(b)(1) depends on whether the defendant makes a facial or factual attack on the plaintiffs' complaint. *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981). The defendant makes a facial attack by the mere filing of a Rule 12(b)(1) motion. *Id.* In such a case, the trial court looks at the sufficiency of the allegations in the complaint, which are presumed to be true. *Id.* The defendant makes a factual attack, on the other hand, by providing affidavits, testimony, or other evidentiary materials challenging the jurisdiction of the court. *Id.* In a factual attack, the plaintiffs are also required to submit facts in support of jurisdiction and have the burden of proving, by a preponderance of the evidence, that the trial court has subject matter

2

jurisdiction over the claims. *Middle South Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th Cir.1986). These Defendants have merely made **a facial (i.e., non-evidentiary)** attack on the allegations made in Plaintiff's complaint.

## II. Factual Background

Plaintiff's suit is based on the following facts.  Plaintiff Alejandro Benavidez was a helper and switchman who worked at the Deer Park Rail Terminal, located  near Beltway 8 and Highway 225 in Pasadena, Texas.  As shown herein, the Terminal provides rail services to the public and is engaged in common carriage by rail (such as moving and switching railroad cars, and in providing general terminal operations).  The Deer Park Rail Terminal ("Terminal") is jointly owned and operated, *inter alia*, by the several defendants, making them jointly engaged in the business of "common carriage by railroad" in interstate commerce, fully subjecting them to the provisions of the Federal Employers' Liability Act of 1908, 45 U.S.C. §§ 51-60 ("FELA").  Many of the several defendants also contracted with railroads to perform essential rail services for them.

While working at the Terminal, Plaintiff was nominally employed by Defendant Railserve, Inc., but the work he was performing was being supervised, managed, directed and/or controlled by the several defendants, making them his FELA "employers."

On April 4, 2005**,** Plaintiff was working as railroad brakeman/switchman, helping to move railroad cars at the Terminal.  While working, Plaintiff was forcefully thrown from a railroad car when the engineer applied the brakes without warning, and the air brakes were not engaged.  As a result, Plaintiff fell onto the tracks and his left leg was run over by the rail car, resulting in excruciating pain and suffering, and requiring amputation. Plaintiff sued

the several defendants under FELA and common-law negligence. *See* Original Complaint, incorporated by reference.

Movants/Defendants listed above seek to dismiss Plaintiff's complaint under Rule 12(b)(1) because they: 1) are not "common carriers by railroad" as that term is understood under FELA, and 2) did not "employ" Plaintiff.  Docs. 25, 26.  Without offering any proof, they seek dismissal simply on the strength of their assertions that they are not subject to FELA.  Id.

### III.  Summary of Argument

In order to recover under FELA, a plaintiff must prove that 1) defendant is a common carrier by railroad, engaged in interstate commerce; 2) he was employed by the defendant with duties advancing such commerce; 3) his injuries were sustained while he was so employed; and 4) the defendant's negligence caused his injuries.  45 U.S.C. §51; *Weaver v. Missouri Pac. R.R. Co.*, 152 F.3d 427, 428 (5th Cir. 1998).  As shown herein, these Defendants are subject to FELA because: (a) they are "common carriers by railroad" engaged in interstate commerce by virtue of their close relationship with each other and their operational and terminal work at the Deer Park Rail Terminal, and (b) they employed Plaintiff because they either contracted for his work and/or controlled it.

With respect to a party's status as a FELA "common carrier," federal courts have defined the term to include a wide variety of entities involved in railroad operations. *See Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967)*; Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498 (1911)(terminal can be a common carrier).  With respect to a party's status as a FELA "employer," the US Supreme Court has identified three

independent methods by which a plaintiff can show that he is employed by an entity for FELA purposes, even if nominally employed by another. *See Kelley v. Southern Pac. Co.,* 419 U.S. 318, 324 (1974)(FELA plaintiff may be a borrowed servant; serving two masters simultaneously; or a subservant of a servant railroad).

As shown herein, there is ample legal authority and extensive factual support for the Plaintiff's claim that the several movants are "common carriers by railroad" who employed him. In reviewing the evidence of evidentiary sufficiency of a plaintiff's employment status, it must be kept in mind that, "Whether the injured worker was acting as an employee of the [common carrier] railroad at the time of the injury under the FELA is a *question of fact* for the jury." *Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322, 1324 (5th Cir. 1985), citing *Baker v. Texas & Pacific Ry. Co.,* 359 U.S. 227, 228 (1959).

The Court should also exercise jurisdiction over the Plaintiff's common-law negligence claims because they are factually related to his FELA claims.

### IV. Evidence in Support of Plaintiff's Response

Plaintiff attaches and hereby incorporates by reference, the following evidence:

| | |
|---|---|
| Exhibit A | US Development Group Website |
| Exhibit B | Agreement between Railserve and DPRT-INC. |
| Exhibit C | Switching Agreement with Burlington Northern & Santa Fe |
| Exhibit D | Affidavit of John Bozant from prior state court lawsuit |
| Exhibit E | Deposition of Paul Tucker, 2/13/2006 |
| Exhibit F | Deposition of Paul Tucker, 11/01/2006 |
| Exhibit G | Deposition of Rick Orms |
| Exhibit H | Deer Park Rail Terminal Switching Agreements With Customers |
| Exhibit I | Exemplar DPRT documents, showing interstate travel of cars |
| Exhibit J | Deposition of Alex Benavidez |

Exhibit K      Deposition of Tim Benjamin

Exhibit L      Real Property Map of Deer Park Rail Terminal[1]

Exhibit M      Corporate Formation Documents

Exhibit N      Defendants' Response to Disclosures in prior state court lawsuit

Exhibit O      Affidavit of Attorney Michael W. Hogue

With respect to Ex. I (documents showing interstate travel of cars), there are many such documents; the ones attached are exemplars. With respect to Ex. L (map of Rail Terminal property), the original document is far too large to scan or copy; accordingly, counsel is retaining the original and will make it available to the Court and opposing counsel when requested.

## V. Argument and Authorities

Defendants' Motions must be dismissed because federal jurisdiction exists under FELA.

> **A.      The 7 Defendants at issue were jointly involved in a joint venture and/or single business enterprise –the Deer Park Rail Terminal– which offers rail terminal services to the public and participates in the common carriage by railroad in interstate commerce. Given their very close interrelation (alter egos or single business enterprises) in the provision of interstate rail services to the public, all 7 are jointly subject to liability as "common carriers by railroad" under FELA.**

Defendants' first ground for dismissal is the unsupported conclusion that they are not "common carriers by railroad" as that term is used by FELA, and thus cannot be sued under FELA. Defendants offer no proof or argument to support this conclusory averment;

---

[1] original far too large to scan; therefore it is being retained by counsel. Defense counsel is in possession of this document, and the Court is being provided with a copy of this document via courtesy copy.

they simply so state.  Although Plaintiff is not required to provide proof to support his response a *facial* motion to dismiss, he hereby does so in an abundance of caution.

> **1.**    **The several defendants are involved in a joint venture and/or single business enterprise– the Deer Park Rail Terminal.  The several defendants are also very closely related to each other in this enterprise.**

> **A.**    **The relationship between Defendants USDG and DPRT-INC**

Defendants USDG and DPRT-INC are part of a group of companies that own rail terminals and provide rail terminal services throughout the US. USDG's website states:

> The concept of "US Development Group" refers to a group of companies with **common or similar ownership** including: **U.S. Development Group, Inc. a Texas Corporation**; Bayport Terminal, Inc. a Texas Corporation; **DPRT, LLC** a Delaware limited liability corporation; USD, LLC a Delaware limited liability corporations; Loma Lita Rail Terminal, LLC a Delaware limited liability corporation; **USD Terminals, LLC; and several other corporations and limited liability corporations**.

*See* Exs A, E and N.  Defendants advise (Motions at p. 1) that Defendant USD Terminals, LLC no longer exists and has been merged into Defendant U.S. Development Group, LLC (USDG).  USDG's website further states:

> The growing success of USD is based on its proven ability to identify and acquire location-critical real estate **throughout the United States** to support a strategy of:

> > Managing the entire process of designing, financing, constructing and **operating and expanding a nationwide network of rail facilities and infrastructure** that provides innovative options for real customer-driven **rail logistics solutions** for:

> > > -**railcar storage**
> > > -**unit train staging**
> > > -**bulk railcar loading/offloading**

7

> **-improved rail fleet management and utilization**
> **-truck-railcar transloading**
>
> Until now these options may have been inaccessible, unavailable or uneconomical to customers attempting to manage their rial supply an distribution processes within the constraints of the present infrastructure of **railroads.**
>
> USD personnel represent years of extensive experience in banking and finance, real estate development, operations and management with **railroad**, chemical manufacturing and **terminalling** industries and has served in the role of supplier and/or customer of all rail services themselves.
>
> USD is uniquely qualified to work FOR the customer by the way of the manner in it which it works with the railroads. In fact, **railroads are counted as key USD customers**. USD takes time to understand particulars of each customers rail logistics and challenges and then develops ....."

Defendant USDG's website includes a section on the Deer Park Rail Terminal, which reads:

> Servicing railroads- Port Terminal Railroad Association (PTRA) with **interchange to Union Pacific and BNSF**.
>
> **Logistics Services-**
>
> -Railcar storage and staging to-from industry
> -Railcar-to-truck transloading
> -On-site access for railcar maintenance and cleaning
> -Unit train terminalling
> -Inventory Management System (Borque Data System)
> -Truck scale
> -Access to pipeline connectivity points for bulk fuels railcar loading
> -Close proximity to marine terminals on the Houston Ship Channel for consistent railcar delivery response.

8

Ex. A (emphasis added).   The Deer Park Rail Terminal, where Plaintiff was injured, is located near Beltway 8 and Highway 225 in Pasadena, Texas.  The real property records show that DPRT-INC owned the Terminal at the time of the accident.  See Ex. L (map). Paul Tucker, the chief operating officer of USDG and DPRT-INC, testified that USDG owned the Terminal.  See Ex. E, 5-6.

DPRT-INC contracted with customers to provide rail terminal services; it also contracted with Railserve to perform the physical rail movements within the Terminal.  See Exs. C, E 9-10, F 41-44 and H.  Defendant USDG is the parent company of Defendants DPRT-INC and DPRT-LLC.  Ex. A.  Additionally, these entities share the exact same employees, owners and officers and directors.  See Ex. E 6-10, N.  In fact, USDG indicated that some of the customer contracts were in the name of DPRT-INC and DPRT-LLC and did not mention any assignment.  See Ex. E, 18.

## B.   The operations of Defendants DPRT-INC and USDG

DPRT-INC and USDG provide rail terminal services to the public and common carriers.  Blocks of rail cars are brought to the Terminal by the Port Terminal Rail Authority (owned and operated by BNSF, TexMex, and Union Pacific Railroads)("PTRA") at the direction of DPRT-INC/USDG customers.   See Exs. A, C, D, E 8-10, H.  The rail cars entering the Terminal re inbound or outbound to both inter- and intra-state destinations. See Ex. I.  While the rail cars are at the Terminal, they are switched, blocked, staged, loaded, assembled, stored and prepared for outbound travel.  See Exs. A, B, C, D, H and I.

DPRT-INC and USDG contracted with BNSF (a common carrier, see Ex. F 13, 17-25) and the Port Terminal Rail Authority (a common carrier railroad, see Ex. F 29-33) to

perform terminal, switching, staging, and blocking for loading and outbound departure and storage services.  See Exs. C and H.   DPRT-INC and USDG also contracted with Air Products Inc., BP Amoco Chemicals, Bayport Rail Terminal, Inc., Celanese Ltd., The Dow Chemical Co., Intercontinental Terminals Co., Lubrizol Corp., Occidental Chemical Corp., PM ag. Products, Rohm & Haas Co. Inc., RohMax, Inc., Vopak Logistic Services, Inc., Velsicol Chemical Corp., A&R Transport, Inc., BASF Corp., Resolution Performance Products LLC, General American Field Services Corp., ChevronPhillips Chemical Co., Munoz Enterprises Inc., Sunoco Inc R&M, Total Petrochemicals USA Inc., Innovene USA LLC, and Shell Oil Products to perform terminal, switching, staging, and blocking for loading and outbound departure and storage services.  See Exs. C and H.

### C.    DPRT-INC / USDG's Relationship with Railserve

DRPT-INC retained Railserve to conduct operational rail movements at the Deer Park Rail Terminal for customers.  See Ex. B.  USDG/DPRT-INC's marketing branch/customer service, located offsite, received directions from customers pertaining to the rail cars that were located at, or bound for the Terminal.  See Exs. E 22, F 35, D.  The marketing branch relayed these instructions to Brent Tucker, yard manager for USDG/DPRT-INC, who was located at the Terminal.  See Ex. D.  Brent Tucker instructed the Railserve personnel Terminal about the operational rail movements that needed to be conducted at the Terminal.  See Ex. D.

Given the foregoing evidence, it is clear that Defendants USDG, DPRT-INC and DPRT-LLC are part of a group that owns rail terminals and provides rail terminal services throughout the US, including at the Deer Park Rail Terminal.  These entities provide rail terminal services to the public, including railroads, and operate in interstate commerce.

10

The work includes moving and switching rail cars while the cars are present at the Deer Park Rail Terminal, where they are switched, blocked, staged, loaded, assembled, stored and prepared for outbound travel.  See Exs. A, B, C, D, H and I.

### D.   USDG is liable under FELA for the acts of DPRT-INC

Where one railroad company actually controls another and both operate as a single system, the dominant company will be liable for injuries due to the negligence of the subsidiary company. See *Davis v. Alexander,* 269 U.S. 114, 117 (1925)*; Southern Ry. Co. v. Crosby*, 201 F.2d 878, 881 ( 4th Cir. 1953)("Defendant's denial that he was its employee is based upon the fact that he was rendering service at the time of his injury on a train which was being operated on the line of the Yadkin Railroad Company and that he was paid for such service from funds of that company. The Yadkin Railroad, however, was little more than a corporate pocket of defendant, maintained for accounting purposes under an order of the ICC. It owned no rolling stock and the few trains which were operated over its line were at all times completely under defendant's control and direction.").   Here, Defendants DPRT-INC and DPRT-LLC are wholly owned subsidiaries of USDG.  See Ex E. 6.  USDG is the parent corporation of the DPRT-INC and DPRT-LLC.  Id.  Therefore, Defendant USDG is liable under FELA for the acts of Defendants DPRT-INC and DPRT-LLC.

As seen, the several defendants are involved in a joint venture and/or single business enterprise– the Deer Park Rail Terminal, which is located in Pasadena, Texas. The defendants are also interrelated to each other in this enterprise.

> **2.**   **The Deer Park Rail Terminal is engaged in interstate railroad commerce, including offering of common carriage to the public.  The defendants are thus each involved in common carriage by railroad in interstate commerce due to their involvement with Deer Park Rail Terminal and the railroads that use it.**

The several defendants seek dismissal on grounds that they are not railroads but are merely providing terminal services. This argument is not correct. The Fifth Circuit has found various considerations helpful in determining whether operations qualify for "common carrier" status within the meaning of FELA.  See *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).   The considerations include whether:

1.   There is actual performance of a rail service;

2.   The service being performed is part of the total rail service contracted for by a member of the public;

3.   The entity is performing as part of a system of interstate rail transportation by virtue of common ownership with a railroad or by contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public; and

4.   Remuneration for the services performed is received in some manner, such as fixed charge from a railroad or by percent of the profits from a railroad.

*Lonestar*, 380 F.2d at 647.

Here, defendants DPRT-INC, DPRT-LLC and USDG contracted with 26 customers including BNSF to switch, block, stage and move rail cars that are inbound or outbound for interstate travel.  See Exs. B, C, D, and I.  Railserve was switching, blocking, staging and moving rail cars that were inbound our outbound for interstate travel. See Exs. B, C, D, and I, Such activity is considered rail service under FELA.  *See Nichols v. Pabtex*, 151 F.Supp.2d 772, 778 (E.D. Tex. 2001)(plant switching can be a rail operation under FELA).

Railserve was the agent of defendants USDG, DPRT-INC and DPRT-LLC for these operational rail movements, which were conducted as part of interstate travel.  See Ex. I.

Defendants DPRT-INC, USDG, and DPRT-LLC hold themselves by virtue of their contractual relationship with Defendant Burlington Northern & Santa Fe, which is unquestionably a rail operation. Defendant Railserve holds itself out to the public because of its contract with Defendants DPRT-INC, and DPRT-LLC, which is a terminal railroad that holds itself out to public and has contracts with common carrier railroads to provide rail services.  Railserve is paid a flat fee and DPRT-INC/USDG is paid per car and flat fee for the rail services rendered.  Therefore, Railserve and DPRT-INC/ USDG/ DPRT-LLC are all common carriers.

As reflected in *Lone Star* and other cases, terminal railroads are common carriers and fall within the *Lone Star* analysis.  A review of the cases involving terminals and similar operations, show that USDG/DPRT-INC/DPRT-LLC and Railserve's operation at the DPRT easily fit within the parameters of the case law that defines the concept of common carrier.

Courts have found the operators, terminals, and other such facilities, to be common carriers by railroad within the meaning of various federal statues. *See, e.g., Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911)(review of ICC order); *United States v. Brooklyn Eastern Dist. Terminal*, 249 U.S. 296 (1919)(hours of service act);  *United States v. Union Stock Yard & Transit Co.*, 226 U.S. 286 (1912) (interstate commerce act); *Union Stockyards Co. of Omaha v. United States*, 169 F. 404 (8th Cir. 1909)(safety appliance law).  Although the defendants in these cases were in a

general sense primarily engaged rail transport, the criteria employed to determine that these entities were common carriers applies equally to this case.

In *Southern Pacific Terminal Co.* and *Brooklyn Eastern Dist. Terminal*, terminal companies were found to be common carriers. The Southern Pacific Terminal maintained wharves and docks to accommodate import / export traffic and charged a fixed wharfage for all freight passing over its track facilities that were connected to tracks of the Southern Pacific system. *Southern Pacific*, 219 U.S. at 498, 500-503. The Court found that the Terminal and the railroads comprising the Southern Pacific system which were commonly owned by the Southern Pacific Co., a holding company, and were united into one system in which all were necessary parts. Since the Terminal formed a vital link in the chain of rail transportation, it was a 'common carrier' properly subject to ICC regulation. *Id.* at 518, 526-27. Similarly, the operation of the Brooklyn Terminal included transporting freight from the Terminal to its docks; it was paid for these services by the railroad or steamship company. *Brooklyn Terminal*, 249 U.S. 296, 301-303. In arguing that it was not a common carrier, the Terminal argued that it performed solely under contract with the railroads, and thus did not perform services for the public. The Court, however, held that the services rendered by the Terminal were public in nature and of a kind ordinarily performed by a common carrier. The Court stated that one is not precluded from being a common carrier merely because the rail transportation services that it renders for the public are performed as another's agent. *Id.* at 306-307.

The stockyards in *Union Stockyards Co.*, 169 F. 404 (8th Cir. 1909), presented essentially the same argument. While admittedly the stockyards were rendering a service

14

that the railroads were bound to preform, they insisted that they were not a common carrier because they performed rail transportation services for the railroad pursuant to contract under which the stockyards received a fixed, per-car charge; therefore, the stockyards argued, they did not perform services for the public. The Court found that the stockyard operation included the carriage of livestock for hire destined to, or from, its sheds or pens, which in effect were the depot of the railroad companies.  The Court attached little significance to the fact the stockyards did not hold themselves out to the public to carry livestock; it was sufficient that the railroad held itself out to the public and that the stockyards were willing to perform, and actually did perform, a part of the service that the railroad companies agreed to perform when livestock were accepted for carriage. Therefore, the stockyards were held to be a common carrier engaged in interstate commerce under the Safety Appliance Act based on their co-operation with railroads.

 Similarly, the stockyard in *Stock Yard and Transit Co.*, 226 U.S. 286, was found to be a common carrier.  Although it had divested itself of its rail facilities by leasing them to the Junction Railroad, the yard  loaded, fed, watered and cared for livestock in transit and received two-thirds of the Junction Railroad's profit.  The Court held that these companies, the stockyard and the Junction Railroad, engaged in carrier rail services when they loaded freight at the stockyard on cars, transported it for a distance under a through rate and bill furnished by the trunk line carrier, or received freight while in commerce on a through rate which included terminal service rendered by the two.

As a general rule, services performed by switching and terminal companies with respect to goods shipped between states constitutes Interstate Commerce.  15A Am. Jur. 2d, "Commerce" § 70; *U.S. v. Brooklyn Eastern District Terminal*, 249 U.S. 296 (1919);

*U.S. v. Union Stockyards & Transit Co. Of Chicago*, 226 U.S. 286  (1912); *State v. Kansas City Stock Yards Co. of Missouri*, 145 P. 831 (Kan. 1915).  A switching line engaged in the handling of cars along its route from the terminus of one railroad to that of another, and to and from various industries with which it established switch connections, for which it makes a uniform charge for every loaded car, is so intimately connected to the public service involved in the carriage and delivery of freight as to constitute part of such service and subject to governmental control. *See, e.g., Norfolk & P. Belt Line R. Co. v. Commonwealth,* 49 S.E. 39 (Va. 1904).

In *Fort Worth Belt R. Co. v. United States*, 22 F.2d 795 (5th Cir. 1927), the court found the defendant was a railroad engaged in interstate commerce within the meaning of the federal Safety Appliance Act; this was true even though at the time the defective rail car was not moved, nor did any car connected thereto contained an interstate shipment. The Fort Worth Belt Railway Co. owned 18 miles of track in Fort Worth and confined its business to switching, classifying and assembling cars in its yards, and switching from the same from, and to, industries in the city to and from transfer tracks owned by railroad companies engaged in both carrying intrastate and interstate fright.

Along similar lines, a local independent switching company is generally held to be a common carrier engaged in interstate commerce when switching cars that are en route from, or to, another state.  *See United States v. Brooklyn Eastern Dist. Terminal*, 249 U.S. 296 (1919); *United States  v. Northern Pacific Terminal Co.,* 144 F. 861 (D. Ore. 1906); *State v. Houston Belt & Terminal R. Co.* 166 S.W. 83 (Tex. Civ. App.--Austin 1914)*,*

*reversed on other grounds*, 108 Tex. 314, 192 S.W. 1054 (Tex. 1917); *United States v. Chicago B. & Q. R. Co.*, 293 F. 185 (8th Cir. 1923).

In *Grand Trunk Western R. Co. v. Boylen*, 81 F.2d 91 (7th Cir. 1936), the performing of switching was held to be interstate commerce, thus entitling the switchman to maintain a FELA action for his injuries.  In this case, the car whose spotting was sole purpose of switching movement, was intended for interstate transportation, notwithstanding the fact the shipper could change the destination of car to an intrastate point.

In *McCall v. Pitcairn*, 6 N.W. 2d 415 (Iowa 1942), the court found that switching of rail cars for the purpose of making an interstate train is a necessary step for the train's movement in interstate commerce, and one engaged in such activities is therefore employed in interstate commerce and covered by FELA.

In *Batchelder & Snyder C. v. Union Freight R. Co.,* 259 Mass. 368, 156 N.E. 698 (1927), the court found that a company engaged in switching and deleting railroad cars between freight terminal and private sidings was a common carrier.

In *Fort Street Union Depot Co. v. Hillen,* 119 F.2d 307, 312 (6th 1941), the court found that the services performed by union depot company at a terminal railroad yards qualified as railroad transportation services performed at a railroad terminal for the public, and in rendering such service, the company became a "common carrier by railroad" as understood under FELA.

In *Cott v. Eerie R. Co.,* 131 N.E. 737 (2nd Cir. 1921), a Terminal Railroad that was switching indiscriminately for foreign and domestic cars when handling interstate or foreign shipments was deemed to be an instrumentality of interstate or foreign commerce subject

17

to FELA, regardless of whether it knew the particular cars are interstate or foreign in nature..

In *Newkirk v. Los Angeles Junction Ry. Co.*, 131 P.2d 535, 541-42 (Cal. 1942), a terminal railroad that operated only within one state for industries and carriers with whom it is connected and which it served as a link through the transport of interstate freight shipments to, and from, points over the connecting carriers was found engaged in "interstate commerce" under FELA by the California Supreme Court .

In *Spaw v. Kansas City Terminal Ry. Co.*, 201 S.W. 927 (Mo. App. 1918), a terminal company whose facilities were necessary to transport person or property by interstate trunk lines, was found to be engaged in interstate commerce.

In *Pipal v. Grand Trunk Western Ry. Co.*, 341 Ill. 320, 173 N. E. 372 (Ill. 1930), the Illinois Supreme Court held that placing rail cars –which were subsequently moved and unloaded – on a hold track was but a temporary interruption of the interstate shipment and such stop did not terminate the interstate character of the actions for FELA purposes.

In *Southern Pac. Co. v. Stephens*, 201 S.W. 1076, 1077-78 (Tex Civ.–El Paso, 1918 writ dism'd), a railroad company engaged in breaking up interstate trains at a junction point within Texas in order to facilitate delivery of shipments to other points within the state, was found to be engaged in interstate commerce even though the interstate cars were to be delivered within state or at terminal where the trains were broken up.

In *Pritt v. West Virginia R. Co.,* 51 S.E.2d 105, 112-113 (W. Va.  1948), a brakeman of a railroad whose terminals were located entirely within one state and whose principal traffic was in interstate commerce over lines connecting with interstate carrier,  fell beneath a rail car while placing it in a tipple on a private spur leading from an intrastate line to be

loaded with coal to be transported in interstate commerce.  He was held to be engaged in an act furthering "interstate commerce" and was entitled to maintain a FELA action.

In *Birmingham Belt R. Co. v. Dunlap,* 58 F. 2d 951, 952 (5th Cir. 1932), a switchman who was injured while working on an engine coupled to a car in intrastate commerce, and on the way to pick up a car for interstate commerce, was found to be engaged in interstate commerce.

A railroad employee, who at the time of injury was engaged in moving a car for a train consisting of both intrastate and interstate cars, is considered to be employed in interstate commerce under FELA.  *Pennsylvania R. Co. v. Morrison,* 3 F.2d 986, 986-87 (6th Cir. 1925); *Baltimore & O.R. Co. v. Fletcher*, 300 F. 318, 320 (6th Cir.1924);  *Davis v. Dowling*, 284 F. 670, 671-672 (6th Cir. 1922); *Hudgins v. Kansas City, M. & O.R. Co.*, 2 S.W.2d 958, 960 (Tex. Civ. App--El Paso 1927, writ ref'd); *Southern Pac. Co. v. Industrial Acc. Commission*, 19 Cal.2d 281, 120 P.2d 887, 888 (Cal. 1942).

Switching for the purpose of making up an interstate train is necessary for the movement of the train in interstate commerce and one so engaged is employed in interstate commerce.  *McCall v. Pitcairn,* 6 N.W.2d 415 (Iowa 1942).

A brakeman working on a train, of which nearly all the cars were bound for outside the state, was held to be engaged in interstate commerce under FELA even though the particular engine would not take them outside the state.  *Louisville & N. R. Co. v. Noble's Adm'x,* 28 S.W.2d 733 (Ky. App. 1930).

Proof of injury, while placing several cars destined to points outside the state so that they might be picked up by interstate train, showed that the plaintiff conductor was

employed in interstate commerce at time of injury within FELA. *McCall v. Pitcairn*, 232 Ia. 867, 6 N.W.2d 415 (Iowa 1942).

A Texas appellate court found that one engaged in the initial step of a switching operation, which would start cars on their return trip to a location in another state where they would again be loaded, was engaged in interstate commerce under FELA. *McAdoo v. McCoy*, 215 S.W. 870 (Tex Civ. App– El Paso 1919, writ ref'd), *cert. denied*, 255 U.S. 575 (1921).

Where a railroad car loaded with freight was destined for another state was sealed and billed for its destination when picked up by switching crew who were moving the car to another switch rack, where it was to be picked up by another crew to be delivered to a connecting carrier engaged in interstate transportation, when the switchman was injured as a result of alleged defective hand brake, the switching crew was found to be engaged in interstate transportation thus bringing him under FELA.  It was not necessary that the car's  movement be continuous, since, when the car was moved from the shippers' warehouse, the interstate trip  began.  *Herb v. Pictairn*, 306 Ill. App. 583, 29 N.E.2d 543 (1940), *reversed on other grounds*, 36 N.E.2d 555 (Ill. 1941) (state supreme court indicated appeals court should remand with instructions, without changing appellate court's legal analysis).

The U.S. Supreme Court held that in the case of an interstate train engaged in moving interstate freight, interstate transportation did not end when the cars reached the terminal yard, even though the cars were not going to points beyond the yard, because it was still necessary that the train be broken up and the cars taken to the appropriate tracks for making up outgoing trains, or for unloading/delivering freight.  This was found to be as

much a part of interstate transportation as movement across a state line. *St. Louis, S. F. & T.R. Co. V. Seale*, 229 U.S. 156 (1913).

Moving empty cars involved in interstate transportation is considered being engaged in interstate commerce. *See Kansas City Southern R. Co. V. Quinn,* 85 F.2d 485 (5th Cir.), *cert. denied*, 299 U.S. 590 (1936); *Crouch v. Chicago Great Western R. Co.,* 216 N.W. 234 (Minn. 1927), *cert denied*, 277 U.S. 591 (1928).

The 1939 amendment to FELA eliminated any necessity of showing that at very time of injury employee was engaged in interstate commerce; nevertheless, the employee must still demonstrate that his duties, at least in part, are in furtherance of interstate or foreign commerce or that they affect such commerce directly or closely and substantially. *Hallaway v. Thompson*, 226 S.W.2d 816 (Tex. 1950); *see also Bowers v. Wabash*, 246 S.W.2d 535 (Mo. App. 1952).

DPRT-INC/USDG/DPRT-LLC is common carrier railroad under the Lone Star Steel and the above listed "terminal railroad" line of cases. It is immaterial that DPRT-INC/USDG/DPRT-LLC hired Railserve to conduct operational movements. FELA and the aforementioned case law ensure that the railroad and the employer agent can both be held liable. Railserve is DPRT-INC/USDG/DPRT-LLC's agent for operational rail movements. Accordingly DPRT-INC/USDG/DPRT-LLC satisfy the remaining *Lone Star* and terminal railroad factors discussed above. Railserve holds itself out to the public because of its contract with a railroad, DPRT-INC/USDG/DPRT-LLC. Together, Railserve and DPRT-INC /USDG are common carriers engaged in interstate commerce and thus liable under FELA.

Accordingly, all elements of Benavidez's FELA claim are satisfied against defendants DPRT-INC/USDG/DPRT-LLC and Railserve.

With respect to Railserve's claim that it "is not a common carrier under the FELA, DPRT-INC, USDG and DPRT-LLC are common carriers because:

1. They contracted with BNSF and PTRA (both common carrier railroads) to perform switching staging, blocking of rail cars in furtherance of interstate commerce  (Exs. C, D, and I).

2. DPRT-INC/USDG/DPRT-LLC contracted with Railserve to provide rail services to its customers (Exs. A, B, D, C, and H).

3. The service they perform is part of the total rail service contracted for by a member of the public  (Exs. A, C, D, H and I).

4. DPRT/DPRT-LLC/USDG are performing as part of a system of interstate rail transportation by virtue of common ownership by a railroad and by contractual relationship with BNSF and PTRA.  (Exs. A, C, D, H and I).

5. DPRT/DPRT-LLC/USDG get paid various flat and per car fees for switching the rail cars (Exs. C and H).

6. DPRT-INC/DPRT-LLC/USDG undertake to carry for all persons indifferently (Exs. A, C, E 13-16 and H).

7. DPRT-INC/DPRT-LLC/USDG arrange for persons or goods to be shipped in interstate commerce (Exs. I, C, D and H).

Railserve is a deemed common carrier because it provides operational rail movements for DPRT-INC/DPRT-LLC/USDG, who is a common carrier.  Railserve is a common carrier under FELA because:

1. It contracted with DPRT-INC /DPRT- LLC (common carrier railroad an entity contracted with common carrier railroads) to perform switching staging, blocking of rail cars in furtherance of interstate commerce (Exs. B, C, D, and I).

2.    Railserve contracted with DPRT-INC /DPRT-LLC/ USDG to provide rail services to DPRT customers (Exs. A, B, C, H, D and E).

3.    The service being performed for DPRT-INC /USDG/ DPRT-LLC's customers was part of the total rail service contracted for by a member of the public ( See Exs. A C, D and H).

4.    Railserve holds itself out to the public as performing part of a system of interstate rail transportation by Railserve's contract with DPRT-INC /DPRT-LLC/ USDG (common carrier) who contracts with BNSF and PTRA, who are both common carriers (Exs. A, C, D, H and I).

5.    Railserve is paid a flat rate for providing rail services to DPRT-INC/ DPRT-LLC/ USDG and its customers (Ex. B);

6.    Railserve undertakes to carry for all persons indifferently by virtue of its contractual relationship to provide rail services for DPRT-INC /DPRT-LLC/ USDG (common carrier), who also contracted with BNSF and PTRA (both of whom are common carriers (Exs. A, B, C, D, H and I).

7.    By virtue of its contractual relationship with DPRT-INC /DPRT-LLC, Railserve arranges for persons or goods to be shipped in interstate commerce (Exs. I, C, D, H and I).

**B.    The 7 Defendants at issue are considered to be Plaintiff's employer for FELA purposes because they <u>participated and/or controlled</u> the operations that led to Plaintiff's injury**.

Defendants' second ground for dismissal is the unsupported conclusion that they are not the Plaintiff's employer as that concept is understood under FELA, and thus they cannot be sued under FELA. They say that Plaintiff was employed by Railserve, and assume that this means he cannot be employed by anyone else.  Again, Defendants offer no proof or argument to support this conclusory averment; they simply so state.

### 1. Federal law recognizes that an 'employer' for FELA purposes extends beyond a nominal employer.

Even though Plaintiff was nominally employed by Defendant Railserve on the occasion in question (see pg. 1 of defendants' motions), he is also considered to be an employee of the several defendants for FELA purposes under case law.  Under FELA, a worker can be an "employee" of the railroad even though he is carried on the employment rolls of another company and paid by the other company.  See *Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322, 1324 (5th Cir. 1985), citing *Kelley v. Southern Pacific Co.* 419 U.S. 318, 327 (1974).  In *Kelley*, the Supreme Court  promulgated three methods by which a plaintiff can establish his employment with a rail carrier for FELA purposes: a plaintiff may either be (1) a borrowed servant; (2) serving two masters simultaneously; or (3) a subservant of a servant railroad. *Kelley*, 419 U.S. at 324.  The test is whether the defendant controlled, **or** had the right to control, the Plaintiff.  See *id.* at 327.

In *Lindsey*, the Fifth Circuit Court of Appeals found that a  payroll employee of the Douglas Public Service Commission was nevertheless an employee of a railroad (the Louisville & Nashville) under FELA where:

1.    the railroad directed the contract employees as to which cars were to be unloaded;
2.    when questions arose about the work, the contract employees checked with the railroad;
3.    on some occasions, the contract employees [loading crews] received orders from the railroad;
4.    the railroad was the recognized boss of the contract employees at the yard;
5.    the railroad inspected the contract employees' work; and
6.    the contract employees reported to work every day at the railroad location and received their paychecks there.

24

*Lindsey,* 775 F.2d 1322, 1324; 45 U.S.C. §§ 41-50.  Moreover, a person who is merely an agent of a covered common carrier may be an employee of such common carrier so as to be covered by the provisions of the FELA.  *See Kelly v. Delaware River Joint Comm'n*, 85 F.Supp. 15 (E.D. Pa. 1949).  Where a railroad employee's injury is caused in whole or part by fault of others performing, under contract, operational activities of his employer, such others are agents within the meaning of this section, rendering railroad liable for negligence of other's employees.  See *Salvail v. Great Northern Ry. Co.,* 473 P.2d 549 (Mont. 1970).

Even independent contractors can be found to be covered by FELA.  An individual who is employed by an independent contractor, who is injured while performing a task which a railroad has a contractual duty to perform, is deemed to be an employee of the railroad for the purposes of claim arising under FELA, provided only that the railroad must have **retained the right or authority to control the means and** methods of the independent contractor's work.  *In re: Penn. Cent. Transp. Co.*, 419 F. Supp. 1370 (E.D. Pa. 1976); *see also Lindsey v. Louisville & Nashville R. Co.*, 775 F.2d 1322 (5th Cir. 1985).

An independent contractor performing service for a railroad employee at request of railroad is "agent" of the railroad within the meaning of this chapter where the service performed constitutes a nondelegable, operational activity of the carrier and where service is such that financial benefit accrues to the railroad therefrom.  *Mangrum v. Union Pac. R. Co.,* 230 Cal.App.2d 960 (Cal. 1st Dist. 1964). Where the operation of a stockyards was part of the operational activities of a railroad, even though by contract the work in connection therewith was being performed by another company, the railroad would be

liable for negligent injury of employee of the other company under FELA.  *Oregon Short Line R. Co. v. Idaho Stockyards Co.*, 364 P.2d 826 (Utah 1961).

Plaintiff hereby reaffirms his allegations that defendants are legally deemed to be his employers under the *Kelley* doctrine.  On this legal ground alone, Defendants' Rule 12(b)(1) "facial" motion to dismiss must be denied because such a theory of recivery exists at law.  Although Defendants have only filed a <u>facial challenge</u> under Rule 12(b)(1) (*i.e.*, they have not presented any evidence or challenged the Plaintiff's factual averments, which must be taken as true), Plaintiff will offer proof that the Defendants are subject to FELA liability because they controlled the work in question.

> **2**.   **The several defendants <u>exercised control and/or were in charge of the activities</u> occurring at the Deer Park Rail Terminal at the time of the accident.**

Defendants DPRT-INC, DPRT-LLC and USDG actively controlled the operational rail movements that were being performed by Railserve at the time of the accident.  See Ex. D (Bozant Affidavit).  On a daily basis, DPRT-INC/ DPRT-LLC/ USDG told Railserve when and where to move the rail cars at the Deer Park Rail Terminal. See Exs. D, E and F.  Further, they instructed Railserve how to move cars and to "kick" three cars on every rail movement.  See Ex. D.  The instructions given by these defendants to Railserve directly caused Plaintiff's injuries.  Therefore, under both FELA and basic common-law negligence principles, DPRT-INC / DPRT-LLC / USDG are liable for the injuries sustained by Plaintiff under FELA.

The Bozant Affidavit (Ex. D) confirms that a master-servant relationship existed between Railserve and DTRPI / USDG / DPRT-LLC. Brent Tucker, employed by DPRT-

INC/ USDG/ DPRT-LLC, was the yard manager for Deer Part Rail Terminal.  See Exs. D, E and F (2). Brent Tucker would instruct the Railserve personnel at the DPRT as to the operational rail movements that needed to be conducted at the DPRT.  Brent Tucker, with the approval of Paul Tucker told Railserve management to "kick" 3 cars during all rail movements.  Brent Tucker instructed Railserve to not engage the air brakes during operational rail movements within the Deer Park Rail Terminal and Brent Tucker indicated that the above instructions were to be followed to "speed up" operations because operations were following behind schedule.  See Ex. D.  The Bozant affidavit demonstrates that a master-servant relationship exists between Railserve (the admitted nominal employer) and Defendants DTRP-INC.,  USDG, and DPRT-LLC.

DPRT-INC/DPRT-LLC contracted with Railserve for Railserve to provide train engines, switching, staging and blocking operations at the DPRT.  Ex. B.  In fact, Railserve was the sole entity conducting operational rail movements at the DPRT at the time of the incident.  Ex. B.  Alex Benavidez was injured in the performance of an operational rail movement at the DPRT.  Ex. J 54-64.   DPRT/USDG/DPRT-LLC retained  Railserve to do the operational rail movements at the DPRT and   is, therefore, liable for the injuries sustained to Benavidez.

USDG/DPRT-INC/DPRT-LLC controlled the means and methods of the operational rail movements performed by Railserve, including Alex Benavidez, at the time Benavidez was injured.   Railserve's policy is to hook up the air brakes on all operational rail movements.   See Ex. D. Brent Tucker, on behalf of USDG/DPRT-INC/DPRT-LLC, specifically told Railserve management and employees to kick three cars and not hook up the air brakes for all operational rail movements.  See Ex. D.  The air brakes were not

27

hooked up on the rail car from which Benavidez fell.  See Ex. G 29 and J 133.  If the air brakes had been hooked up, then Benavidez would not been thrown from the train.  See Ex. G 29.  Therefore, USD policy and procedure of not hooking up the air brakes directly led to the injuries sustained by Benavidez.  Ex. G 29.

For these reasons, there is ample evidence to show that the several defendants qualify as Plaintiff's employer by virtue of the fact that they controlled and/or directed Plaintiff's work on the occasion in question.

## VI.  Conclusion

For the above reasons, Plaintiff respectfully requests that this Court deny in whole the Defendants' Motions to dismiss for lack of subject matter jurisdiction, and for any and all further relief to which he is entitled.

Respectfully submitted,

SPAGNOLETTI & CO.

*/s/ Francis I. Spagnoletti*

_____
Francis I. Spagnoletti
State Bar No. 18869600
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone:   713-653-5600
Facsimile:    713-653-5656

COLLINS & O'NEAL, P.L.L.C.
Wayne D. Collins
Texas Bar No.: 00796384
1177 West Loop South, Suite 700
Houston, Texas  77027
(713) 222-0381
(713) 759-9650 - Facsimile

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that service of the foregoing was on this date automatically accomplished on all known Filing Users through the Notice of Electronic Filing.  Service on any party or counsel who is not a Filing User was accomplished via Email, Facsimile, Certified Mail/RRR or U.S. First Class Mail, in accordance with the Federal Rules of Civil Procedure on this 18th day of June, 2007.

*/s/ Francis I. Spagnoletti*

_____
Francis I. Spagnoletti