# Exhibit B

# RAIL SWITCHING AGREEMENT

This Rail Services Agreement (the "Agreement") is made this 2nd day of Dec___, 2002 (the "Effective Date"), by and between DEER PARK RAIL TERMINAL, INC. (together with such party's designee, successors and assigns, referred to collectively herein as "DPRT"), a Texas corporation, and RAILSERVE, INC., a Delaware corporation ("Operator"; DPRT and the Operator being referred to collectively herein as the "Parties" or individually as a "Party").

In consideration of the mutual covenants, conditions, and premises set forth herein, the receipt and sufficiency of which are hereby acknowledged by the Parties hereto, as well as for other good and valuable consideration, the Parties agree as follows:

## I. SERVICES TO BE PROVIDED

### A. SWITCHING SERVICES.

As provided herein and for the fees described below, Operator hereby agrees to provide i) all switching and movement services for any and all rail cars (the "Switching Services") located within the Deer Park Rail Terminal (the "Terminal") regardless of ownership, and ii) any other tasks for services reasonably requested by DPRT related to the operation of the Terminal during the term of this Agreement or any extension thereof (all of such services being collectively referred to hereinafter as the "Work"). All Work shall be supervised by Operator continually to ensure that it is performed in a prompt, safe and efficient manner in compliance with all applicable laws, rules and regulations governing such conduct, including, but not limited to, written safety rules and precautions as issued by DPRT and as amended in writing.

Operator shall provide Switching Services in the Terminal sixteen (16) hours a day, seven (7) days a week. The Switching Services would consist of two (2) shifts per day. Each shift will have one Operator crew. Starting times would correspond to existing shift schedules at the Terminal, or as mutually agreed by the Parties. Operator shall be solely responsible for providing sufficient manpower to perform the Switching Services.

Each switch shall be accomplished by Operator in a timely fashion. In addition, Switching Services shall include without limitation i) all loaded or empty railcars moving either inbound or outbound to the Terminal and ii) all intraplant and interplant switching (loaded or empty) within the Terminal.

### B. QUALITY CONTROL/SERVICE PERFORMANCE MEASURES

Operator shall initiate and maintain a service quality management process which shall include without limitation abiding by objective performance measures and periodic reporting of service performance measures to DPRT. If DPRT or Operator desires to change or amend the performance measures and the performance reporting measures set forth in this Section I(B), it shall provide the other party reasonable advance notice of the proposed change or amendment and the reasons therefore. If such a proposal is made, the Parties will consider such proposal in good faith and, if the Parties agree upon such proposal, the Parties shall enter into an amendment to the Agreement reflecting such agreed upon change or amendment.

Operator shall abide by and continuously track and report to DPRT monthly, the following service performance measures.

1. Classification of railcars within the Terminal shall be maintained at all times and shall be audited weekly by DPRT. Operator shall report results to DPRT and any corrective actions to restore classification of the railcars shall be completed and implemented within seven (7) days.

2. Per mutually agreed cutoff time(s) for all railcar switching within the Terminal, all railcars released by a mutually agreed cutoff time(s) shall be accurately switched to make outbound

1



Plaintiff's EXHIBIT NO. 1

RALSRV 00133

movements. Specific failures to do so shall be reported with written explanation to DPRT within 24 hours.

3. Railcars ordered for shipment outbound from the Terminal shall be selected, placed and made available at the outbound delivery point specified in the order within four (4) hours after the original time of order, or, if the order is received after the normal work day shift has ended, within twelve (12) hours after the original order.

4. Railcars ordered for delivery to internal Terminal transload tracks from the Terminal storage tracks shall be selected, placed and blocked for trainload activity within two (2) hours of the original order or, if the order is received after the normal work day has ended, within ten (10) hours after the original time of order.

5. Railcars placed on designated entry tracks of the Terminal shall be received into the Terminal at the Inbound Delivery Point and electronically recorded into inventory by the Operator with four (4) hours of such placement or, if such placement occurs after the normal work day shift has ended, within twelve (12) hours after such placement.

Any orders placed with Operator through whatever other communication means are agreed upon between DPRT and Operator, shall be considered received by Operator, for all purposes of this Agreement as of the time of initial contact.

Operator shall also report monthly to DPRT the following measures of safety performance.

1. OSHA reportable injuries (not to exceed one incident in a rolling twelve (12) month period) and investigated results.

2. Non-OHSA reportable injuries (not to exceed two incidents in a rolling twelve (12) month period) and investigated results.

3. Near-miss safety incidents.

4. Number of derailments, shove-offs and investigated results (not to exceed three (3) per rolling twelve (12) month period)

## II. EQUIPMENT AND PERSONNEL

A. Operator shall supply two (2) switching locomotives as well as any and all other equipment and vehicles necessary to perform the Work. Operator shall, at its sole expense, maintain the locomotives. In the event that the locomotives should be down for an extended period of time Operator shall, at its sole cost and expense, provide back up equipment in order to perform the Work without interruption. DPRT will supply, at its sole cost and expense, adequate office space for Operator's service manager and crews. DPRT shall be solely responsible for maintenance of said office space. In addition, DPRT shall procure and supply, at it sole cost and expense, fuel for the two (2) switching locomotives necessary to perform the Work.

B. Operator shall also provide the necessary hand tools and personal safety equipment associated with the performance of the Switching Services. All switching equipment shall be operated safely and efficiently in compliance with all applicable federal, state and local requirements, and any safety rules and precautions issued by DPRT or Operator.

C. All personnel hired by Operator to perform the Work shall be in good health and shall have passed Operator's qualifying pre-employment physical examinations (which shall include pre-employment drug testing). No employee will commence work at the Terminal until the results of the physical exam (and the pre-employment drug test) are reviewed by Operator management. Operator shall ensure that all switching and other personnel shall be trained and well-qualified and shall be familiar with applicable laws, rules, practices and any other requirements

2

(including requirements of DPRT) governing their switching duties at the Terminal. Operator shall provide its personnel with the Operator's (and DPRT's, if applicable) written operating and safety rules to govern their conduct, the safety of equipment entrusted to their care, the safety of DPRT personnel and property, and the switching and handling of hazardous materials.

## III. UNSATISFACTORY PERFORMANCE

In the event Operator's performance, in the sole but good faith discretion of DPRT, is unsatisfactory pursuant to the standards set forth herein, DPRT shall provide Operator written detailed notice of such unsatisfactory performance ("Detailed Unsatisfactory Performance Notice"), which notice shall be accompanied by an explanation detailing such unsatisfactory performance. Operator shall be allowed thirty (30) days after DPRT delivers such written notice to correct the situation or circumstances described in the Detailed Unsatisfactory Performance Notice and to render satisfactory performance as well as a detailed explanation of how the unsatisfactory performance has been corrected and how unsatisfactory performance shall be avoided in the future. Should Operator, in DPRT's sole but good faith discretion, fail to correct the situation described in the Detailed Unsatisfactory Performance Notice and to provide the detailed explanation to DPRT within such thirty (30) day period, DPRT may terminate this Agreement by written termination notice, which termination shall be effective thirty (30) days after DPRT delivers such notice of termination to Operator.

## IV. TERM

The term of this Agreement shall commence on December 3, 2002 (the "Effective Date"), and continue in effect for three (3) years (the "Initial Term"), unless earlier terminated pursuant to this Section IV. At the end of the Initial Term, this Agreement shall continue in effect on a month-to-month basis until either Party provides the other with thirty (30) days written notice of termination. Prior to the end of the Initial Term, this Agreement may be terminated by DPRT with or without cause with forty-five (45) days written notice.

## V. COMPENSATION

A. MONTHLY FEE. The Operator shall be paid a fee, monthly in arrears (the "Monthly Fee"). During the Initial Term, the Monthly Fee shall be Forty-Five Thousand Five-Hundred Dollars ($45,500).

B. OVERTIME. In addition to the Monthly Fee, DPRT shall pay to the Operator overtime at a rate of One-Hundred Twenty Dollars ($120) per clock hour or fraction thereof, for any Switching Services requested by DPRT and rendered by the Operator beyond the scope of work outlined above. Failure by Operator to adequately staff a crew shall not entitle Operator to overtime compensation.

C. COMPENSATION ADJUSTMENTS. As long as this Agreement is in effect, the Monthly Fee shall be adjusted annually to reflect the change in the Producer Price Index for Finished Goods (the "Index"), as published by the United States Department of Labor, Bureau of Labor Statistics, or any successor agency. However, the Operator shall be allowed a minimum annual increase of two percent (2%) and a maximum annual increase of four percent (4%). Adjustment shall be made annually, effective January 1, based on the previous twelve (12) months, ending December 31. The initial adjustment shall be made on and effective as of January 1, 2004. Upon expansion of services by Operator to the Terminal and upon agreement between DPRT and Operator that an appropriate incremental cost increase pursuant to such expansion of services is beneficial to both Parties, DPRT shall pay Operator a sum which shall be equal to such an agreed upon incremental cost increase incurred by Operator. During the period of time such cost is incurred, the sum shall be included within the Monthly Fee.

## VI. INVOICING

Operator shall submit monthly invoices in duplicate, to:

> Deer Park Rail Terminal
> 5100 Underwood Road
> Pasadena, TX 77507

RALSRV 00135

Attn. Mr. Robert Eckles

All invoices are payable in 30 days and should be mailed to:

Railserve, Inc.
P.O. Box 99178
Chicago, IL 60693-9178

## VII. LIABILITY AND INDEMNIFICATION

The Parties hereby agree that all liability, losses, cost, or expenses (including reasonable attorneys' fees) resulting from personal injury (including death arising therefrom) and property damage shall be borne by the Parties as follows:

A. NEGLIGENCE OF OPERATOR. Operator shall be solely responsible for, and shall bear all liability, losses, cost, or expenses (including reasonable attorneys' fees) resulting from personal injury (including death) and loss and damage to property caused by the negligence of Operator, its agents, contractors or employees, or by violation of the Operator, its agents, contractors or employees of any term or provision of this Agreement (including terms or provisions relating to safety and operating procedures). Operator hereby agrees to indemnify and hold DPRT harmless from all such claims for liability, losses, cost, or expenses.

In addition, Operator shall be solely responsible for, and shall bear Operator's proportionate share of liability, losses, cost, or expenses (including reasonable attorneys' fees) resulting from personal injury (including death) and loss and damage to property caused in part by the negligence of Operator, its agents, contractors or employees. Operator hereby agrees to indemnify and hold DPRT harmless from all such claims for liability, losses, cost, or expenses.

B. NEGLIGENCE OF DPRT. DPRT shall be solely responsible for, and shall bear all liability, losses, cost, or expenses (including reasonable attorneys' fees) resulting from personal injury (including death) and loss and damage to property caused by the negligence of DPRT, its agents or employees, or by the violation of DPRT, its agents or employees of any term or provision of this Agreement (including terms or provisions relating to safety and operating procedures). DPRT hereby agrees to indemnify and hold Operator harmless from all such claims for liability, losses, cost, or expenses.

In addition, DPRT shall be solely responsible for, and shall bear DPRT's proportionate share of liability, losses, cost, or expenses (including reasonable attorneys' fees) resulting from personal injury (including death) and loss and damage to property caused in part by the negligence of DPRT, its agents, contractors or employees. DPRT hereby agrees to indemnify and hold Operator harmless from all such claims for liability, losses, cost, or expenses.

## VIII. INSURANCE

A. COVERAGE. Operator shall purchase (at its sole cost and expense) and maintain during the term of this Agreement or any extensions thereof, the following classes of insurance (as well as other classes if reasonably requested by DPRT):

1. Worker's compensation coverage as required by the State of Texas;
2. Comprehensive Railroad Liability Insurance with the limit of not less than Ten Million ($10,000,000) dollars per occurrence for one person and with no pollution exclusion. This Coverage shall be expanded to Fifteen Million Dollars ($15,000,000) within sixty (60) days of the execution of this Agreement. With regards to the Coverage expansion to Fifteen Million Dollars ($15,000,000), the parties agree that if such Coverage expansion is disproportionately expensive as compared to the coverage of Ten Million Dollars, then in good faith, the parties shall negotiate the most cost effective way to provide such Coverage expansion within the sixty (60) day period described above, as well as future renewals; and

4

3. Automobile Liability of One-Million ($1,000,000) dollars.

B. CARRIERS AND CERTIFICATES. All of the insurance described above (except for worker's compensation) shall be obtained by Operator from an insurance carrier or carriers authorized to underwrite risks therein and all insurance policies for the aforementioned coverage shall be reasonably satisfactory to DPRT. Prior to the date on which Operator commences the performance of Switching Services (or any other Work) hereunder, Operator shall provide DPRT with certificates of insurance evidencing the required insurance coverage. Such certificates shall indicate that DPRT is an additional insured under such policies. Copies of all renewal certificates shall also be furnished DPRT immediately upon renewal of any insurance coverage required hereunder. Operator shall pay the insurance premium on any insurance policy required herein and the Parties hereto agree the Monthly Fee (and other compensation) as set forth above includes payment for Operator's assumption of these insurance obligations. Nothing in this Agreement shall be construed as limiting Operator's liability to the limits of the insurance coverage required above. The insurance specified in this Section VIII shall provide that DPRT receive ten (10) days' written notice prior to cancellation or material reduction in insurance.

## IX. FORCE MAJEURE

In the event that the performance by Operator or DPRT of any of its obligations or undertaking hereunder shall be prevented or delayed by any occurrence and not occasioned by the conduct of either Party hereto, whether such occurrence be due to or resulting from one or more of the following causes: act of God including, but not limited to, floods, storms, earthquake, hurricanes, tornadoes or other severe weather or climate conditions; act of the public enemy, war, blockage, riot, insurrection, vandalism or sabotage; fire, explosions, or governmental laws, ordinance, orders or regulations, whether valid or invalid and including, but not limited to, rail embargoes; and if such Party shall give to the other Party written notice of such force majeure, then the obligations of the Party giving such notice under this Agreement shall be reduced to the extent, but only to the extent, made necessary by such force majeure and only during its continuance, provided that reasonable efforts are made to eliminate the effect of such force majeure and neither Party shall be liable to the other for loss, damage or delay caused by such force majeure.

## X. ASSIGNMENT

Neither Party shall assign or transfer this Agreement, in whole or in part, or any interest arising hereunder, without the other Party's prior written consent. Such consent will not be unreasonably withheld or delayed. Subject to the provision of this Section, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties.

## XI. INDEPENDENT CONTRACTOR

No agency or partnership relationship is established or intended by this Agreement. The Parties to this Agreement are entirely independent of one another and have no authority to act on behalf of, or bind, one another in connection with any third-party dealings. Matters governing the terms and conditions of employment of Operator employees, agents, or other contractors, such as work schedules, wage rates, and the manner and means through which the services under this Agreement shall be accomplished are solely the responsibility of Operator. Operator shall retain complete control over its personnel and operations, conforming to all statutory requirements with respect to its employees and providing all employee benefits. Neither Operator nor any of its employees shall be, in any sense DPRT employees or agents or have any authority to represent or bind it in any way.

## XII. CONFLICT OF INTEREST

No director, employee or agent of Operator shall knowingly give or receive any commission, fee, rebate, gift or entertainment of significant cost or value (> $25.00) in connection with this Agreement or enter into any business arrangement with any director, employee or agent of DPRT or any affiliate other than as a representative of DPRT or its affiliate, without prior written notification thereof of DPRT.

5

XIII.  AUDIT

Each Party and its duly authorized representatives shall have access to the railcar movement and other Switching Service or Work records and other documents maintained by the other Party which relate to this Agreement. DPRT shall have the right to audit such records at any reasonable time or times within twenty-four (24) months after termination of this Agreement. Operator shall retain records for three (3) years.

XIV.  NOTICES

All notices or certificates under this Agreement shall be in writing and shall be delivered to the Party entitled to receive the same by hand or by U.S. certified mail, return receipt requested, addressed as follows or as the parties may hereafter designate:

COMPANY NAME & ADRESS

Tim J. Benjamin
Controller
Railserve, Inc.
1691 Phoenix Blvd. Suite 110
Atlanta, Ga. 30349

Patrick J. Allen
General Counsel
The Marmon Group, Inc.
225 West Washington St.
Chicago, IL 60606-9998

XV.  NO WAIVER OF DEFAULT.

Failure to enforce any term of this Agreement or waiver of any default hereunder shall not be construed as a waiver of the term or of a subsequent or continuing default.

XVI.  CONFIDENTIALITY

Each Party agrees to limit the disclosure of any provision of this Agreement to information required by statute or government regulations or necessary to properly conduct its business, and to its parent, affiliate and subsidiary companies.

XVII.  ENTIRE AGREEMENT

This Agreement contains the entire understanding and agreement of the Parties hereto in respect of the subject matter hereof and supersedes all prior agreements and undertakings between the Parties with respect to such subject matter.

XVIII.  AMENDMENTS

This Agreement may be amended only by a written instrument duly executed by authorized representatives of both Parties.

XIX.  SEVERABILITY

If a provision of this Agreement is deemed to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision of this Agreement. Any part, term or provision of this Agreement that is held to be unenforceable, illegal or in conflict with any federal, state, or local laws as determined by a court of competent jurisdiction shall be considered severable from the rest of this Agreement. The remaining portions of this Agreement shall not be affected, the rights and obligations of the Parties shall be construed and inferred as if this Agreement did not contain the particular term, part or provision held to be invalid, unless the invalid provisions contain the material, financial or service terms of this Agreement, or when considered in the aggregate, render continued operation of this Agreement manifestly unjust, in which case this Agreement shall be renegotiated or deemed void

6

RALSRV 00138

XX. RENEGOTIATION

If the terms of this Agreement have a material adverse effect on either Party hereto due to causes beyond that Party's control, the affected Party may request in writing that this Agreement be renegotiated. This clause is intended to allow the Parties to renegotiate in good faith the original intent of this Agreement, but it is not intended to protect either Party from their poor bargaining.

XXI. WAIVERS

Any conditions to a Party's obligation to perform hereunder may be waived by such Party but only if such waiver is in writing. The failure of either Party to exercise any right hereunder, or to take any action permitted upon a breach by the other Party shall not be deemed a waiver thereof.

XXII. APPLICABLE LAW

The interpretation and construction of this Agreement, and all matters relating hereto, shall be governed by and construed in accordance with the laws of the State of Texas applicable to contracts executed and to be performed entirely within the state of Texas, without reference to its principles of conflicts of law.

XXIII. DISPUTE RESOLUTION. The dispute resolution procedures set forth in this Section XXIII shall be the exclusive and binding means of resolving all disputes arising under this Agreement. If there is a claim, dispute or other matter arising out of or related to this Agreement the parties shall cooperate in the resolution of the issue. Initially executives of each Party who are not involved in the administration of this Agreement shall meet to explore alternatives for resolving the dispute. In the event that the issue cannot be resolved then either Party may request non-binding mediation in an effort to resolve the dispute. If the matter cannot be resolved through non-binding mediation within 10 days after conclusion of the mediation, either Party may submit the unresolved matter to binding arbitration. Notice of the demand for arbitration shall be filed with the other party and the American Arbitration Association. The arbitration shall be held in Houston, Texas before a board of three arbitrators. Bayport and Operator shall each designate one arbitrator with the designees selecting the third operator. The arbitrators shall be free from any conflicts with either of the parties. The award rendered by the arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on _December 2_, 2002.

DEER PARK RAIL TERMINAL, INC.

By: _____

Title: _President_

RAILSERVE, INC.

By: _Timothy J. Benjamin_

Title: _Controller_

7

RALSRV 00139