# FACILITIES AND SWITCHING SERVICES AGREEMENT

This Agreement is made effective the 31st day of March, 2004 (the "Effective Date"), by and among The Burlington Northern and Santa Fe Railway Company ("BNSF"), a Delaware corporation with its principal offices at 2650 Lou Menk Drive, Fort Worth, TX 76131 and Deer Park Rail Terminal LLC, a Delaware limited liability company with its principal offices at 5100 Underwood Road, Pasadena, TX 77507 ("DPRT");

WHEREAS, BNSF desires to obtain railcar staging, transit capacity and terminal switching services within the Deer Park Rail Terminal (the "Deer Park Rail Terminal" or the "Yard") as described in Exhibit A attached hereto, and;

WHEREAS, in order to assist BNSF, DPRT desires to provide such railcar staging, transit capacity and terminal switching services as described herein;

NOW THEREFORE, in consideration of the mutual promises set forth herein the parties agree as follows:

I. **Definitions**

<u>Claims</u> - Any demand, claim, loss, cost (including reasonable attorney's fees and costs), damage, expense, action, suit, proceeding, judgment, claim and liability of any nature whatsoever (including those arising from or relating to personal injury or death).

<u>Environmental Claims</u> - Any Claims or threatened Claims by any governmental authority or person for environmental conditions, situations, circumstances, events or incidents on, at or concerning, originating at or from or relating to the Yard and arising from or related to a violation of or remedial requirement under any Environmental Laws or any emissions, releases or discharges of petroleum or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas or synthetic gas or any Polluting Substances and/or any potential Claims with respect to any of the foregoing.

<u>Environmental Laws</u> - All local, state and federal laws, rules and regulations relating to pollution or protection of the environment (including ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), the Toxic Substances Control Act ("TSCA") the Clean Water Act the Oil Pollution Act of 1990, any comparable state laws, and all other Laws relating to (i) emissions, discharges or releases of pollutants, contaminants, chemicals, polychlorinated biphenyl's ("PCBs"), solid wastes, or toxic or hazardous substances or wastes, including petroleum or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas or synthetic gas (collectively, "Polluting Substances") or (ii) the

1

manufacture, processing, distribution, use, treatment, handling, storage, disposal or transportation of Polluting Substances.

<u>Deer Park Rail Terminal (the "Yard")</u> - All track and structures owned or operated by DPRT (or its affiliate(s)) in the vicinity of Deer Park, Texas and as further described in Attachment A hereto.

<u>Yard Space</u> - Space within the Yard to be designated by DPRT for the staging, handling, sorting, and classifying of railcars en route to and from the Yard for the benefit of BNSF or BNSF customers.

## II.   Switching Services and Compensation

DPRT shall switch inbound cars (which inbound cars shall be delivered to DPRT by the Port Terminal Railroad Association (the "PTRA"), BNSF or its designee) into customer groups for delivery and spotting by the PTRA, BNSF or its designee. DPRT shall provide BNSF Yard Space sufficient to accommodate the transit, handling, staging, sorting and classification of up to 400 BNSF (and BNSF customer) rail cars (the "Base Leased Trackage") and up to an average of eighty (80) inbound rail car movements per day (the "Base Volume") at any given time.

DPRT shall also switch outbound cars into as many as five (5) blocks as directed by BNSF, and deliver the outbound cars to the PTRA, BNSF or its designee within twenty-four (24) hours from receipt of BNSF's car order request, bill of lading, or accepted equivalent in the blocks specified by BNSF's car order request.

In consideration for providing BNSF the Base Leased Trackage for the 400 BNSF (and BNSF customer) rail cars, and the switching, classification and blocking services required to handle Base Volume of rail cars as described above BNSF shall pay DPRT a fee equal to two hundred thousand dollars ($200,000.00) per month (the "Base Fee") with the first Base Fee due on April 30, 2004 and on the last day of each month thereafter during the Base Term and all Renewal Terms of this Agreement. Commencing six months after the Effective Date of this Agreement the PTRA Block Switch Charge, as defined below, shall also be included as part of the Base Fee. For six months after the Effective Date of this Agreement the PTRA Block Switch Charge incurred by DPRT will be re-billed to BNSF at cost less an allowance for an average of eighty (80) inbound rail car movements per day (the "Excess PTRA Block Switch Charge"); and BNSF shall remit payment to DPRT for said Excess PTRA Block Switch Charge, if any, during the first six months of this Agreement only.

In addition, after the first six months of this Agreement, and in the event that in a given month inbound car movements exceed an average of eighty (80) per day, a fee of $90.00 for each inbound car movement in excess of the product of eighty (80) inbound car movements times the number of days in that specific month shall be charged to BNSF (the "Excess Handling Fee"). (For example, in a particular thirty-one (31) day month if there are an average of one hundred (100) inbound car movements per day [or a total of

2

DPRT 00139
**CONFIDENTIAL**

3,100 inbound car movements during such month] then the Excess Handling Fee shall be $55,800.00 (3,100 actual inbound moves less the Maximum Volume of 2,480 moves = 620 extra inbound moves times $90.00).

Deer Park Rail Terminal, Inc., an affiliate of DPRT and the PTRA have entered into an agreement whereby certain blocks of railcars of fifty (50) or more may be delivered to the Deer Park Rail Terminal for a delivery charge of $30.00 per railcar (the "PTRA Block Switch Charge") and which currently stipulates that if the PTRA elects to deliver blocks of railcars which are in quantities of less than 50, the delivery charge will remain $30 per car, and which also requires PTRA to make certain payments to Deer Park Rail Terminal, Inc. for provision of services, a copy of which is attached hereto as Exhibit B (as amended), the "PTRA Agreement".

The parties to this Agreement acknowledge and agree that the Deer Park Rail Terminal may not be economically viable in the event the material economic terms of the PTRA Agreement change, or if the PTRA Agreement terminates. Accordingly, BNSF agrees, as a member of the board of directors of the PTRA, that it will not vote to amend or terminate the PTRA Agreement without the prior written consent of DPRT.

If during any single day, during the Term of this Agreement, the "overnight" rail car count attributable to BNSF and BNSF customer cars exceeds the Base Leased Trackage, then DPRT, at its sole discretion, may either refuse to allow additional rail cars into the Yard or direct the immediate release of rail cars from the Yard to bring the rail car count to, or nearer to, the Base Leased Trackage level. The overnight rail car count shall be calculated by counting the number of BNSF and BNSF customer cars remaining in the Yard after the conclusion of a day's business including the receipt of inbound cars and the release of outbound cars for the day.

So long as this Agreement is not earlier terminated pursuant to the express terms of this Agreement, the obligation of BNSF to make payments of the Base Fee under this Agreement is absolute, unconditional and continuing, without any right of offset or counterclaim and whether or not any services are actually performed by DPRT. BNSF shall be liable for and shall pay to DPRT, on a monthly basis, the sum of (i) the Base Fee and (ii) the Excess Handling Fee, if any.

Commencing on the date of this Agreement, DPRT shall, on a monthly basis, invoice BNSF the Base Fee and the Excess Handling Fee (if any). BNSF shall pay undisputed invoices within 30 days of receiving such invoices. In the event that the actual computed charges invoiced exceed the Base Fee, BNSF may withhold disputed amounts from such excess payments to DPRT under this provision. Any disputed amounts appearing on DPRT invoices which exceed the Base Fee will be resolved pursuant to Section XIV of this Agreement. So long as this Agreement is not terminated, the aggregate monthly amount billed by DPRT shall not be less than $200,000. The Base Fee shall be payable without abatement or reduction, setoff, counterclaim, defense or deduction, offset, or other charge. If DPRT fails to cure the Events of Default set forth in Section IX.(A)(3) of this Agreement, beginning on the sixteenth (16th) day following the Event of Default, BNSF shall be entitled to invoice DPRT for an amount equal to

DPRT 00140
CONFIDENTIAL

Apr-05-04 10:42A US DEVELOPMENT GROUP        816 524 5722           P.05
MAR. 5. 2004  5:00PM    BNSF                                    NO. 3804  P. 4

$6,667.00 for each day the Event of Default continues. (For example, if DPRT violates Section IX(A)(3) and the Event of Default continues for 20 days, beginning on the 16th day, BNSF may invoice DPRT an amount equal to $26,668.00.) DPRT shall pay such invoice within thirty days of receiving such invoices. Failure by DPRT to remit payment shall be considered an Event of Default under Article IX below. Each payment of the Base Fee and the Excess Handling Fees (if any) by BNSF to DPRT pursuant to this Article II shall be made by electronic funds transfer in immediately available funds to the credit of DPRT or DPRT's designee not later than 11:00 a.m. central time on a day on which such payment is required to be made hereunder and at such place as DPRT or DPRT's designee may from time to time notify BNSF in writing.

The compensation and fees described herein shall constitute the entire amounts due to DPRT for all the services described herein. The Base Fee and the Excess Handling Fee shall be adjusted yearly on each anniversary of the Effective Date of this Agreement by 100% of the Rail Cost Adjustment Factor Unadjusted ("RCAFU"), as published by the Surface Transportation Board (STB). In the event that the RCAFU is no longer calculated by the STB, the parties to this Agreement shall look to the appropriate successor index, or reasonable similar inflation/cost index as calculated by the U.S. Government.

### III. General and Operating Guidelines

a.  DPRT shall retain operational control over train/locomotive movements within the Yard.

b.  DPRT will provide terminal switching seven (7) days a week for the benefit of BNSF or its designee for both inbound and outbound cars for the BNSF customers.

c.  DPRT will communicate with BNSF and/or its designee's switch crews and BNSF Customer Service to ensure that BNSF customers are provided satisfactory service and that their transportation needs are met. BNSF shall install, at its expense, a BNSF compatible transportation application computer and associated telecommunication connection at DPRT's Customer Service Center to ensure that DPRT is capable of effectively communicating with BNSF. DPRT shall provide any required radio communication equipment at its sole cost and expense.

d.  BNSF or its designee will on a daily basis deliver unblocked cars in a single "Deer Park" block and shall deliver inbound cars to the tracks designated by DPRT. DPRT will be responsible for pulling delivered inbound cars from the tracks and switching inbound cars into customer, or other, groups (as directed by BNSF). After blocking by DPRT, the cars shall be set-out on the designated tracks for pick-up by BNSF or its designees and delivery to BNSF customers.

e.  DPRT shall ensure that adequate interchange track capacity (clear tracks) is available for the timely acceptance and delivery of cars at DPRT.

DPRT 00141
CONFIDENTIAL

Apr-05-04 10:42A US DEVELOPMENT GROUP        816 524 5722                P.06
MAR 31 2004  5:01PM  BNSF                                    NO. 3894  P. 5

### IV. Maintenance of DPRT Trackage and Yard Space

DPRT shall be responsible for all trackage and facilities necessary to provide the services herein described and for the maintenance and condition of all trackage provided for herein, including, to the extent within the control of DPRT, all public grade crossings, railroad crossing signs, devices and signals. At its sole cost and expense, DPRT (or its subcontractors for which DPRT shall be responsible) shall conduct all operations, maintenance, servicing, inspection, repair and preservation in a safe manner and in full compliance with all applicable federal, state and local governmental statutes, ordinances, orders, regulations and laws (including, without limitation, Environmental Laws, Federal Railroad Administration rules and regulations), and in accordance with Association of American Railroads (the "AAR") and BNSF standards and operating practices and shall maintain the trackage in good and safe operating condition and repair and in conformity with BNSF's operating and maintenance standards. DPRT shall ensure that its subcontractors or employees are competent and qualified to perform the services herein described.

### V. Inspections

At all reasonable times, on reasonable advance written notice, BNSF, or any authorized representatives thereof may inspect any trackage or properties of DPRT used in the provision of Yard Space or services under this Agreement and so much of the books and records of DPRT as are reasonably necessary relative thereto solely for the purpose of determining DPRT's performance of, and compliance with, the terms of this Agreement, and, at such times as BNSF may reasonably request, DPRT will furnish accurate statements regarding the condition and state of repair of the trackage herein described together with such supporting documentation as may be reasonably requested. BNSF shall have no duty to make any such inspection or inquiry and shall not incur any liability or obligation by reason of not making any such inspection or inquiry or failing to discover any condition or facts upon making such inspection or inquiry.

### VI. Liability and Indemnity

DPRT SHALL RELEASE, INDEMNIFY, DEFEND, PROTECT, SAVE AND KEEP HARMLESS BNSF FROM AND AGAINST, ANY AND ALL CLAIMS (INCLUDING ENVIRONMENTAL CLAIMS) OF WHATSOEVER KIND AND NATURE, IMPOSED ON, ASSERTED AGAINST OR REASONABLY INCURRED BY BNSF IN ANY WAY RELATING TO OR ARISING OUT (IN WHOLE OR IN PART) OF DPRT'S VIOLATION OF ANY OF DPRT'S COVENANTS, REPRESENTATIONS OR WARRANTIES CONTAINED IN THIS AGREEMENT REGARDLESS OF ANY NEGLIGENCE, ALLEGED NEGLIGENCE OR STRICT LIABILITY OF BNSF OR ANY OF ITS PARTNERS OR THEIR SUCCESSORS, ASSIGNS, AGENTS, EMPLOYEES, OR CONTRACTORS ("BNSF PARTIES"). DPRT SHALL NOT BE REQUIRED TO INDEMNIFY ANY BNSF PARTY FOR CLAIMS RESULTING FROM THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF A BNSF PARTY.

DPRT 00142
CONFIDENTIAL

SPECIAL OR EXEMPLARY DAMAGES, WHETHER IN CONTRACT OR TORT (INCLUDING STRICT LIABILITY AND NEGLIGENCE), SUCH AS BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS.

Upon written notice from a party entitled to indemnification pursuant to the provisions above (the "Indemnified Party"), the party required to provide such indemnification (the "Indemnitor") shall assume the defense of any lawsuit or other proceeding brought against such Indemnified Party by any entity, relating to any matter covered by the Indemnitor's indemnification obligation under this Agreement. In such event, the Indemnitor shall pay all costs incident to such defense, including, but not limited to, attorneys' fees, investigators' fees, litigation and appeal expenses, settlement payments, and amounts paid in satisfaction of judgments.

VII. **Insurance**

DPRT shall, at its sole cost and expense, procure and maintain during the life of this Agreement the following insurance coverage:

Railroad liability policy of insurance acceptable to *Railroad* in an amount of at least TEN MILLION DOLLARS ($10,000,000) per occurrence. Such insurance shall include coverage for:

- injury to or death of persons whomsoever, Personal Injury, Federal Employers Liability Act, property damage liability including but not limited to, damage or destruction of any and all property including public liability, bill of lading and foreign line rolling stock,
- seepage and pollution coverage,
- contractual liability for the liability assumed in this Agreement
- If the policy is written on a claims made basis the policy shall be endorsed as follows:

If coverage is purchased on a "claims made" basis, DPRT hereby agrees to maintain coverage in force for a minimum of three years after expiration, cancellation or termination of this contract. Annually DPRT agrees to provide evidence of such coverage as required hereunder.

(b) **Other Requirements**.

(1) DPRT agrees to waive its right of recovery against BNSF for all claims and suits against BNSF relating to the operation of the properties, excluding any claims and suits by DPRT alleging a breach of this Agreement by BNSF. In addition, insurers, through policy endorsement, shall waive their right of subrogation against BNSF for all claims and suits. The certificate of insurance must reflect waiver of subrogation endorsement.

7

DPRT 00144
CONFIDENTIAL

(2) All policy(ies) required above shall include a severability of interest endorsement and shall name BNSF as an additional insured with respect to activities undertaken under this Agreement. Severability of interest and naming BNSF as additional insured shall be indicated on the certificate of insurance.

(3) With written consent of BNSF, DPRT shall be allowed to self-insure any and all of the insurance policies, or any part of the any of the insurance coverages, required above. If granted by BNSF, any deductible, self insured retention or other financial responsibility for claims shall be covered directly by DPRT in lieu of insurance.

(4) DPRT shall furnish to BNSF an acceptable certificate(s) of insurance (or statement of self-insurance, if approved) evidencing the required coverage, endorsements, and amendments. The policy(ies) shall contain a provision that obligates the insurance company(ies) issuing such policy(ies) to notify BNSF in writing at least 30 days prior to any cancellation, substitution or material alteration. This cancellation provision shall be indicated on the certificate of insurance.

(5) Any insurance policy shall be written by a reputable insurance company acceptable to *BNSF* or with a current Best's Guide Rating of A- and Class VII or better, and authorized to do business in the state(s) in which the service is to be provide.

(6) Not more frequently than once every five years, *BNSF* may reasonably modify the required insurance coverage to reflect then-current risk management practices in the railroad industry and underwriting practices in the insurance industry.

(7) If any portion of the operation is to be subcontracted by DPRT, DPRT shall require that the subcontractor shall provide and maintain insurance coverages as set forth herein, naming *BNSF* as an additional insured, and shall require that the subcontractor shall release, defend and indemnify *BNSF* to the same extent and under the same terms and conditions as DPRT is required to release, defend and indemnify *BNSF* herein.

(8) The fact that insurance is obtained by DPRT shall not be deemed to release or diminish the liability of DPRT including, without limitation, liability under the indemnity provisions of this Agreement. Damages recoverable by BNSF shall not be limited by the amount of the required insurance coverage.

(9) For purposes of this section, *BNSF* shall mean "Burlington Northern Santa Fe Corporation", "The Burlington Northern and Santa Fe Railway Company" and the subsidiaries, successors, assigns and affiliates of each.

VIII. <u>Use of Deer Park Rail Terminal</u>

8

DPRT 00145
CONFIDENTIAL

a.  DPRT will provide an on-duty office/room where BNSF, or designee, crews can communicate with BNSF customer service, BNSF management, or customers. The office shall be provided at a location to be mutually agreed upon by BNSF and DPRT, and shall include at least one telephone. BNSF personnel shall have access to the office/room 24 hours per day, 7 days per week

b.  BNSF may install at the DPRT office appropriate computer and telecommunication equipment that will allow access to BNSF mainframe transportation applications by BNSF and DPRT personnel.

## IX. Events of Default

(A)  The following events shall constitute Events of Default (herein so called) by DPRT (whether any such event shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(1) Except as set forth in Paragraph (3) of this Section IX., DPRT shall fail to comply in a material respect with any of its material covenants or undertakings hereunder and either such failure shall continue unremedied or unmitigated for a period of 60 days after written notice thereof by the non-defaulting party has been received by DPRT, or, if such failure is not reasonably capable of being remedied or mitigated during such 60 days, DPRT shall have commenced such remedy or mitigation during such 60 days and shall continue diligently thereafter to complete such remedy or mitigation with reasonable promptness; or

(2) With the exception of any assignment required to obtain financing for provision of any facilities to be provided under this Agreement, DPRT shall make a general assignment for the benefit of creditors or admit in writing its inability to pay its debts generally as they become due or shall file a voluntary petition in bankruptcy or under the corporate reorganization provisions of the Federal Bankruptcy Code (as now in existence or hereafter amended) or an answer admitting the material allegations of a petition filed against such party under such provisions, or shall, by voluntary petition, answer or consent, seek relief under the provisions of any other now existing or future bankruptcy or other Laws providing for the reorganization, dissolution, liquidation or winding up of companies on the ground of insolvency; or if any order, judgment or decree shall be entered by any court of competent jurisdiction, without the consent of, BNSF, adjudicating such party to be bankrupt or insolvent or appointing a liquidator, trustee or receiver of DPRT or of the whole or of any substantial part of DPRT's property, and such adjudication shall not have been set aside or the appointment so made shall not have been revoked, as the case may be, within 90 days thereafter; or DPRT shall consent to a petition or application for its adjudication as a bankrupt or insolvent or for the appointment of a liquidator, trustee or receiver of itself or of the whole or any substantial part of its property.

9

DPRT 00146
CONFIDENTIAL

(3) DPRT shall fail to (i) perform the switching services (including, without limitation, providing the Base Leased Trackage) set forth in Section II of this Agreement, (ii) follow the Operating Guidelines set forth in Section III. of this Agreement, or (iii) meet the Service Performance Standards (defined below) for twenty percent (20%) of the volume of railcars exchanged in any consecutive six month period, and DPRT has not undertaken substantive corrective measures to remedy service deficiencies within fifteen (15) days following notice of such deficiencies.

(B) If an Event of Default occurs, BNSF, shall have the following rights and remedies, which shall be distinct, separate and cumulative, and which may be exercised by BNSF concurrently or consecutively in any combination and which shall not operate to exclude or deprive BNSF of any other right or remedy which BNSF may have in law or equity:

(1) Subject to Section XIV (Disputes) of this Agreement, BNSF may terminate this Agreement by giving DPRT at least sixty (60) days' prior written notice of such party's intention to do so, in which event the Base Term (or any applicable Renewal Term) shall end on the date stated in such notice

(2) Subject to Section XIV (Disputes) of this Agreement, BNSF may, at it's option, and providing that BNSF continues to pay the Base Leased Trackage Fee, enter into and use the Leased Base Trackage (and the Yard Space) in accordance with the terms of this Agreement.

(3) To the extent the remedies herein below are available under applicable Laws, BNSF may enforce the provisions of this Agreement and may enforce and protect the rights of BNSF hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including injunctive relief and recovery of moneys due or to become due from DPRT under any of the provisions of this agreement.

(C) If BNSF shall fail to make any payment due hereunder and such nonpayment shall persist for thirty (30) days following written notice from DPRT or its permitted assigns, then DPRT or its permitted assigns may enforce and protect their rights hereunder by a suit or suits in equity or at law for the enforcement of any appropriate remedy.

In any litigation between the parties, the losing party shall pay all costs, charges and expenses, including court costs and reasonable attorney's fees, of the prevailing party

X. **Service Performance Standards**

10

DPRT 00147
CONFIDENTIAL

DPRT shall provide the services herein in a safe timely and efficient manner and in full compliance with all applicable federal, state and local governmental statutes, ordinances, orders, regulations and laws (including, without limitation, Federal Railroad Administration rules and regulations), and in accordance with AAR and BNSF standards and operating practices. DPRT shall ensure that

BNSF is provided a daily inventory listing identifying specific track location of BNSF railcars within the Yard; and that work and services hereunder will be undertaken and performed in compliance with all relevant laws, rules, and regulations and at all times in a safe and timely workmanship like manner.

The foregoing Service Performance Standards shall be modified as necessary to the extent delays on a particular car(s) result from causes not within the reasonable control of DPRT.

## XI. Governing Law

The terms of this Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to its conflicts of laws principles.

## XII. Entirety and Amendments

The terms of this Agreement comprises the entire agreement and understanding between the parties, and merges and supersedes all prior understandings, whether oral or written, of the parties. No modifications or amendment hereto shall be effective unless agreed to in writing and signed by all parties.

## XIII. Captions/Construction of Terms

The Captions and headings of this Agreement are used for convenience only and shall not govern construction of the terms herein. This Agreement was negotiated by both parties after mutual negotiation and reviewed by counsel, and the parties agree that its terms shall not be construed against either party regardless of who drafted its terms.

## XIV. Dispute Resolution

Any controversy or claim between the parties arising out of or relating to enforcement, construction or performance of this Agreement, or adjustment of disputed amounts or other charges, breach or anticipatory breach of any provision hereof or the occurrence of an Event of Default (the "Dispute"), shall be settled by neutral binding arbitration. Arbitration shall be initiated by notice from one party to the other party (ies). Within 30 days after receipt of such notice, each party to the Dispute shall designate a competent and disinterested person to act as arbitrator, with the persons selected designating a competent and disinterested additional party to act as an additional neutral arbitrator, said additional neutral arbitrator selection to be made within 30 days after the appointment of the initial arbitrators. In the event the first initial arbitrators are unable to agree upon the additional arbitrator, then the arbitrators shall apply to the American

DPRT 00148
CONFIDENTIAL

Arbitration Association solely to designate and appoint the third arbitrator (but not to administer the arbitration proceeding) within 30 days. All evidence taken will be under oath, or if in writing shall be verified. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association and the Federal Rules of Evidence with discovery (a) conducted under the Federal Rules of Civil Procedure, as such rules may be amended from time to time, and (b) according to a discovery timeline consistent with the time limitations of this article. Such arbitration shall be conducted in Fort Worth, Texas, within four months after the appointment of the additional neutral arbitrator. The decision and the award of the majority of the arbitrators shall be rendered in writing within 45 days after the conclusion of the proceeding (including all post-hearing briefs, if any) and shall be binding upon all of the disputing parties. Any decision and award shall be held in confidence by the parties. Judgment upon the award rendered may be entered in any court within or outside of the State of Texas having jurisdiction and shall be enforceable in accordance with the then applicable laws of the State of Texas. Cost for appointment of an additional neutral arbitrator by the AAA, as well as fees and expenses of all arbitrators, shall be borne equally by all parties to the dispute. The parties hereby agree that punitive and consequential damages shall be expressly excluded from any arbitration award. These procedures shall be the sole and exclusive procedures for the resolution of any Dispute arising under this Agreement. DPRT shall carry on the services and maintain its performance of the Agreement during any Dispute and resulting arbitration proceedings and BNSF shall continue to pay the Base Fee.

## XV. Waivers

No term or provision of this Agreement may be waived or discharged orally, but only by an instrument in writing signed by the Person against whom the enforcement of the waiver or discharge is sought. No amendment or modification to the terms of this Agreement shall be effective unless such amendment or modification shall be in writing and signed by all parties.

## XVI. Term

The effectiveness and term of this Agreement is conditioned upon the closing of the purchase and sale contemplated between DPRT and Equilon Enterprises LLC d.b.a. Shell Oil Products U.S. for the assets as set forth on Exhibit A attached hereto. If the purchase and sale fails to close, this Agreement shall become null and void. Subject to the terms of this Agreement (including the provisions for termination as set forth herein), this Agreement shall be effective from the Effective Date until the last day of the month ending one hundred and twenty (120) months from the Effective Date (the "Base Term"). BNSF will have the option of extending the term of this Agreement for ten (10) additional term(s) ("Renewal Term(s)") of twelve (12) months each on the same terms and conditions provided in this Agreement; provided, however that (a) any exercise of an extension option hereby granted to BNSF will be in writing delivered to DPRT no later than sixty (60) days prior to the then-current expiration date of this Agreement. All rights and obligations which accrued prior to the termination shall survive and be enforceable for the applicable statute of limitations period.

DPRT 00149
CONFIDENTIAL

## XVII. Termination for Convenience

BNSF may terminate this Agreement by providing 12 months prior written notice, with such termination not to take effect before sixty (60) months after the Effective Date ("Termination for Convenience"), and by paying an amount (the "Early Termination Payment") equal to a Base Fee of $200,000 per month for the remaining Term of this Agreement. In the event of Termination for Convenience, this Article XVII and all provisions of Article II, paragraph nine governing payment of the Base Fee shall apply to the Early Termination Payment and shall survive such termination and remain in full force and effect through the Base Term of this Agreement as if no Termination for Convenience had occurred.

Upon receipt each month of the Early Termination Payment, DPRT shall, (i) provide BNSF up to 400 railcar spaces at no charge for the remainder of the Base Term, and terms and conditions of this Agreement will govern the use of such space by BNSF as if no Termination for Convenience had occurred, or (ii) at the option of BNSF, remit to BNSF a monthly amount equal to $16.44 for each rail car space per day of the Leased Trackage which is not used by BNSF. (Payment to BNSF by DPRT for said Leased Trackage will, if not used by BNSF, be $6,576.00 per day ($16.44 / car spot / day x 400 car spots), or at an annualized rate of $2,400,000.00 per year during the remainder of the Base Term.) To secure DPRT's payment obligations herein, DPRT shall provide BNSF on the Date of Termination for Convenience, a subordinate deed of trust for the Leased Trackage in a form and substance acceptable to BNSF and to DPRT's secured lenders.

## XVIII. Governmental Approvals

DPRT shall be responsible for obtaining all governmental approvals, permits and right of way necessary to provide the trackage and services herein described.

## XIX. Assignment and Subcontracting

Subject to the terms of this Article, all of the terms, covenants, representations, warranties and conditions of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns. DPRT or BNSF may, without the consent of the other party, assign in whole, but not less than whole, this Agreement as follows: a) to an affiliate owned or controlled by the assigning party, or under common control with the assigning party, providing, however, that BNSF or DPRT as the case may be shall remain liable for payments arising under this Agreement; b) in connection with a transaction pursuant to which such party sells all or substantially all of its assets to any other entity or merges or consolidates with or into any other entity, provided such party's assignee or successor shall assume by operation of law or by written agreement reasonably satisfactory in form and substance to the non-assigning party all of the liabilities and obligations of the assigning party under this Agreement, or c) to an entity which has equal or greater capacity to fulfill the assigning party's obligations, including payment obligations,

DPRT 00150
CONFIDENTIAL

hereunder and which is not a direct competitor of the non-assigning party. In addition, and more specifically, Either party ("Assignor") shall have the right to assign this Agreement with the prior written consent of the other party ("Consenting Party"), which approval shall not be unreasonably withheld, conditioned or delayed to an entity (i) having a credit rating equal to or better than Assignor or (ii) a credit rating which the Consenting Party reasonably determines to be sufficient to assure the future performance by the assignee at the date of such assignment or (iii) supported by a guaranty or guaranties, in a form and substance satisfactory to the Consenting Party and it's assigns, from one or more persons with a credit rating equal to or better than Assignor and provided such assignee or successor shall assume by operation of law and by written agreement reasonably satisfactory in form and substance to the Consenting Party all of the liabilities and obligations of the assigning party under this Agreement.

Furthermore, notwithstanding any provision to the contrary, the parties agree that DPRT may assign, without the prior written consent of BNSF all of DPRT's right title and interest in and to all payments arising under this Agreement (including the Base Fee) to an institutional lender. BNSF shall, upon execution of this Agreement and upon any subsequent request by DPRT and without delay, acknowledge such assignment and execute such reasonable documentation as may be required for purposes of such financing. Except as otherwise provided in this Article, this Agreement shall not be assigned in whole or in part without the prior written consent of the other parties, which approval shall not be unreasonably withheld, conditioned or delayed. In addition, DPRT shall have the right to subcontract with any party in order to fulfill its duties hereunder; provided, however, BNSF shall have the right to approve of any proposed subcontractor, which approval shall not be unreasonably withheld, conditioned or delayed. For purposes of this Agreement, BNSF hereby acknowledges and accepts that RailServe Inc. has been contracted to perform certain operations at the Yard.

## XX.  Confidentiality

The parties agree to maintain the terms of this Agreement strictly confidential as between the parties. The parties may disclose so much of the terms of this Agreement as necessary to lenders, consultants, attorneys, agents, and representatives of the parties performing work or consultation related to the terms of this Agreement who agree to be bound by its terms of confidentiality and other representatives as necessary to obtain financing or regulatory approvals for any matters described herein. Notwithstanding anything herein to the contrary, any party subject to confidentiality obligations hereunder or under any other related document (and each employee, representative, or other agent of such party) may disclose to any and all persons, without limitation of any kind, such party's U.S. federal income tax treatment and the U.S. federal income tax structure of the transactions contemplated by this agreement and any other agreement related thereto and all materials of any kind (including opinions or other tax analyses) that are provided to the taxpayer relating to such tax treatment and tax structure.

## XXI. Notices

DPRT 00151
CONFIDENTIAL

Except as may be expressly provided otherwise in this Agreement, all notices required under the terms and provisions hereof shall be in writing, and any such notice shall become effective when hand delivered or deposited in the United States mail, with proper postage for first class mail prepaid, addressed:

If to BNSF:

The Burlington Northern and
Santa Fe Railway Company
2650 Lou Menk Drive
Fort Worth TX 76131
Attn:   Joint Facilities
        Vice President

If to DPRT:

5100 Underwood Drive
Pasadena, Texas 77507
Attn:   Daniel K. Borgen

With additional copies to other parties as requested by DPRT in writing.

## XXII. Severability

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable laws, the parties hereby waive any provision of laws which, absent such waiver, would render any provision hereof prohibited or unenforceable in any respect.

## XXIII. Compliance with Laws

Neither DPRT nor BNSF shall commit any waste, nuisance, or act contrary to law (including Environmental Law) in connection with the provision of services and facilities under this Agreement and/or the use and occupancy of any Yard Space.

## XXIV. Further Assurances

The parties shall from time to time request execution and delivery of documents and actions as may be necessary to permit or empower the other party (ies) to exercise its rights and fulfill its obligations under this Agreement, and the parties agree to provide reasonable and timely cooperation in execution and delivery of such documents and actions.

15

DPRT 00152
CONFIDENTIAL

## XXV. Taxes on Trackage

DPRT shall be responsible for and make payment of all property taxes on all properties necessary for the provision of services and on all trackage under this Agreement.

## XXVI. Force Majeure.

If any party to this Agreement is rendered unable by Force Majeure (defined below) to carry out in whole or in part its obligations hereunder and such party gives notice and full details of the Force Majeure event to the other party as soon as practicable, then during such Force Majeure event, the obligations of the party claiming Force Majeure (other than payment obligations) will be suspended. The party claiming Force Majeure will use commercially reasonable efforts to remedy the Force Majeure with all reasonable dispatch. "Force Majeure" shall be defined herein to mean an event which is not within the reasonable control of a party, and which by the exercise of due diligence the affected party is unable to overcome or obtain or caused to be obtained a commercially reasonable substitute therefor.

This Facilities and Switching Services Agreement,

ACCEPTED AND AGREED:          ACCEPTED AND AGREED:

**DEER PARK**                 **THE BURLINGTON NORTHERN AND**
**RAIL TERMINAL LLC.**        **SANTA FE RAILWAY COMPANY**

By: _Michael R. Cuwn_         By: _[signature]_
Title: _President or Manager_ Title: _Executive Vice President and_
                                     _Chief Financial Officer_

16

DPRT 00153
CONFIDENTIAL