IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

ALEJANDRO BENAVIDEZ                     §
                                        §
VS.                                     §
                                        §
BURLINGTON NORTHERN SANTA               §
FE CORP; et al                          §          CIVIL ACTION: 3:07-CV-00105
                                        §          [JURY]


**PLAINTIFF'S MEMORANDUM AND BRIEF IN SUPPORT OF
PLAINTIFFS' RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT
<u>OF DEFENDANTS RAILSERVE INC. AND DEER PARK RAIL TERMINAL, INC. ET AL</u>**

## TABLE OF CONTENTS

Table of Contents.................................................................................ii

Table of Authorities............................................................................iv

Nature and Stage of Proceedings......................................................1

Issues Presented................................................................................2

Summary of the Argument..................................................................2

Plaintiff's Summary Judgment Evidence............................................3

Statement of Facts............................................................................12

    Overview of Related Entities............................................................12

    Operations at the DPRT...................................................................14

    Evidence Connection to Interstate Commerce................................15

    The Event.........................................................................................16

Summary Judgment Standard...........................................................17

Arguments and Authorities................................................................18

    FELA Elements.................................................................................20

    Defendants Are Common Carriers by Railroad Engaged
    in Interstate Commerce....................................................................20

        Defendants Do Not Operate an In-Plant Rail System................21

        Defendants Do Not Operate as a Private Carrier......................24

        Linking Carrier............................................................................25

        Defendants Operate a Common Carrier Interstate Railroad System
        under *Lonestar*.........................................................................26

    *Lonestar* Analysis .........................................................................36

        Defendants Perform Rail Services ...........................................37

The Defendants Perform Rail Services as Part of the Total
Rail Service Contracted for by a Member of the Public ............................38

The Defendants are Performing as Part of the Interstate Rail
System by Contract with a Rail Road .......................................................39

Remuneration ............................................................................................40

Objection to Affidavit of Paul Tucker ....................................................................39

Conclusion .................................................................................................................41

TABLE OF AUTHORITIES

Cases

*Baltimore & O.R. Co. V. Fletcher*,
    300 F. 318 (Ohio 1924) cert denied 69 L.Ed. 468................................................33

*Batchelder & Snyder C. v. Union Freight R. Co.*,
    156 N.E. 698 cert denied 72 L.Ed. 424 (1927)....................................................31

*Birmingham Belt R. Co. v. Dunlap*,
    58 F. 2d 951 (5th Cir. 1932)...............................................................................33

*Bowers v. Wabash*,
    246 S.W.2d 535 (Mo. 1952)................................................................................35

*Brotherhood of Maintenance Way Employees v. Burlington Northern Santa Fe*,
    383 F. Supp.2d 1000 (N.D.Ill.,2005).....................................................................6

*Celotex v. Catrett*,
    477 U.S. 317, 322 (1986)...................................................................................17

*Cooperative Legislative Comm. of Railroad Bhds. v. P.U.C.*,
    149 Ohio St. 511, 80 N.F.2d 159 (1948)..............................................................21

*Cott v. Eerie R. Co.*,
    131 N.E. 737 (2nd Cir. 1921), cert. denied 66 L.Ed. 409................................32, 38

*Crouch v. Chicago Great Western R. Co.*,
    216 N.W. 234 (Minn. 1927), cert denied 72. L. Ed. 1003....................................35

*Davis v. Dowling*,
    284 F. 670 (6th Cir. 1922)..................................................................................33

*Dawkins Lumber Co. v. L. Carpenter & Co.*,
    281 S.W. 1013 (1926)....................................................................................24-26

*Duffy v. Armco Steel Corp.*,
    225 F.Supp. 737 (W.D.Pa.1964).........................................................................21

*Felton v. SEPTA*,
    952 F. 2d 59, 62 (3d Cir. 1991).........................................................................20

*Fort Street Union Depot Co. v. Hillen,*
  119 F.2d 307 (6th 1941) cert. denied 86 L. Ed. 515............................................32

*Fort Worth Belt R. Co. V. United States*
  22 F. 2d 795,(5th Cir. 1927).........................................................................12, 30

*Grand Trunk Western R. Co. V. Boylen,*
  81 F.2d 91 (7th Cir. 1936)...........................................................................31, 32

*Hallaway v. Thompson,*
  226 S.W.2d 816 (Tex. 1950)................................................................................35

*Herb v. Pictairn,*
  29 N.E.2d 543 (Ill. 1940)reversed 36 N.E.2d 555................................................35

*Hudgins v. Kansas City, M. & O.R. Co.,*
  2 S.W.2d 958 (Tex. Civ. App--El Paso 1927, writ refused n.r.e.).......................33

*International Shortstop, Inc. v. Rally's, Inc.,*
  939 F.2d 1257, 1263 (5th Cir. 1991)...................................................................17

*Kansas City Southern R. Co. V. Quinn,*
  85 F.2d 485 (5th Cir. 1936) cert. denied 81 L. Ed. 434........................................35

*Kelly v. Delaware River Joint Commission,*
  85 F.Supp. 15 (E.D. Pa. 1949)...........................................................................37

*Kelly v. General Elec. Co.,*
  110 F.Supp. 4, 6 (E.D.Pa), aff'd 204 F.2d 692 (3 Cir.) cert. den.,
  346 U.S. 868. 74 S.Ct. 137, 98 L.Ed. 390 (1953)........................................20, 22

*Kelley v. So. Pac. Co.,*
  419 U.S. 318, 324 (1974)...................................................................................38

*Kieronski v. Wyandotte Terminal Railroad Company*
  806 F.2d 107 (6th Cir. 1986)..........................................................................24, 37

*Lindsey v. Louisville & Nashville R. Co.,*
  775 F.2d 1322 (5th Cir. 1985)...........................................................................37

*Lonestar Steel Co. v. McGee,*
  380 F.2d 640, 647 (5th Cir. 1967),
  cert. den., 19 L.Ed.2d 471 (1967)......................................3, 19, 24-29, 36, 39-40

*Louisville & N.R. Co. V. Noble's Adm'x,*
    28 S.W.2d 733 (Ky. 1930).........................................................................34, 37

*Loveless v. Railway Switching Services Inc.,*
    665 N.E.2d 252 (Ohio App. 1995).......................................................................24

*Mack v. East Camden & Highland Railroad Company,*
    297 F.Supp.2d 1052 (W.D. Tenn 2003).................................................................24

*Malvern Gravel Co. v. Mitchell*, et al.,
    238 Ark. 852, 385 S.W.2d 144, cert. den.,
    382 U.S. 828, 86 S.Ct. 64, 15 L.Ed.2d 73 (1965)..................................................21

*Mangrum v. Union Pac. R. Co.,*
    230 Cal.App.2d 960 (Cal. 1st Dist. 1964)...............................................................37

*Matter of Penn. Cent. Transp. Co.,*
    419 F. Supp. 1370 (E.D. Pa. 1976).......................................................................37

*McAdoo v. McCoy,*
    215 S.W. 870 (Tex Civ App–El Paso, 1919) cert. Denied 65 L.Ed. 793......34, 38

*McCall v. Pitcairn,*
    6 N. W. 2d 415 (1942).........................................................................31, 34, 38

*McCrea v. Harris County Ship Channel Navigation District,*
    423 F.2d 605, 607 FN.8 (5th Circuit, 1970)...........................................................14

*New York Cent. & H.R.R. Co. v. General Elec. Co.,*
    219 N.Y. 227, 114 N.E. 115 (1916) cert. den.,
    343 U.S. 636, 37 S.Ct. 400, 61 L.Ed. 941..............................................................21

*Newkirk v. Los Angeles Junction Ry. Co.,*
    131 P.2d 535 (Cal. 1942)...................................................................................32

*Nichols v. Pabtex et al.,*
    151 F.Supp 772, 778 (E.D. Tex. 2001).................................................................37

*Norfolk & P. Belt Line R. Co. V. Com.*
    49 S.E. 39, 41 (Va. 1904)..................................................................................30

*Oregon Short Line R. Co. V. Idaho Stockyards Co.,*
    364 P.2d 826 (Utah 1961).................................................................................38

*Pennsylvania R. Co. V. Morrison,*
    3 F.2d 986 (6th Cir. 1925)..................................................................33

*Pipal v. Grand Trunk Western Ry. Co.,*
    173 N. E. 372 (Ill. 1930) cert denied 75 L.Ed. 1449............................32

*Powell v. Pacific Naval Air Base Contractors, et al.,*
    93 Cal.App.2d 629, 209 P.2d 631 (1949)............................................21

*Pritt v. West Virginia R. Co.,*
    51 S.E.2d 105 (W. Va.  1948) , cert. denied 93 L. Ed. 1113................33

*St. Louis, S. F. & T.R. Co. V. Seale,*
    229 US 156, 33 S.Ct. 651, 57 L.Ed. 1129 (1913)................................35

*Salvail v. Great Northern Ry. Co.,*
    473 P.2d 549 (Mont. 1970).................................................................37

*Silver Lake Ry. & Lumber Co. v. Public Service Comm'n,*
    201 P. 765 (1921).......................................................................24, 25

*Smith v. Norfolk & W. Ry. Co.,*
    407 F.2d 501 (Ca. 1969), cert. denied 23 L.Ed.2d 767.......................37

*Southern Pac. Co. v.  Industrial Acc. Commission,*
    120 P.2d 887 (Ca. 1942)...................................................................34

*Southern Pac. Co. v. Stephens,*
    201 S.W. 1076 (Tex Civ.–El Paso, 1918 writ dismissed)..............33, 38

*Southern Pacific Terminal Co., et al. v. ICC, et al.,*
    219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911)..............................26

*Spaw v. Kansas City Terminal Ry. Co.,*
    201 S.W. 927 (Mo. App. 1918)..........................................................32

*State v. Houston Belt & Terminal R. Co.*
    166 S.W. 83 (Tex. Civ- Houston 1914, reversed on other grounds)...................31

*State v. Kansas City Stock Yards Co. Of Missouri,*
    145 P. 831 (1915).............................................................................30

*Sulivan v. Baltimore,*
    116 A. 793 (Pa. 1922) cert denied 66 L. Ed. 795...............................33

*U.S. v. Kiff*,
   377 F. Supp.2d 586, 589 (E.D.La.,2005).............................................................6

*Union Stockyards Co. of Omaha v. United States*,
   169 F. 404 (8 Cir. 1909)...............................................................................27, 28

*United States v. Brooklyn Eastern Dist. Terminal*,
   249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613 (1919)........................................26, 31

*United States v. Chicago B. & Q. R. Co.*
   293 F. 185 (1923)....................................................................................................31

*United States  v. Northern Pacific Terminal Co.*
   144 F. 861 (1906)....................................................................................................31

*United States v. St. Joseph Stockyards Co.*
   181 F. 625 (D.C. 1909)...........................................................................................31

*United States v. State of California*,
   297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936)........................................29, 36

*United States v. Union Stock Yard & Transit Co.*, et al.,
   226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226 (1912)...................................................27

*Ward Transport, Inc. v. Public Utilities Comm*,
   151 Colo. 76, 376 P.2d 166, 169 (1962).........................................................24, 25

*Wells Fargo & Co. v. Taylor*,
   254 U.S. 175, 187, 41 S.Ct. 93, 65 L.Ed. 205, 213 (1920).................................20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| ALEJANDRO BENAVIDEZ | § | |
| | § | |
| VS. | § | |
| | § | |
| BURLINGTON NORTHERN SANTA | § | |
| FE CORP; et al | § | CIVIL ACTION: 3:07-CV-00105 |
| | § | [JURY] |

## PLAINTIFF'S MEMORANDUM AND BRIEF IN SUPPORT OF HIS RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS RAILSERVE INC. AND DEER PARK RAIL TERMINAL, INC. ET AL

### TO THE HONORABLE UNITED STATES DISTRICT JUDGE GRAY H. MILLER:

COMES NOW ALEJANDRO BENAVIDEZ, Plaintiff herein ("Plaintiff" and/or "Alex" and/or "Benavidez"), and, for his Memorandum and Brief in Support of his Response to the Motions for Summary Judgment of Defendants Railserve Inc. ("Railserve") and Deer Park Rail Terminal, Inc. ("DPRTI"), Deer Park Rail Terminal, LLC (DPRTLLC), U. S. Development Group, Inc. (USDGI), U. S. Development Group, LLC ("USDGLLC") USDLLC, and USD Terminals LLC (collectively referred to as "The Group") would respectfully show as follows:

### I.
### NATURE AND STAGE OF PROCEEDINGS

This case was originally pending in the Harris County District Court. The Defendants continued to maintain that they were not involved in interstate railroad commerce and thus FELA does not apply to the Defendants. Faced with a significant issue of Federal jurisdiction involving almost one hundred years of case and FELA history, the Plaintiff chose to dismiss and refile this case in Federal Court.

The Defendants attempt to divide the issues of common carrier among Railserve and The Group. However, the facts show that this integrated group of companies function as a common carrier railroad subject to FELA. Therefore, the Plaintiff responds with one Response and Brief because the issues are identical and integrated.

Plaintiff filed FELA actions against all Defendants and common law negligence claims against The Group. Discovery is ongoing and docket call is set for February 29, 2008.

## II.
## ISSUES PRESENTED

Is Railserve, Inc. ("Railserve") deemed to be a common carrier railroad involved in interstate commerce subject to FELA?

Is Deer Park Rail Terminal, Inc. ("DPRTI") Deer Park Rail Terminal, LLC (DPRTLLC), U. S. Development Group, Inc. (USDGI), U. S. Development Group, LLC ("USDGLLC") USDLLC, and USD Terminals LLC (collectively referred to as "The Group") and/or deemed to be a common carrier railroad involved in interstate commerce subject to FELA?

## III.
## SUMMARY OF THE ARGUMENT

The Defendants are *Lonestar Steel* railroad common carriers and their Motion For Summary Judgment must therefore be denied. The evidence and the case law shows:

1.  Railserve performs actual rail services pursuant to a contractual relationship with DPRTI;

2.  The railroad switching services being performed are part of the total rail service contracted for by a member of the 26 different customers of DPRTI/DPRTLLC and the customers of the PTRA (common carrier) and BNSF (common carrier);

2

3.      DPRTI/DPRTLLC is performing as part of a system of interstate rail (i.e. Switching rail cars bound to and inbound from interstate destinations) transportation by virtue of common ownership between itself and a The Group (common carrier) and by a contractual relationship with a with BNSF and the PTRA, and hence such entity is deemed to be holding itself out to the public; further, Railserve is performing its duties by virtue of its close contractual relationships with The Group and DPRTI/DPRTLLC and is thus deemed to be holding itself out to the public; and

4.      Remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad; Railserve is paid a flat fee by DPRTI/DPRTLLC (a railroad) and DPRTI/DPRTLLC is paid per car by its customers and per rail car by PTRA (common carrier railroad) and BNSF (common carrier railroad).

See *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

**IV.**
**PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE**

This Response is supported by the following summary judgment evidence and incorporates the same herein by reference.  Further, the Exhibits A-U are true and correct copies of same (Ex. V):

**EXHIBIT A:**  U S Development Group Website

1.      The concept of "US Development Group" refers to a group of companies with **common or similar ownership** including: **U.S. Development Group, Inc. a Texas Corporation**; Bayport Terminal, Inc. a Texas Corporation; **DPRT, LLC** a Delaware limited liability corporation; USD, LLC a Delaware limited liability corporations; Loma Lita Rail Terminal, LLC a Delaware limited liability corporation; **USD Terminals, LLC; and several other corporations and limited liability corporations**.

2.      The growing success of USD is based on it's proven ability to identify and acquire location-critical real estate **throughout the United States** to support a strategy of:

3

Managing the entire process of designing, financing, constructing and **operating and expanding a nationwide network of rail facilities and infrastructure** that provides innovative options for real customer-driven **rail logistics solutions** for:

**-railcar storage-unit train staging; bulk railcar loading/offloading; improved rail fleet management and utilization-truck-railcar transloading**

Until now these options may have been inaccessible, unavailable or uneconomical to customers attempting to manage their rial supply an distribution processes within the constraints of the present infrastructure of railroads.

3.      USD personnel represent years of extensive experience in banking and finance, real estate development, operations and management with **railroad**, chemical manufacturing and **terminalling** industries and has served in the role of supplier and/or customer of all rail services themselves.

USD is uniquely qualified to work FOR the customer by the way of the manner in it which it works with the railroads. In fact, **railroads are counted as key USD customers**. USD takes time to understand particulars of each customers rail logistics and challenges and then develops ....."

4.      The USDG website includes an entire section on the DPRT which reads:

Servicing railroads- Port Terminal Railroad Association (PTRA) with **interchange to Union Pacific and BNSF**.

Logistics Services; Railcar storage and staging to-from industry; Railcar-to-truck transloading;  On-site access for railcar maintenance and cleaning; Unit train

4

terminalling; Inventory Management System (Borque Data System); Truck scale; Access to pipeline connectivity points for bulk fuels railcar loading; Close proximity to marine terminals on the Houston Ship Channel for consistent railcar delivery response.

**EXHIBIT B:**  Agreement Between Railserve and DPRT, Inc. (12/3/02-06)

1.      Para. I. A. Switching Services- Railserve will provide switching services and all tasks need for the operation of the Terminal.  Switching Services shall include all empty or loaded rail cars moving either outbound to, and all intraplant and interplant switching.

2.      Para. I. B.-Quality Control: DPRT can change or amend the performance measures; classifications of railcars will be audited by DPRT; railcars ordered for shipment shall be selected, placed and made available within 4 hours; internal transloads shall be made within 2 hours; railcars stored in the terminal shall be entered into inventory management system within 4 hours.

3.      Para. II. A.-DPRT will provide the fuel for the switch engines.

4.      Para. III. Unsatisfactory Performance: DPRT in its sole discretion can terminate the contract upon 30 days notice.

5.      Para. V. B.  DPRT will pay overtime.

6.      Para. VII. A.2.- Railserve will carry Railroad Liability Insurance.

7.      Para. X.-Neither party can assign this contract without other parties prior written consent.

**EXHIBIT C:** Terminal Services Agreement-deer Park Rail Terminal

1.  BNSF(**a common carrier railroad**)[1] and DPRTI terminal services agreement-7/15/2003 to 3/31/2004.

    a.  "Witnesseth, whereas Customer (BNSF) desires to obtain **railcar staging and terminal switching services** within the Deer Park Rail Terminal (the "Yard") **in order to provide better service to its Customers, under the terms and conditions...**

    b.  Para. 1: DPRTI **shall** make available to Customer trackage within the yard sufficient to place up to 600 railcars.

    c.  Para. 3 and Exhibit A: BNSF will pay DPRTI per railcar switch and per railcar storage fees.

    d.  Para. 6: DPRTI shall deliver rail cars to customers or customers designee within 24 hours.

    e.  Para. 9(ii): DPRT is required general liability insurance that **includes coverage for FELA**.

    f.  the parties shall conference daily.

2.  "Facilities and switching Services Agreement" between BNSF and DPRTLLC effective 3/31/2004 through 2006.

---

[1]     **BNSF** is a **commoncarrier** and the nation's second-largest railroad. (R. 1, Compl. at 2 ¶ C). *Brotherhood of Maintenance Way Employees v. Burlington Northern Santa Fe* 383 F. Supp.2d 1000 (N.D.Ill.,2005); **BNSF** Railway Company yard in Bridge City, Louisiana, a **common carrier** moving in interstate or foreign commerce, in violation of Title 18, United States Code, Section 659. *U.S. v. Kiff*, 377 F. Supp.2d 586, 589 (E.D.La.,2005);

a.   "Whereas, BNSF desires to obtain **railcar staging, transit capacity and terminal switching services** within the Deer Park Rail Terminal"

b.   Section II "Switching Services and Compensation": DPRTLLC will **switch, transit handle and stage** 400 cars at a flat rate and charge per car thereafter.

c.   Section III "General Operating Guideline": DPRTLLC shall provide switching operations 7 days a week for BNSF; **DPRTLLC will communicate with BNSF's customers to ensure satisfactory service**; BNSF will install a communication system to ensure this proper communication with BNSF's customers. **DPRTLLC will be responsible for pulling inbound cars from the tracks and switching inbound cars into customer, or other groups as directed by BNSF.**

d.   DPRTLLC is required to have **FELA insurance**.

**EXHIBIT D:**  Affidavit of John Bozant

**EXHIBIT E:**  Deposition of Paul Tucker, 2/13/06

1.   Brent Tucker is the Yard Manager for the DPRT.  Page 9.

2.   Brent Tucker is employed by DPRTI.  Page 9.

3.   Brent Tucker reports to Paul Tucker.  Page 9.

4.   Paul Tucker is the Chief Operating Officer for U. S. Development.  Page 4-5.

5.   DPRTI only turns down Customers for Creditworthiness and Safety.  Page 64.

7

6.     U. S. Development marketing Branch receives directions from customers on railcar movements and passes those to Brent Tucker who passes the instructions to Railserve.  Page 22.

7.     PTRA brings the Railcars to the DPRT were the cars are switched, blocked, stored and classified.  Page -8; 21; 26 and 27.

8.     Paul Tucker knew that the railcars switched at the DPRT were destined for Florida and to Love's Gas Stations across the nation.  Page 38; 39.

9.     DPRTI does not know who owns the cars it switches at the DPRT. Page 49.

**EXHIBIT F:**  Deposition of Paul Tucker, 11/01/06

1.     Bryan Tucker is the Yard Manager at the DPRT.  Page 7.

2.     Bryan Tucker is employed by DPRTLLC.  Page 7.

3.     Bryan Tucker Reports to Paul Tucker.  Page 34.

4.     Paul tucker employed by USD,LCC.  Page 5..

5.     Marketing Branch of U. S. Development Group receives directions from customers and passes it along to Brent Tucker who instructs Railserve as to the operational rail movements.  Page 35.

6.     BNSF is a common carrier railroad.  Page 17.

7.     PTRA is a common carrier railroad.  Page 31.

**EXHIBIT G:**  Deposition of Rick Orms

1.     No air was a contributing cause in Alex Benavidez's injuries.  Page 29.

**EXHIBIT H:**  DPRTI/DPRTLLC Switching Agreements with 26 Customers

8

**EXHIBIT I:**   DPRTI/DPRTLLC Documents Showing Interstate Travel of Railcars Arriving and Departing the DPRT

**EXHIBIT J:**  Deposition of Alex Benavidez

**EXHIBIT K:**  Deposition of Tim Benjamin

**EXHIBIT L:**  Incident Report

**EXHIBIT M:**  Corporate Formation Documents

**EXHIBIT N:**  BNSF's Answers to Deposition Upon Written Questions

**EXHIBIT O:**  Deposition of Paul Tucker-October 2007

1.    Brent Tucker the yard manager for DPRT.  Page 10.

2.    Brent Tucker employed by DPRTLLC.  Page 10.

3.    Brent Tucker reports to Paul Tucker.  Page 10.

4.    Paul Tucker employed by U. S. Development Group.  Page 5.

5.    Other U S Development locations Paul Tucker oversees on behalf of U. S. Development.  Page 8-9.

6.    Only has Knowledge of the corporate formation of The Group from what his lawyer told him.  Page 77.

**EXHIBIT P:**  Deposition of Orms-October 2007

1.    Railserve works at several locations on behalf of The Group.  Page 12-13.

2.    Railserve written policy and actual policy at the DPRT was to lace and engage airbrake system ("100% air).  Page 27.

3.    Railserve began to not lace and engage the airbrakes ("no air") after a discussion with Paul Tucker.  Page 30-31.

4.     Railserve changed back to 100% air after Railserve pushed a railcar off the track at the DPRT.  Page 33.

5.     Paul Tucker told Railserve to go to no air again.  Page 33-34.

6.     Railserve changed its policy back to no air.  Page 33-34.

7.     None of the air brakes were laced or engaged on the 26 car movement in which Alex was injured.  Page 22.

**EXHIBIT Q:**  Affidavit and Report of Railroad Expert Charles Culver

**EXHIBIT R:**  Railroad  Transportation  Contract  Between  Port  Terminal Railroad Association and DPRTI (04/16/03)

1.     Para. 2: "PTRA has a published tariff, Freight Tariff PTRA 2000";

2.     Para. 3: "said item 200 switching charges apply to outbound movement of loaded cars stored at the Deer Park Rail Terminal located at 4155 Highway 225, Pasadena TX (the "Terminal"), and said Item 240 switching charges apply to outbound movement of empty cars stored at the Terminal";

3.     Para. 4: "In recognition of DPRT's commitment to coordinate with PTRA for storage and switching movement of cars delivered to the Terminal, PTRA is willing to permit deviation from said Item 200 and 240 and to set contract shipping fees under the conditions set forth";

4.     Para. 5: "the Terminal has the capacity to store and block for delivery certain cars on behalf of the PTRA and PTRA desires to have the operating flexibility of utilizing such Terminal capacity;"

10

5.   Sec. 1(b): "All cars received by PTRA from UP, BNSF and TM, loaded and empty, destined to shipper(s), will be delivered by PTRA to Terminal.....";

6.   Sec. 1.c: "DPRT will store such cars delivered to the Terminal as directed by Shipper(s). In addition, DPRT will switch out and make ready for pick up by PTRA such cars which are to be delivered to Shipper(s) by PTRA without storage within the Terminal, as well as any cars which have been stored for Shipper(s) by DPRT";

7.   Sec. 1(d): "PTRA will provide pickup service daily of all Shipper(s) cars to the Terminal and will handle the intra-terminal switch service for delivery to Shipper(s). The switching charges provided in PTRA tariff items 200 and 240 will be waived for such cars";.

8.   Sec. 2(a): "If the PTRA delivers cars to DPRT ....DPRT shall provide storage, switching and blocking services...";

9.   Sec. 2(b): "PTRA shall assess no contract switching charge to DPRT for cars described in preceding paragraph. However, DPRT shall share equally (50% and 50%) with PTRA any revenue generated from PTRA tariffs on rail car storage. PTRA shall bill and collect from Shippers amounts due under such tariff items. DPRT's revenue sharing payment to be paid by PTRA to DPRT shall be (½) of the revenue paid and received by the PTRA from the involved shippers for any car delivered to DPRT under the terms of this Section 2. The revenue sharing under this paragraph and the payments are to be based on specific car-by car written documentation reasonably required by PTRA."

**EXHIBIT S:** Railserve Website

**EXHIBIT T:** PTRA Tariff

11

**EXHIBIT U:**  BNSF Website

**EXHIBIT V:**  Affidavit of Wayne D. Collins

**V.**
**STATEMENT OF FACTS**

**A.   Overview of the Related Entities**

Railserve was the direct employer of Plaintiff.  Railserve entered into the "Rail Switching Agreement" with Deer Park Rail Terminal, Inc. (DPRTI) to perform switching operations at Deer Park Rail Terminal ("DPRT") location.[2]  (Ex. B).  Brent Tucker was the yard manager for DPRTI and was present at the location on a daily basis.  (Ex. E,1; F,1; O,1).  However, it is still not clear who actually employed Brent Tucker, including at the time when Plaintiff's leg was amputated.  (Ex. E,2; F2; O,2).

Brent Tucker reported to his father Paul Tucker.  (Ex. E,3; F,3; O,3; D).  Paul Tucker was the Chief Operating Officer for one or all of the various entities containing the name U. S. Development Group.  (Ex. E,4; F,4; O,4).

Its website indicates that U. S. Development Group "refers to a group of companies with common or similar ownership including: U. S. Development Group, Inc; BayPort Terminal, Inc.; DPRT, LLC; USD, LLC; Loma Lita Rail Terminal, LLC and USD Terminals, LLC ("The Group").  (Ex. A,1).  The Group operates railroad terminals at the DPRT, the Bayport Rail Terminal, in Fort Worth, and the Loma Lita Rail Terminal in Baltimore, Maryland.  (Ex. A,1; O,5).  Railserve provides the actual rail switching services for these locations as well.  (Ex. P,1).  The Group advertises on the world wide web that it acquires

---

[2]

DPRTI apparently assigned the "Rail Switching Agreement" to Deer Park Rail Terminal, LLC, which was in effect at the time of the accident.  Please note that the "Rail Switching Agreement" could not be assigned without prior written consent of Railserve.  No evidence of Railserve's consent exists.

and operates an expanding nationwide network of rail facilities and infrastructure for rail logistic solutions. (Ex. A,2). The Group advertises on the world wide web that it can provide rail car storage, unit train staging, bulk railcar loading/offloading, improved rail fleet management and utilization and truck rail car transloading. (Ex. A,2) The Group advertises on the world-wide web that it has years of operations management experience with railroads and terminalling industries. (Ex. A,3). Specific to the DPRT, The Group advertises on the world-wide web that it services the Port Terminal Rail Association ("PTRA") with interchange to Union Pacific and BNSF. (Ex. A,4) Further, The Group further advertises that the DPRT can provide railcar storage, staging to and from industries, railcar to truck transloading, unit train terminalling, inventory management, access to pipeline connectivity and close proximity to the Houston Ship Channel. (Ex. A,4) Nowhere in its website does it even imply that these services are not open to the public, i.e. anyone who can pay for and needs its services. and does create safety hazards. (Ex. A; E,5).

DPRTI/DPRTLLC has contractual relationships with over 26 customers to provide rail switching services at the DPRT. (Ex. H). DPRTI/USDG contracted with Air Products Inc., BP Amoco Chemicals, **Bayport Rail Terminal, Inc**., Celanese Ltd., The Dow Chemical Company, **Intercontinental Terminals Company**, Lubrizol Corporation, Occidental Chemical Corporation, PM Ag. Products, Rohm & Haas Company, Inc., RohMax, Inc., Vopak Logistic Services, Inc., Velsicol Chemical Corp., A&R Transport, Inc., BASF Corporation, Resolution Performance Products LLC, General American Field Services Corporation, ChevronPhillips Chemical Company, Mun oz Enterprises Inc., Sunoco Inc. R&M, Total Petrochemicals USA Inc., Innovene USA LLC, and Shell Oil

13

Products to do terminal, switching, staging, and blocking for loading and outbound departure and storage services.  (Ex. H).

Additionally, DPRTI/DPRTLLC have rail terminal and switching agreements with BNSF and PTRA,[3] both of which are undoubtedly common carrier railroads. DPRTI/DPRTLLC switch rail cars for BNSF's and the PTRA's customers as part of the total rail services the PTRA and BNSF offer to its customers.  (Ex. C,1,a; C,2,a; R,3-9)

### B.    Operations at the DPRT

DRPTI retained Railserve, to conduct all operational rail movements at the DPRT for the customers.  (Ex. B).  The Group's marketing branch/customer service department, located offsite, received directions from its customers pertaining to the rail cars located at or inbound to the DPRT.  (Ex. E,6; F,5; D).  The marketing branch relayed those instructions to Brent Tucker (yard manager for USDG/DPRTI), who was located on-site at the DPRT.  (Ex. D; E,6; F,5).  Brent Tucker would then instruct the Railserve personnel at the DPRT as to the operational rail movements that needed to be conducted at the DPRT. (Ex. D).

Thus, DPRTI/DPRTLLC provides rail terminal services to the public and common carriers.  Blocks of rail cars are brought to the DPRT by the PTRA (owned an operated by BNSF, TexMex, and Union Pacific Railroads (Ex. T)) at the direction of DPRTI/USDG customers.  (Ex. A; C; D; E 7,H; R).  The rail cars entering the DPRT are inbound from or outbound to both **INTERSTATE** and intrastate destinations. (Ex. I; N;; D; E,7)  While the

---

[3]       PTRA is a common carrier by **railroad** and subject to FELA, as well as other federal rail carrier legislation.  *McCrea v. Harris County Ship Channel Navigation District*, 423 F.2d 605, 607 FN.8 (5th Circuit, 1970)

rail cars are at the DPRT, the cars are switched , blocked, staged, loaded, assembled, stored and prepared for outbound travel.  (Ex. B; C; D; E 7-8; H; I; N; O; R).

DPRTI/DPRTLLC contracted with BNSF (common carrier Ex. F,6) and the PTRA (common carrier railroad (Ex. F,7)) to do terminal, switching, staging, and blocking for loading and outbound departure and storage services.  (Ex. C and H).  DPRTI/DPRTLLC agreed to accept at least 400-600 railcars for the PTRA and BNSF.  The railcars entering the DPRT are outbound to and inbound from primarily interstate locations.  (Ex. I; N; D; E,7).  DPRTI/DPRTLLC provide the following rail services to  BNSF:

Plaintiff asks this Court to take note that DPRTI/DPRTLLC does not physically conduct these operations themselves.  Rather, Railserve, pursuant to the "Rail Switching Agreement," performs these duties on  monthly flat rate basis.  (Ex. B).  DPRTI/DPRTLLC is paid on a per car basis with limited flat rate exceptions.  (Ex.C; H; R)

C.    **Evidence Connection to Interstate Commerce**

Exhibit I is a list of Railcars that entered the DPRT and for which DPRTI/DPRTLLC performed the rail services described above.  Exhibit I shows out-of-Texas "ship to cities" such as Berry, Jayhawk, Winslow, Phoenix, Gallup, Ontario, Idaho Falls, Butte, Gary, Gallup, Clovis, Lordsburg, Rawlings, and Berry.  Larry Ruple, who is employed by BNSF, testified that the railcars BNSF caused to be delivered to or retrieved from the DPRT, were inbound from or bound to locations outside the State of Texas, for the time period of January 1, 2004 to December 31, 2005.  (Ex. I; N; E,7).  Paul Tucker testified that he is aware that the tank cars loaded with fuel and switched at the DPRT are headed to "Loves" gas stations all over the United States.  (Ex. E,7; D).  Paul Tucker also testified that he was aware the tank cars loaded with fuel and switched at the DPRT were going to Florida and

other Gulf States affected by recent hurricanes.  (Ex. E,7; D).  John Bozant, the yard

manager for Railserve at the DPRT, testified:

> In 2004 and 2005, Burlington Northern Santa Fe ("BNSF") was one of the
> largest customers of the DPRT.  In fact, if there were not at least 400 BNSF
> cars at the DPRT at any one time, BNSF would immediately send more of
> its customers rail cars to the DPRT.  Based on my day to day experience,
> oral and written instructions and review of the paper work in the course of my
> employment at the DPRT, the rail cars coming from BNSF were inbound
> from locations all over the United States and primarily for BNSF's customers
> Solvay, OXY, Atofina, Cheveron-Phillips and Sunoco.  The cars would come
> through the PTRA to DPRT.  Railserve would switch, block and stage the
> BNSF customer cars for plant destinations near the DPRT or to outbound
> locations throughout the United States.
>
> In 2004 and 2005, fuel tank rail cars were loaded at the DPRT by Shell Oil,
> who had a pipeline into the DPRT.  These cars were often referred to the
> "Milk Train."  The Milk Train cars were loaded with fuel by Shell Oil at the
> DPRT.  The rail cars were cars controlled by BNSF for the benefit of BNSF
> customers.  Railserve would block, stage and switch the fuel tank rail cars for
> destinations throughout the United States, including Albuquerque, New
> Mexico.  Most of the cars would be loaded with diesel fuel bound for "Love"
> gas stations throughout the United States.  During the time period Alex
> Benavidez worked for Railserve, the Milk Train was blocked for "Unitrain"
> movement.  The term "Unitrain" meant the cars were placed in long lines of
> rail cars that remained intact until these rail cars reached their ultimate
> destination throughout the Untied States.

(Ex. D).

### D.    The Event

In July 2004, Alex Benavidez began his employment with Railserve at the DPRT.

On April 4, 2005, Plaintiff was employed directly by Railserve and was performing the job

of a railroad brake man/switch man.  During the movement of 26 rail cars, Plaintiff was

thrown from the rail car because Railserve's engineer, Devon Stroud, applied the brakes

too soon and the "slack action" jerked Benavidez off the end of the train.  As a result,

Plaintiff, who was only 24 years old, was thrown from the train and had his left leg severed.

16

The dangerous policy and procedure of not engaging the air brakes was a significant cause of Alex Benavidez's severe injuries. (Ex. G,1; Q; L).

Further, when Railserve first began operations at the DPRT, the crews laced and engaged all of the air brakes. (Ex. P,2). In order to speed up operations, Paul Tucker told Railserve to change Railserve's policy to switch cars without lacing or engaging the air brakes. (Ex. P,3; D). Railserve complied and changed its policy to not lace or engage the air brakes, which makes stopping the cars much more dangerous. (Ex. P,4; D). However, some time after this policy change, one of the Railserve crews pushed a railcar off the DPRT tracks. (Ex. P,5). Thereafter, Railserve returned to its original policy of "100% air." (Ex. P,6). Shortly thereafter, Paul Tucker again told Railserve to not use "100% air." (Ex. P,7; D). Railserve again amended its policy and began switching railcars without lacing or engaging the air brakes. (Ex. P,8). According to Paul Tucker, at the time in which Alex's leg was amputated, the Railserve crews did not lace or engage the airbrakes. None of the air brakes were laced or engaged on the 26 rail cars and locomotive involved in the "shove" which caused Alex to be severely injured. "No air" is listed on the applicable Incident Report as the "contributing factor" causing Alex's amputation. (Ex. L). Further, Charles Culver concurs that the lack of use of air brakes caused an increase in the severity of the slack action, causing Alex to be thrown from the train. (Ex. Q).

## VI.
## SUMMARY JUDGMENT STANDARD

The moving party in a Summary Judgment must show that there is no genuine issue of material fact and that it is entitled to judgment in its favor as a matter of law. *Celotex v. Catrett* 477 U.S. 317, 322 (1986); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d

1257, 1263 (5th Cir. 1991).  The nonmoving party must provide the Court with evidence in the record from which a jury might return a verdict in its favor.  *Id.* at 1264.  If it does so, a trial is required and summary judgment is not appropriate.  *Id.*

## VII.
## ARGUMENTS AND AUTHORITIES

The Defendants challenge the first element of the FELA action.  Specifically, the Railserve contends there is no evidence: (1) Railserve is a "common carrier by railroad" under FELA; (2) Railserve operates a railroad as a means of carrying persons or goods for the public generally; (3)Railserve is a railroad engaged in interstate commerce; (4) Railserve actually performs rail service; (5) Railserve provides services as part of a total rail service contracted for by a member of the public; (6)Railserve holds itself out to the public as performing as part of a system of interstate rail transportation by virtue of common ownership with a railroad or by a contractual relationship with a railroad; (7) Railserve receives remuneration for its services by fixed charge or a percent of profits from a railroad; (8)Railserve undertakes to carry for all persons indifferently; and (9) Railserve arranges for persons or goods to be shipped in interstate commerce.

DPRTI and The Group contend there is no evidence that:  (1)Defendants are a "common carrier by railroad" under FELA; (2)Defendants operates a railroad as a means of carrying persons or goods for the public generally; (3)Defendants are railroads engaged in interstate commerce; (4) Defendants actually perform rail services; (5)Defendants provide services as part of a total rail service contracted for by a member of the public; (6) Defendants hold themselves out to the public as performing as part of a system of interstate rail transportation by virtue of common ownership with a railroad or by a

18

contractual relationship with a railroad; (7)Defendants undertake to carry for all persons indifferently; and (8)Defendants arrange for persons or goods to be shipped in interstate commerce.

Defendants attempt to confuse and torture the case law to require the above.  In addition the Defendants torture and omit key facts in an attempt to show Defendants are not covered by FELA even though the Defendants' sole business is to switch rail cars, bound to and inbound from interstate destinations, for 26 different customers and BNSF and PTRA.

The evidence outlined above shows that the **Defendants are *Lonestar Steel* railroad common carriers**:

1.    Railserve performs actual rail services pursuant to a contractual relationship with DPRTI;

2.    The railroad switching services being performed is part of the total rail service contracted for by a member of the 26 different customers of DPRTI/DPRTLLC and the customers of the PTRA (common carrier) and BNSF (common carrier);

3.    DPRTI/DPRTLLC is performing as part of a system of interstate rail (i.e. Switching rail cars bound to and inbound from interstate destinations) transportation by virtue of common ownership between itself and a The Group (common carrier) and by a contractual relationship with a with BNSF and the PTRA, and hence such entity is deemed to be holding itself out to the public; further, is performing its duties by virtue of its close contractual relationships with The Group and DPRTI/DPRTLLC and is thus deemed to be holding itself out to the public; and

4.    remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad; Railserve is paid a flat fee by DPRTI/DPRTLLC (a railroad) and DPRTI/DPRTLLC is paid per car by its customers and per rail car by PTRA (common carrier railroad) and BNSF (common carrier railroad).

*Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

### A.    FELA Elements

The elements of a FELA cause of action are:    (1)Defendant is a common carrier by railroad engaged in interstate commerce; (2)He was employed by the defendant; (3) Injury occurred while employed by the defendant; and (4) Defendant's negligence caused the injuries. *Felton v. SEPTA*, 952 F. 2d 59, 62 (3d Cir. 1991).

### B.    Defendants Are Common Carriers by Railroad Engaged in Interstate Commerce

The Federal Employers' Liability Act by its terms applies to "every common carrier by railroad while engaging in commerce between any of the several States," 45 U.S.C. § 51, and the Safety Appliance Act by its terms is applicable to "any common carrier engaged in interstate commerce by railroad", 45 U.S.C. § 1.

The common carrier concept has long been in usage. At an early date the term as used in the FELA was held in *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 187, 41 S.Ct. 93, 65 L.Ed. 205, 213 (1920) to mean, "one who operates a railroad as a means of carrying for the public (and) * * * this view * * * is in accord with the ordinary acceptation of the words * * *." A discussion of the term is found in *Kelly v. General Elec. Co.*, 110 F.Supp. 4, 6 (E.D.Pa), aff'd 204 F.2d 692 (3 Cir.) cert. den. 346 U.S. 868. 74 S.Ct. 137, 98 L.Ed. 390 (1953) where the district court stated:

> A common carrier has been defined generally as one who holds himself out to the public as engaged in the business of transportation of person or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.

### 1.   Defendants Do Not Operate an In-plant Rail System

Courts have long recognized the distinction between plant facilities and "true agencies of transportation." In *New York Cent. & H.R.R. Co. v. General Elec.* Co., 219 N.Y. 227, 114 N.E. 115 (1916) cert. den. 343 U.S. 636, 37 S.Ct. 400, 61 L.Ed. 941, the court held that where an industry maintains a complicated intra-plant railroad system, such rail operations will be regarded as plant facilities rather than those of a common carrier. The movement of freight within the plant is not common carriage but rather industrial plant usage.[4]

The rail operations of the defendant in *Duffy v. Armco Steel Corp.*, 225 F.Supp. 737 (W.D.Pa.1964) were also held to be plant facilities. Armco was engaged in the manufacture of steel products and owned and operated railroad equipment within its manufacturing plant. This equipment was used to transport material and equipment from place to place in the plant and to Armco's other nearby plant. Inbound railroad cars were delivered by the Bessemer & Lake Erie Railroad to a track within the plant, and the cars were then distributed to various parts of the plant by Armco. This procedure was reversed on outbound shipments. In *Powell v. Pacific Naval Air Base Contractors*, the court held that Armco was not a common carrier under the FELA because its railroad equipment had not been used to transport goods of others, nor had Armco offered their use to the public.

---

[4] See also *Malvern Gravel Co. v. Mitchell*, et al., 238 Ark. 852, 385 S.W.2d 144, cert. den. 382 U.S. 828, 86 S.Ct. 64, 15 L.Ed.2d 73 (1965); *Powell v. Pacific Naval Air Base Contractors*, et al., 93 Cal.App.2d 629, 209 P.2d 631 (1949); *Cooperative Legislative Comm. of Railroad Bhds. v. P.U.C.*, 149 Ohio St. 511, 80 N.F.2d 159 (1948).

21

The court in *Kelly v. General Elec. Co.*, 110 F.Supp. 4 (E.D.Pa.1953) aff'd 204 F.2d 692 (3 Cir.) cert. den. 346 U.S. 868, 74 S.Ct. 137, 98 L.Ed. 390 also dealt with the question of whether an industry's operation of its internal rail system constituted such industry a common carrier under the FELA. General Electric was engaged in the business of manufacturing, rebuilding and repairing electrical equipment and other products. As part of its plant equipment it had a system of internal trackage some 2.17 miles in length, 2 switching engines, 9 cars which it rented to rail carriers, and 10 cars which it used for its own purposes. Its tracks were connected to a siding of the Pennsylvania Railroad located within its plant. The railroad delivered cars to the siding and thereafter the cars were removed and distributed throughout the plant by General Electric's switching engines. Occasionally cars containing G.E.'s goods as well as goods of others were removed by General Electric to its buildings where it unloaded its goods and then returned the cars to the siding for delivery by the railroad to the other consignees. It was contended that General Electric was a common carrier because, *inter alia*, it moved property of others when it moved less-than-carload shipments and when it moved its outbound shipments to the siding, since goods were shipped FOB plant and title to the goods passed as soon as they were placed in the cars. General Electric contended that it maintained its railroad system for its own convenience and necessity in the conduct of its business. The court held that General Electric was not a common carrier under the FELA in that it did not hold itself out generally to the public as offering services of transportation for hire, nor was it employed to carry goods of others for hire. The court found that there was nothing to indicate that the public could demand service of General Electric with respect to its rail facilities. The court concluded that moving less-than-carload shipments was for General

22

Electric's own convenience and added nothing to the service contracted by Pennsylvania Railroad and the other consignees and no charge was made for the service. In addition, the court stated that carrying goods inbound and outbound to and from the siding was a common feature in every plant facility, and whether the shipment was inbound or outbound, it still comprised General Electric's products that it had sold or bought, and therefore General Electric was engaged solely in rail services for itself.

Defendants argue that the DPRTI/DPRTLLC operates an in-plant facility and not a common carrier. However, without exception every case that exists, including the cases cited by Defendants on in-plant, have one very important requirement. In every in-plant case the Defendant being sued was in another type of business and was hauling **its "stuff" inside its plant** and its rail operations did not benefit anyone else.

The Defendants point to an almost endless list of cases found to be in plant systems. While true that the rail services discussed therein never left the facility, without exception, the cars being moved were cars owned by the same entity who owned the facility. It was moving its cars itself or had contracted itself, but it was not moving other people's cars in its facility. Defendants move cars for over twenty six customers and BNSF and the PTRA, both of which are common carriers. Neither Railserve, The Group, DPRTI or DPRTLLC does not own one car or the freight therein it moves. (Ex. E 9; A; C; D; H; I, N) The sole business of DPRTI/ USDG is providing rail terminal services for the public and common carriers. (Ex. B, I, N and H). See Section VII.B.2. below.

23

### 2.    Defendants Do Not Operate as Private Carrier

A private carrier is one who, **without making it a vocation**, or holding himself **out to the public as ready to act for all who desire his services**, undertakes, by special agreement **in particular instance only**, to transport property from one place to another either gratuitously or for hire.   He carries only for persons with whom he as an **initial contract**, and assumes no obligation to carry for others; and in this lies the chief distinction between a private carrier and a common carrier.  *Lonestar* citing *Ward Transport, Inc. v. Public Utilities Comm*, 151 Colo. 76, 376 P.2d 166, 169 (1962); *See also Dawkins Lumber Co. v. L. Carpenter & Co.*, 281 S.W. 1013 (1926).

The Defendants make the argument that Railserve and USD /DPRT are private carriers because it enters into a contract with each of its customers it has the **ALLEGED** right to refuse anyone's cars.  If one examines *Kieronski v. Wyandotte Terminal Railroad Company* 806 F.2d 107 (6th Cir. 1986); *Mack v. East Camden & Highland Railroad Company*, 297 F.Supp.2d 1052 (W.D. Tenn 2003); *Loveless v. Railway Switching Services Inc.,* 665 N.E.2d 252 (Ohio App. 1995), **private carrier is defined as "private carriers haul for others, but only pursuant to individual contracts, entered into separately with each customer**." This general definition by itself was first espoused in the *Kieronski* case and since repeated and cited throughout other jurisdictions.  However, *Kieronski* in repeating this general definition of a private carrier cited to *Ward Transportation Inc. v. Public Utilities Commission*, 376 P.2d 166, 169 (1962) (trucking company); *Dawkins Lumber Co. v. L. Carpenter & Co.,* 281 S.W. 1013 (1926); *State ex rel. Silver Lake Ry. &*

24

*Lumber Co. v. Public Service Comm'n*, 201 P. 765 (1921), which definitions are stated

above in section C.1. Additionally, *Lone Star Steel Company* states:

> In other instances lumber companies which operated railroads primarily for
> their own use were found by the court to be private carriers, as opposed to
> common carriers, where the lumber companies engaged in some
> transportation of persons or property for hire. See *Dawkins Lumber Co. v.*
> *L. Carpenter & Co.,* 281 S.W. 1013 (1926); *State ex rel. Silver Lake Ry. &*
> *Lumber Co. v. Public Service Comm'n*, 201 P. 765 (1921). The Court found
> them to be private carriers in that they did not hold themselves out to the
> public as being engaged in the business of transportation for any who wished
> to avail themselves of their service but merely rendered rail service for
> certain people of certain business usually pursuant to a contract. The
> following quote for *Ward Transport, Inc. et al v. Public Utilities Comm.,* 376
> P.2d 166, 169 (1962) aptly differentiates private carriers from common
> carriers: "a private carrier is one who, without making it vocation, or holding
> himself out to the public as ready to act for all who desires his services,
> undertakes, by special agreement in a particular instance only, to transport
> property from one place to another either gratuitously or for hire. He carries
> only for persons with whom he has an initial contract, and assumes no
> obligation to carry for others; and in this lies the chief distinction between a
> private carrier and common carrier.

Day in and day out The Group, DPRTI and DPRTLLC is solely in business of switching,

blocking and staging rail cars involved in interstate transit for over 26 customers, including

BNSF and PTRA, which are a common carrier railroads. Therefore, The Group and

DPRTI/DPRTLLC are NOT private carriers. Rather, the railroad services are its SOLE

vocation.

### 3.    Linking Carrier

A linking carrier is "where a rail entity links two or more common carriers, the linking

entity has become a vital part of the common carrier system and therefore become

common carrier." The Group's and DPRTI's website states that it has interchange service

with BNSF and Union Pacific. As such, DPRTI can be characterized as a linking carrier.

**4.   Defendants Operate a Common Carrier-Interstate Railroad System under *Lonestar***

Although the principle use of Lone Star's intra-plant railroad, to move its own goods, equipment, etc., was identical to the rail operations in the above cases, Lone Star was engaged in a method of operation not found in the above cases. **Lonestar regularly shuttled the goods of other business concerns located within its plant and thereby is performing a part of the total rail services which another railroad, T & N (a common carrier railroad), has obligated itself to perform**. The services which Lone Star performed clearly distinguished Lone Star's intra-plant railroad from those in *Armco* and *Kelly*. Additionally, Lone Star's operations are markedly different from those in *Dawkin*s and *Silver Lake*, supra. In neither of those cases did the entity involved perform its rail services in connection with an interstate common carrier, **whereas Lone Star's provided services as a necessary part of T & N's (common carrier) total rail operation**. As a consequence, Lone Star could not claim to be a private carrier because by undertaking the obligations of a common carrier, T & N, it held itself out to the public as being engaged in the business of public transportation. Moreover, **since T & N held itself out to the public as performing all the duties of a common carrier, Lone Star could not claim that the duties it performs for T & N are not offered indiscriminately to the public**. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

In deciding whether Lone Star is a common carrier, the Fifth Circuit compared Lonestar's railroad to the operation of **terminal facilities**, *Southern Pacific Terminal Co., et al. v. ICC*, et al., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *United States v. Brooklyn Eastern Dist. Terminal*, 249 U.S. 296, 39 S.Ct. 283, 63 L.Ed. 613 (1919),

stockyards, *United States v. Union Stock Yard & Transit Co.*, et al., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226 (1912); *Union Stockyards Co. of Omaha v. United States*, 169 F. 404 (8 Cir. 1909), and short line railroads, *United States .v State of California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936); see *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967). Although the business entities in these cases were in a general sense were primarily engaged in aspects of rail transportation and Lone Star was mainly a steel industry and engaged in railroading only as an incident to its business, the criteria used by the courts to determine whether these entities were common carriers were just as applicable in the Fifth Circuit's determination of whether Lone Star was a common carrier. See *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

In *Southern Pacific Terminal Co. and Brooklyn Eastern Dist. Terminal*, supra, the terminal companies were found to be common carriers. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967). The Southern Pacific Terminal maintained wharves and docks for the accommodation of import and export traffic and it charged a fixed wharfage for all freight passing over its track facilities which were connected to tracks of the Southern Pacific System. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967). The operation of the Brooklyn Terminal included the transportation of freight **from the Terminal to its docks and for these services it was paid by the railroad or steamship company**. The Terminal, in contending that it was not a common carrier, **argued primarily that it performed solely under contract with the railroads and therefore did not perform services for the public**. The court held that the services rendered by **the Terminal were public in their nature and of a kind ordinarily performed by a common carrier**. The

27

court stated that one is **not precluded** from being a common carrier the **rail transportation services which it renders to the public are performed as agent for another merely because those services are contracted to a third party**. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

The stockyards in *Union Stockyards Co.*, supra, presented essentially the same argument. While admittedly the stockyards were rendering a service which the railroads were bound to preform, they insisted that they were not a common carrier because the rail transportation services were performed for the railroad pursuant to contract under which the stockyards received a fixed charge per car and therefore the services were not performed for the public. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967). The court found that the stockyard operation included the carriage of livestock for hire destined to or from its sheds or pens which in effect were the depot of the railroad companies. **It was of little significance to the court that the stockyards did not hold themselves out to the public to carry livestock. It was sufficient that the railroad did so hold itself out to the public and the stockyards were willing to perform and actually did so perform a part of the service which the railroad companies had agreed to perform when the livestock were accepted for carriage**. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967). Therefore, the stockyards were held to be a common carrier engaged in interstate commerce.

Similarly, the stockyard in *Stock Yard and Transit Co.*, supra, was found to be a common carrier. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967). Although it had divested itself of its rail facilities by leasing them to the Junction Railroad,

it loaded, fed, watered and cared for livestock in transit and received two-thirds of the profit of the Junction Railroad. The Investment Co., a holding company, owned both the stockyard and the railroad. The court held that these companies, the stockyard and the Junction Railroad, engaged in carrier rail services when they loaded freight at the stockyard on cars, transported it for a distance under a through rate and bill furnished by the trunk line carrier, or received freight while in commerce upon a through rate which included terminal service rendered by the two, and completed its delivery to the consignee. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

Likewise the California owned State Belt Railroad was held in *United States v. State of California, supra,* to be a common carrier engaged in transportation by rail under the Safety Appliance Act because it **transported freight back and forth from industries to the railroads from which it received a flat charge per car.** *Lonestar Steel Co. v. McGee,* 380 F.2d 640, 647 (5th Cir. 1967). The court found that the services performed by the Railroad were of a public character for hire and held that all the essential elements of a common carrier were present, **that is, the receipt and transportation for the public for hire of cars moving in interstate commerce.** *Lonestar Steel Co. v. McGee,* 380 F.2d 640, 647 (5th Cir. 1967).

**As a general rule, the services performed by  switching and terminal companies with respect to goods shipped between the sates constitute interstate commerce.** See  15A Am. Jur. 2d Commerce 70; *U.S. v. Brooklyn Eastern District Terminal,* 249 U.S. 296, 39 S. Ct. 283, 63 L. Ed. 613, 6. A.L.R. 527 (1919); *U.S. v. Union Stockyards & Transit Co. Of Chicago,* 226 U.S. 286, 33 S. Ct. 83, 57 L.Ed. 226 (Vomm.

29

Ct. 1912); *State v. Kansas City Stock Yards Co. Of Missouri*, 145 P. 831 (1915). A switching line engaged in the handling of cars along its route from the terminus of one railroad to that of another, and to and from various industries with which it established switch connections, for which it makes a uniform charge for every loaded car, is so intimately connected to the public service involved in the carriage and delivery of freight as to constitute part of such service and subject to governmental control. *Norfolk & P. Belt Line R. Co. V. Com.* 49 S.E. 39.

The Fort Worth Bel Railway Company, owning 18 miles of track in the city of Fort Worth, confining its business to switching, classifying and assembling cars within its yards, and switching from the same from and to industries in the city to and from transfer tracks owned by railroad companies engaged in both carrying intrastate and interstate freight, is a railroad engaged in interstate commerce within the meaning of the Safety Appliances Act, U.S.C. title 45 sections 2, 8, so as to liable for the penalty prescribed by the act, in moving over its lines a car the coupling apparatus of which was so out of repair that the car could not be coupled or uncoupled without the necessity of a man going between the ends of that car and the one with which it was coupled, although at the time the defective car was moved neither that car nor any car with which it was then connected or moved contained any interstate shipment. *Fort Worth Belt R. Co. V. United States* 22 F. 2d 795,(5th Cir. 1927).

Likewise a stockyard company doing a general terminal business, owning 22 miles of track, connecting with the stockyards and various railroad lines, **over which it alone moves cars with its own locomotives and crews, but which issues no bills of lading**

30

**and receives no part of the freight charges paid** to the trunk-line companies, but receives merely a fixed charge for each car moved, regardless of weight, is nevertheless a common carrier. *United States v. St. Joseph Stockyards Co.* 181 F. 625 (D.C. 1909).

A local independent switching company is generally held to be a common carrier engaged in interstate commerce when switching cars which are en route from, or to, another state. *United States v. Brooklyn Eastern Dist. Terminal* 63 L. Ed. 613 (1919); *United States v. Northern Pacific Terminal Co.* 144 F. 861 (1906); *State v. Houston Belt & Terminal R. Co.* 166 S.W. 83 (Tex. Civ- Houston 1914, reversed on other grounds); *United States v. Chicago B. & Q. R. Co.* 293 F. 185 (1923).

Switching movement held interstate, entitling switchman to maintain action under FELA for injuries sustained therein, where car whose spotting was sole purpose of switching movement, was intended for interstate transportation, **not withstanding that shipper could change destination of car to some intrastate point**. *Grand Trunk Western R. Co. V. Boylen*, 81 F.2d 91 (7th Cir. 1936).

**Switching for the purpose of making an interstate train is necessary for the movement of the train in interstate commerce, and one so engaged is employed in interstate commerce within the meaning of FELA.** *McCall v. Pitcair*, 6 N. W. 2d 415 (1942).

A company engaged in switching and deleting railroad cars **between freight terminal and private sidings** is a common carrier. *Batchelder & Snyder C. v. Union Freight R. Co.,* 156 N.E. 698 cert denied 72 L.Ed. 424 (1927).

31

The services performed by union depot company at terminal railroad yards were railroad transportation services performed at a railroad terminal for the public, and in rendering such service the company became a "common carrier" by railroad within this section. *Fort Street Union Depot Co. v. Hillen* 119 F.2d 307 (6th 1941) cert. denied 86 L. Ed. 515.

A Terminal Railroad switching for foreign and domestic cars when handling interstate or foreign shipments is an instrumentality of interstate or foreign commerce subject to this chapter, whether or not it knows that the particular cars are interstate or foreign. *Cott v. Eerie R. Co.* 131 N.E. 737 (2nd Cir. 1921), cert. denied 66 L.Ed. 409.

A terminal railroad operating only within the state for industries and carriers with which it is connected and which it served as a link through transportation of interstate freight shipments to and from points over the connecting carriers was engaged in "interstate commerce" within this chapter. *Newkirk v. Los Angeles Junction Ry. Co.*, 131 P.2d 535 (Cal. 1942).

Terminal company whose facilities are used and necessary in transportation of person or property by interstate trunk lines, is engaged in interstate commerce. *Spaw v. Kansas City Terminal Ry. Co.*, 201 S.W. 927 (Mo. App. 1918).

Placing cars, **subsequently moved and unloaded, on hold track, was but temporary interruption of interstate shipment and did not terminate character thereof**. *Pipal v. Grand Trunk Western Ry. Co.*, 173 N. E. 372 (Ill. 1930) cert denied 75 L.Ed. 1449.

A railroad company in **breaking up interstate trains** at a junction point within the state to facilitate delivery of shipments to other points within the state, is engaged in interstate commerce notwithstanding interstate cars were to be delivered within state or at terminal where trains were broken up. *Southern Pac. Co. V. Stephens*, 201 S.W. 1076 (Tex Civ.–El Paso, 1918 writ dismissed).

Brakeman of railroad terminals, which were entirely within one state and principal traffic of which was in interstate commerce over lines connecting with interstate carrier, who fell beneath car while placing it in a tipple on private spur leading from intrastate line to be loaded with coal to be transported in interstate commerce, was engaged in an act in furtherance of "interstate commerce" and was entitled to maintain action for personal injuries under this chapter. *Pritt v. West Virginia R. Co.,* 51 S.E.2d 105 (W. Va.  1948) , cert. denied 93 L. Ed. 1113.

Switchman injured while on engine coupled to car in intrastate commerce, and on the way to pick up a car for interstate commerce was engaged in interstate commerce. *Birmingham Belt R. Co. v. Dunlap,* 58 F. 2d 951 (5th Cir. 1932).

A railroad employee who at the time of injury was engaged in the moving a car for a **train consisting of both intrastate and interstate cars** is employed in interstate commerce. *Pennsylvania R. Co. V. Morrison,* 3 F.2d 986 (6th Cir. 1925); *Sulivan v. Baltimore*, 116 A. 793 (Pa. 1922) cert denied 66 L. Ed. 795.; *Baltimore & O.R. Co. V. Fletcher*, 300 F. 318 (Ohio 1924) cert denied 69 L.Ed. 468. *Davis v. Dowling*, 284 F. 670 (6th Cir. 1922); *Hudgins v. Kansas City, M. & O.R. Co.*, 2 S.W.2d 958 (Tex. Civ. App--

El Paso 1927, writ refused n.r.e.); *Southern Pac. Co. v. Industrial Acc. Commission*, 120 P.2d 887.

**Switching for the purpose of making up an interstate train is necessary for the movement of the train in interstate commerce and one so engaged is employed in interstate commerce.** *McCall v. Pitcairn,* 6 N.W.2d 415 (Iowa 1942).

Brakeman working on train, nearly all cars of which were going outside state, was engaged in interstate commerce though particular engine and crew would not take them outside state. *Louisville & N.R. Co. V. Noble's Adm'x,* 28 S.W.2d 733 (Ky. 1930).

Proof of injury, while placing several cars destined to points outside the state so that they might be picked up by interstate train, showed that the plaintiff conductor was employed in interstate commerce at time of injury within this section. *McCall v. Pitcairn*, 6 N.W.2d 415 (Iowa 1942);

**One engaged in the initial step of switching operation, which would start cars upon their return trip to a place in another state to be again loaded, was engaged in interstate commerce.** *McAdoo v. McCoy,* **215 S.W. 870 (Tex Civ. App–El Paso, 1919) cert. Denied 65 L.Ed. 793.**

Where railroad car loaded with freight destined for foreign state was sealed and billed for destination when picked up by switching crew **who were moving car to another switch rack where it was to be picked up by another crew to be delivered to connecting carrier engaged in interstate transportation when switchman was injured as a result of alleged defective hand brake, switching** crew was engaged in interstate transportation so as to bring switchman with the purview of this chapter and sections 1 to

16 of this title, and it was not necessary that movement of car be continuous, since, when car was moved from shippers' warehouse, interstate trip  began. *Herb v. Pictairn*, 29 N.E.2d 543 (Ill. 1940)reversed 36 N.E.2d 555. (Appellate court rendered and the supreme court indicated it should remand with instructions, without changing the appellate courts legal analysis).

In the case of an interstate train engaged in the movement of interstate freight, **interstate transportation is not ended** on reaching the terminal yard although the cars are not going to points beyond, **for it is still necessary that the train be broken up and the cars taken to the appropriate** tracks for making up outgoing trains or for unloading or delivering freight, and this is as much a part of interstate transportation as is the movement across state line. *St. Louis, S. F. & T.R. Co. V. Seale*, U.S. Tex. 1913,, 57 L.Ed. 1129.

**Moving empty cars involved in interstate transportation** is engaged in interstate commerce. *Kansas City Southern R. Co. V. Quinn,* 85 F.2d 485 (5th Cir. 1936) cert. denied 81 L. Ed. 434; *Crouch v. Chicago Great Western R. Co.,* 216 N.W. 234 (Minn. 1927), cert denied 72. L. Ed. 1003.

The 1939 amendment to this section eliminated necessity of showing that at the very time of injury employee was engaged in interstate commerce; **but employee must show that his duties at least in part are in furtherance of interstate or foreign commerce or that they affect such commerce directly or closely and substantially**. *Hallaway v. Thompson*, 226 S.W.2d 816 (Tex. 1950); See Also *Bowers v. Wabash*, 246 S.W.2d 535 (Mo. 1952).

Also courts have specifically rejected as a controlling criterion the status which the entity declares itself to be in determining whether the entity is a common carrier. 'Whether a transportation agency is a common carrier depends not upon its corporate character or declared purposes, but upon what it does.' *United States v. State of California, supra*, 297 U.S. at 181, 56 S.Ct. at 422. The answer to the question of whether an entity is a common carrier "does not depend upon whether its charter declares it to be a common carrier, nor upon whether the state of incorporation considers it such; but upon what it does." *Brooklyn Eastern Dist. Terminal, supra,* 249 U.S. at 304, 39 S.Ct. at 285. The fact that Lone Star's carriage for other industries comprises only a minor portion of its rail movements also does not prevent it from being a common carrier. *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967.)

### C.    The *Lonestar* Analysis

According to these cases, the *Lonestar* considerations are of prime importance in determining whether a particular entity is a common carrier.

1.    actual performance of rail service;

2.    the service being performed is part of the total rail service contracted for by a member of the public;

3.    the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and

4.    remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.

36

*Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).  The stockyards, terminal and short line cases were held by *Lonestar* to be the basis of and to meet the above standards.  The operations at the DPRT , likewise, meet these requirements.  In fact the DPRT operations are even closer than the facts in *Lonestar*.  Lonestar was a steel company that operated a rail yard.  The sole business of The Group in combination with DPRTI/DPRTLLC and Railserve was rail switching and rail operations for money.

### 1.    Defendants Perform Rail Services

Pursuant to a contractual relationship with DPRTI, Railserve was switching, blocking, staging and moving rail cars involved in interstate commerce on behalf of DPRTI and its customers (Ex. B, C, D, and I), which is considered rail services.  *See Nichols v. Pabtex et al.*, 151 F.Supp 772, 778 (E.D. Tex. 2001) *citing Kieronowski v. Wyandotte* at 108 (even in plant switching is a rail operation under FELA).  It is of no consequence and DPRTI and The Group are not afforded any protection from FELA because DPRTI hired Railserve to do its operational rail movements/rail services.[5]

---

[5]
        **Individual employed by independent contractor, who is injured while performing a task which a railroad has a contractual duty to perform, is deemed to be an employee of the railroad for the purposes of claim arising under this chapter, provided only that the railroad must have retained the right or authority to control the means and methods by which the work of the independent contractor is to be done.** ***Matter of Penn. Cent. Transp. Co.,* 419 F. Supp. 1370 (E.D. Pa. 1976). See Also *Lindsey v. Louisville & Nashville R. Co.,* 775 F.2d 1322 (5th Cir. 1985).** An employee of an agent of a common carrier may be an employee of such carrier so as to be covered by the provisions of this chapter. *Kelly v. Delaware River Joint Commission*, 85 F.Supp. 15 (E.D. Pa. 1949).  Where a railroad employee's injury is caused in whole or part by fault of others performing, under contract, **operational activities** of his employer, such others are agents within the meaning of this section, rendering railroad liable for negligence of other's employees.  *Salvail v. Great Northern Ry. Co.,* 473 P.2d 549 (Mont. 1970).  Though employees of an independent contractor are not accorded coverage under this chapter, if injured worker is employed by agent or adjunct of railroad he will be treated as employee of railroad for purposes of this chapter. *Smith v. Norfolk & W. Ry. Co.,* 407 F.2d 501 (CA4 1969), cert. denied 23 L.Ed.2d 767.  Independent contractor performing service for railroad employee at request of railroad is an "agent" of railroad within the meaning of this chapter where service constitutes nondelegable operational activity of the carrier and where service is such that financial benefit accrues from the railroad therefrom.  *Mangrum v. Union Pac. R. Co.,* 230 Cal.App.2d 960 (Cal. 1st Dist. 1964).  Where operation of stockyards was part of operations activities of railroad, even though

### 2. The Defendants perform Rail Services as Part of the Total Rail Service Contracted for by a Member of the Public

Switching is part of the total rail service needed to get railcars from point A to point B.  See *McCall v. Pitcairn,* 6 N.W.2d 415 (Iowa 1942)(**Switching for the purpose of making up an interstate train is necessary for the movement of the train in interstate commerce and one so engaged is employed in interstate commerce.**);  *McAdoo v. McCoy*, 215 S.W. 870 (Tex Civ. App–El Paso, 1919) cert. Denied 65 L.Ed. 793 (**One engaged in the initial step of switching operation, which would start cars upon their return trip to a place in another state to be again loaded, was engaged in interstate commerce.**);  *Cott v. Eerie R. Co.* 131 N.E. 737 (2ⁿᵈ Cir. 1921), cert. denied 66 L.Ed. 409 (A Terminal Railroad switching for foreign and domestic cars when handling interstate or foreign shipments is an instrumentality of interstate or foreign commerce subject to this chapter, whether or not it knows that the particular cars are interstate or foreign.) .

*Southern Pac. Co. V. Stephens*, 201 S.W. 1076 (Tex Civ.–El Paso, 1918 writ dismissed)(**breaking up interstate trains** at a junction point within the state to facilitate delivery of shipments to other points within the state, is engaged in interstate commerce notwithstanding interstate cars were to be delivered within state or at terminal where trains were broken up.)

---

by contract the work in connection therewith was being performed by another company, railroad would be liable for negligent injury of employee of other company.  *Oregon Short Line R. Co. V. Idaho Stockyards Co.*, 364 P.2d 826 (Utah 1961).

    The Defendants will argue that the *Kelley* case somehow trumps the above; however, further, *Kelley* did not address **agents involved in operational rail movements**, rather it addressed related and tangential agency relationships.  Accordingly the following cases still apply to this matter. ” *Kelley v. So. Pac. Co.*, 419 U.S. 318, 324 (1974).

DPRTI/DPRTLLC contracted to switch the railcars for its 26 customers, and made that service open to the general railroading community, not just one company, as would be seen if DPRT truly operated an in-plant service.

DPRTI/DPRTLLC contracted with the PTRA and BNSF(Common Carrier Railroads), to switch the railcars for the customers of the PTRA and BNSF. (Ex. C; R). The epilogue to the contract between DPRTI/DPRTLLC and BNSF states that the purpose of the agreement is to better assist the customers of BNSF. BNSF and PTRA offer its services indiscriminately to the public and subject their customers to published tariffs. (Ex. T; U). The services provided were part of the total rail services provided to the public by PTRA and BNSF. Railserve did the physical switching of these railcars on behalf DPRTI/DPRTLLC. (Ex. B). Therefore, Railserve on pursuant to its contractual relationship with of DPRTI/DPRTLLC is performing rail switching services as part of the total rail service contracted for by a member of the public.

### 3. The Defendants are Performing As Part of the Interstate Rail System by Contract with A Rail Road

BNSF, a common carrier railroad contracted with DPRTI/DPRTLLC to switch cars for the Customers of BNSF. (Ex. C). The PTRA agreed to reduce its tariffs and have those made payable to DPRTI/DPRTLLC pertaining to the railcars to be switched at the DPRT. Both PTRA and BNSF are common carrier railroads. (Ex. R). The railcars switched by the Defendants are engaged in interstate commerce. (Ex. B; C; D; H; I; N) Thus, DPRTI/DPRTLLC are deemed to be holding itself out to the public as a railroad for hire by virtue of its close contractual relationships with BNSF and the PTRA. See *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

Further, The Group in conjunction with the DPRT/DPRTLLC advertises on the world wide web that it can perform rail services to anyone nationwide. (Ex. A). The Group in conjunction with DPRTI holds itself on the world wide web as providing rail services throughout the Nation. (Ex. A,1) The Group and DPRTI advertise on the world wide web that it operates an expanding a nationwide network of rail facilities and infrastructure; can provide rail logistic solutions, including railcar storage, unit train staging, bulk car loading/offloading, fleet management, truck-railcar transloading. (Ex. A,2). The Group and DPRTI advertise on the world wide web that it has years of experience in the railroad and terminal industries. (Ex. A,3). The Group and the DPRTI advertise on the world wide web that the DPRT can provide railcar storage, railcar staging, transloading, unit train terminalling, inventory management, access to pipeline connectivity and interchanges to PTRA, Union Pacific and BNSF. (Ex. A,4). As stated in the website, The Group has common ownership and employees and is operating as an integrated unit switching railcars involved in interstate transit. Therefore, DPRTI/DPRTLLC in conjunction with The Group is a common carrier railroad in its own right. See Section VII.B.4. *supra*.

Railserve is deemed to be holding itself out to the public by virtue of its close contractual relationship with The Group and DPRTI. (Ex. B); See *Lonestar Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967).

### 4.   Remuneration

The contracts show how DPRTI/DPRTLLC and Railserve is paid. For the most part, as reference on Exhibit A to the contracts, DPRTI/DPRTLLC is paid on a per car basis for

40

switching, classification and other items.  (Ex. C; R; H).  Railserve is paid for switching

services by DPRTI/DPRTLLC and the Group on a flat monthly basis.  (Ex. B).

**D.**     **Objection to Affidavit of Paul Tucker (Exhibit 7 to Defendants' Motion)**

In paragraph 2 of the Affidavit Paul Tucker testifies as to the ownership of the DPRT

and the corporate status of USD Terminals LLC and merger with U. S. Development Group

LLC.  Plaintiff objects to this testimony in that it is a self interested witness without personal

knowledge.  Paul tucker testified in deposition that the only source of this information is

what his attorney had told him and he had not seen or reviewed any documents regarding

this issue.  (Ex. P.6).

In Paragraph 3 Paul Tucker testifies that no railroad company has an ownership

interest in the Terminal.  This statement is a legal conclusion without foundation or support.

See Arguments and Authorities above.

**VII.**
**CONCLUSION**

For these reasons the Defendants Motions For Summary Judgment should be

denied.

41

WHEREFORE PREMISES CONSIDERED, Plaintiff requests that this Court Deny the Defendants Motions for Summary Judgments, and grant Plaintiff all relief to which he may be entitled, under law and equity.

Respectfully submitted,

*/s/ Francis I. Spagnoletti*

Francis I. Spagnoletti
SBN 18869600 / Federal ID 5369
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone:   713-653-5600
Facsimile:   713-653-5656

**OF COUNSEL**

SPAGNOLETTI & CO.

COLLINS & O'NEAL, P.L.L.C.
Wayne D. Collins
SBN 00796384 / Federal ID 21258
1177 West Loop South, Suite 700
Houston, Texas  77027
(713) 222-0381
(713) 759-9650 - Facsimile

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing was on this date automatically accomplished on all known Filing Users through the Notice of Electronic Filing.  Service on any party or counsel who is not a Filing User was accomplished via Email, Facsimile, Certified Mail/RRR or U.S. First Class Mail, in accordance with the Federal Rules of Civil Procedure on this 25th day of October, 2007.

*/s/ Francis I. Spagnoletti*

Francis I. Spagnoletti

42