## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ALEJANDRO BENAVIDEZ | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION G-07-105 |
| | § | |
| | § | |
| BURLINGTON NORTHERN SANTA FE | § | |
| CORP, *et. al.* | § | |
| | § | |
| *Defendant*. | § | |

## ORDER

Pending before the court are defendants Deer Park Rail Terminal, LLC's, USD, LLC's, (collectively referred to as the "USD Defendants")[1] and Railserve's motions for summary judgment. Dkts 45, 46, & 85.  The USD Defendants and Railserve move for partial summary judgement and summary judgment, respectively, on the issue of whether they are common carriers under FELA. Dkts. 45 & 46.  Additionally, the USD Defendants  move for summary judgment on the issue of whether they are the plaintiff's employer for the purposes of FELA.[2] Dkt. 85.  In the same motion, the USD Defendants move the court to limit the plaintiff's negligence claim to only a *Redinger* claim as the basis of the duty owed him.  *Id.*  And last, the USD Defendants move the court to name

---

[1] The plaintiff originally sued nine defendants (including Railserve), but later amended his complaint to name only Deer Park Rail Terminal, LLC; USD, LLC; and Railserve as defendants. *See* Dkt. 100.  As a result, a motion for summary judgment by four other original defendants (Deer Park Rail Terminal, Inc.; U.S. Development Group, Inc; U.S. Development Group LLC; and USD Terminals LLC) was denied as moot by this court in an earlier order.  *See* Dkts. 82 & 128.

[2] This motion also requests the court to find that several of the other defendants originally named are not alter egos/joint ventures of Deer Park Rail Terminal, LLC and USD, LLC, and therefore claims against them should be dismissed.  Dkt. 85 at 4.  As those defendants have since been non-suited from the case, that issue is now moot. *See* Dkt. 128 (dismissing their summary judgment motions as moot).

Railserve as a responsible third party should it dismiss Railserve from the case.  Dkt. 105.  Upon consideration of the defendants' motions, subsequent proceedings in the case, and for the reasons detailed below, Railserve's motion for summary judgment is DENIED.  Dkt. 46  The USD Defendants' motion for partial summary judgment based on the issue of the USD Defendants as a common carrier under FELA is likewise DENIED.  Dkt. 45.  The USD Defendants' second motion for partial summary judgment on the issue of the USD Defendants as the plaintiff's employer is GRANTED IN PART only insofar as it seeks to limit the plaintiff to a *Redinger* negligence claim, and DENIED IN PART as to all other motions.  Dkt. 85.  In light of these rulings, the USD Defendants' motion to name Railserve as a responsible third party is DENIED AS MOOT.  Dkt. 105.

## BACKGROUND

Plaintiff Alejandro Benavidez sustained serious injury while working as a railroad brakeman/switchman for defendant Railserve, Inc. ("Railserve") at the Deer Park Rail Terminal ("terminal").  Dkt. 101 ¶ 13.  On April 4, 2005, Mr. Benavidez was thrown from a rail car during the movement of cars at the yard.  *Id.*  He fell onto the tracks and his left leg was run over by a rail car.  *Id.*  As a result, Mr. Benavidez required a below-the-knee amputation of his left leg.  Dkt. 84 ¶ 13.

Mr. Benavidez alleges this accident occurred because employees of the USD Defendants told Railserve not to engage the smoother air brakes when making train movements.  Dkt. 100 at 4.  During a rail movement on April 4, a Railserve engineer applied the regular brakes without warning, and as a result Mr. Benavidez was thrown from the train.  *Id.*

The terminal is a storage facility for railcars.  Dkt. 49, Ex. 7.  It provides storage and switching services for customers pursuant to individual contracts.  *Id.*  At the time of Mr.

Benavidez's accident, the terminal was owned by an entity of the USD Defendants. *Id.* Railserve had an exclusive contract to provide rail switching operations at the terminal. *Id.*

The Port Terminal Railroad Association ("PTRA"), which is owned and operated by Burlington Northern Santa Fe ("BNSF"), TexMex, and Union Pacific Railroads, brings cars into the terminal when a customer of the terminal wishes them to be stored. Dkt. 59 at 14; Dkt. 47 at 4. Railserve then takes the cars and puts them on the appropriate tracks for storage inside the terminal. *Id.* When customers notify the terminal they need their cars out of storage, the terminal sends a list to Railserve of the cars that should be assembled and put on certain tracks for pickup. *Id.* Railserve provides the switching operations needed to move the cars onto the designated tracks. *See id.* The PTRA then picks up the assembled cars from the designated track. *Id.*

The plaintiff has brought claims under FELA against both Railserve and the USD Defendants and a claim of common law negligence against the USD Defendants.[3] Dkt. 100.

### ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, L.P. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "material" if its

---

[3]These issues were originally raised in a motion to dismiss by Railserve and the USD Defendants. *See* Dkts. 25 & 26. This court, however, held that the arguments concerning the definition of a "common carrier" and the plaintiff's employment status went to the core of the FELA claim and were thus inappropriate subjects for a 12(b)(1) motion. Dkt. 43.

3

resolution could affect the outcome of the action.  *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 347 (2001).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322.  If the moving party fails to meet this burden, then they are not entitled to a summary judgment and no defense to the motion is required.  *Id*.

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163-64 (5th Cir. 2006).  The court must review all of the evidence in the record, but make no credibility determinations or weigh

4

any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005). However, the nonmovant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

## I.     FELA Claims

The Federal Employer's Liability Act ("FELA") provides in part that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in [interstate] commerce . . . ." 45 U.S.C. § 51. To recover damages under FELA, the plaintiff must establish four points: (1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) the plaintiff was employed by the defendant and assigned to perform duties which furthered interstate commerce; (3) the plaintiff's injuries were sustained while he or she was employed by the common carrier; and (4) the plaintiff's injuries were the result of the defendant's negligence. *Mack v. E. Camden & Highland R. Co.,* 297 F.Supp. 2d 1052, 1056–57 (W.D.Tenn. 2003) (citing *Felton v. Se. Pa. Trans. Auth.*, 952 F.2d 59, 60 (3rd Cir. 1991)).

A.    **Common Carrier**

The USD Defendants and Railserve argue that they do not meet the definition of a common carrier under FELA.[4]  Dkts. 45 & 46.

A common carrier is "one who operates a railroad as a means of carrying for the public." *Edwards v. Pac. Fruit Exp. Co.* 390 U.S. 538, 540, 88 S. Ct. 1239 (1968) (quoting *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 187, 41 S. Ct. 93 (1920)).  The distinguishing factor in determining whether a defendant is a common carrier is that "he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant."  *Kelly v. Gen. Elec. Co.*, 110 F.Supp. 4, 6 (E.D. Pa. 1953).  The plaintiff bears the burden of proving that the defendant is a common carrier and "therefore must present affirmative evidence indicating such."  *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 189 n.3 (6th Cir.1993); *see also Mack,* 297 F.Supp. 2d at 1057. In *Lone Star Steel Co. v. McGee*, the Fifth Circuit set out several factors of "prime importance" for determining whether a defendant is a common carrier: (1) evidence of "actual performance of rail service"; (2) the entity's service is "part of the total rail service contracted for by a member of the public"; (3) the service is "part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public"; and (4) evidence of remuneration, "such as a fixed charge from a railroad or by a percent of the profits from a railroad."  *Lone Star Steel Co.*

---

[4] Railserve and the USD Defendants have filed separate motions for summary judgment on the common carrier issue.  Railserve moves for full summary judgment because the FELA claim is the only claim the plaintiff has brought against it.  Dkt. 46.  Because the plaintiff also brings a common law negligence claim in addition to the FELA claim against the USD Defendants, they move for partial summary judgment.  Dkt. 45.  The motions on the common carrier issue are almost identical (and in fact the plaintiff has responded to them in a consolidated manner), therefore the court treats them as one motion.

*v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967). This is not a fixed test, but rather a list of "various considerations" that should be taken into account. *Id.*; *see also Kieronski v. Wyandotte Terminal R.R. Co.*, 806 F.2d 107, 108 (6th Cir. 1986) ("We do not believe that the list of considerations should be applied as a *test* because it is . . . only a list of *considerations* for a court to keep in mind when determining whether a carrier is a 'common carrier.'"). In *Kieronski v. Wyandotte Terminal Railroad Co.*, the Sixth Circuit reviewed existing case law and determined that carriers could be divided into a non-exhaustive list of categories: in-plant facilities; private carriers; and linking carriers. *Kieronski*, 806 F.2d at 108-09 & n.1. The court found this analysis to be more instructive than the *Lone Star Steel* factors.

### 1.   In-Plant Facilities

In-plant facilities have traditionally not been found to be common carriers, even when the operations are quite extensive. *Id.* at 109. In-plant facilities typically have small rail systems that transport only, or at least mainly, products internal to the plant itself. *See e.g., Duffy v. Armco Steel Corp.*, 225 F.Supp. 737, 738 (W.D. Pa. 1964) (manufacturer who owned locomotives and used them solely for in-plant use not a common carrier)*; Kelly*, 110 F.Supp. at 5 (incidentally transporting another manufacturer's products via an in-plant rail system does not  make someone a common carrier). The fact that an in-plant rail system is connected to a common carrier is not alone sufficient to make the in-plant system itself a common carrier. *See Kelly*, 100 F.Supp. at 7 (dismissing the argument that because an in-plant system is connected to common carrier via a switch it is "impressed with public use" and therefore a common carrier); *Loveless v. Ry. Switching Serv., Inc.*, 665 N.E.2d 252, 255 (Ohio Ct. App. 1995) ("The mere fact that an in-plant system is connected to tracks owned or operated by a common carrier is not enough to bring the in-plant system within the

scope of the FELA provisions, because virtually all in-plant operations share this characteristic.").
Even in situations where a company is hired to manage an in-plant rail system for a manufacturer,
that fact by itself is not sufficient to make the company a common carrier.  *See Mack*, 297 F.Supp.
2d  at 1059 (defendant who had an exclusive contract with an Army ammunition plant to manage
in-plant rail service is not providing any services to the public and therefore not a common carrier).

### 2.   Private Carriers

Private carriers are also not usually found to be common carriers.  *Kieronski*, 806 F.2d at 109.
Although they haul for others, they do so only pursuant to individual contracts.  *Id.*; *see also Ward
Transp., Inc. v. Pub. Util. Comm'n*, 376 P.2d 166, 169 (Colo. 1962) ("[A] private carrier is one who,
without making it a vocation, or holding himself out to the public as ready to act for all who desire
his services, undertakes, by special agreement in a particular instance only, to transport property from
one place to another either gratuitously or for hire.  He carries only for persons with whom he has
an initial contract, and assumes no obligation to carry for others; and in this lies the chief distinction
between a private carrier and a common carrier."(quoting *McKay v. Pub. Util. Comm'n*, 91 P.2d 965,
971 (Colo. 1939))).

### 3.   Linking Carriers

A linking carrier is invariably labeled a common carrier.  *Kieronski*, 806 F.2d  at 109.  As
the *Kieronski* court stated, "Where a rail entity links two or more common carriers, the linking entity
has become a vital part of the common carrier system and, therefore, becomes a common carrier."
*Id.*  Such a relationship is found when there is either common ownership between the linking and
common carrier or a contractual relationship between the two.  *Id.*

### B.     Analysis

Railserve and the USD Defendants argue that they are not "common carriers within the meaning of FELA." Dkt. 45 at 3; *see also* Dkt. 46 at 2.  The USD Defendants claim they fail the *Lone Star Steel* test for several reasons:[5]  (1) they do not provide rail services by transporting people or goods from place to place; (2) they do not perform rail services as part of a total rail service contracted for by a member of the public; (3) there is no common ownership between the USD Defendants and Railserve; (4) they do not hold themselves out to the public as common carriers; and (5) they do not receive profits from a railroad.  Dkt. 47 at 10.  At best, they feel they should be considered an in-plant rail operation under the categories set out in *Kieronski*.  *Id.* at 22 (citing *Kieronski*, 806 F.2d at 109).

In support of these arguments, the USD Defendants point to several facts.  First, they contract only with customers of the terminal for storage and switching services, pursuant to individual contracts.  Dkt. 43 at 3; Dkt. 47 at 4, 11.  Also, almost all the activities take place within the premises of the terminal, and the cars are not loaded on location.  Dkt. 47 at 4–5.  In fact, in many cases, the USD Defendants do not know where the cars are headed.  *Id.* at 5.  Moreover, the USD Defendants contend that they do not advertise their services to the public indiscriminately.  Dkt. 47 at 4; Dkt. 77 at 8.  Additionally, they state they do not have an ownership interest in Railserve.  Dkt. 45 at 3.  Instead, there is only a contractual relationship with Railserve to perform switching and storage operations at the terminal.  *Id.*  These factors, they argue, demonstrate that the USD Defendants are not common carriers under FELA.

---

[5]The USD Defendants and Railserve also argue that *Lone Star Steel* is an out-dated case that has been limited to its facts. *See e.g.*, Dkts. 47 at 10 n.8 & Dkt. 77 at 5. However, as the plaintiff notes, the defendants have not provided any Fifth Circuit or U.S. Supreme Court cases that have overruled or limited *Lone Star Steel*. *See* Dkt. 97 at 3.

The arguments put forth by Railserve for why it is not a common carrier under FELA mirror those put forward by the USD Defendants.[6] Dkt. 48 at 9–10.  Railserve points out that it is "not part of a corporate structure that owns railroads."  Dkt. 48 at 9.  Nor does it carry cargo; it simply switches and parks cars.  *Id.*  The terminal is Railserve's only client at this location, and Railserve is paid a flat fee per month for its services, regardless of the number of cars switched in a given month.  Dkt. 47 at 5; Dkt. 48 at 10.  Railserve also relies on the fact that in a different case, a district court concluded that Railserve was not a common carrier under FELA.  *See* Dkt. 48 at 13 (citing *Allen v. Railserve, Inc.*, No. CIV.A.00-3135, 2001 WL 1352323 (E.D. La. Oct. 31, 2001)).  Furthermore, Railserve alleges that the plaintiff is seeking to avoid the exclusive remedy provision of the Texas Labor Code by making a claim under FELA.  *Id.* at 7.

The plaintiff argues that both the USD Defendants and Railserve are common carriers under *Lone Star Steel*.  Based upon the four elements put forth in *Lone Star Steel*, the plaintiff asserts that: (1) Railserve does perform actual rail services as part of its contract to perform storage and switching operations at the terminal; (2) the railroad switching being performed by Railserve at the terminal is part of an overall package of total rail service paid for by the 26 individual customers and the customers of PTRA and BNSF; (3) the USD Defendants are part of a larger rail service through a contract with BNSF and PTRA and are, as such, holding themselves out to the public; and the contract between Railserve and the USD Defendants extends this relationship to Railserve; and (4)

_____

[6]Interestingly, the USD Defendants argue they are actually "one step further from the operations at the terminal" than Railserve because they do not perform the storage and switching operations themselves but instead contracted with Railserve for that purpose.  Dkt. 47 at 8 n.1. However, the court notes that  they are arguably actually closer to the operations since they, and not Railserve, are a party to the contracts with the 26 individual customers, PTRA, and BNSF.

remuneration is being received either per car (the USD Defendants) or a flat fee arrangement (Railserve).  Dkt. 58 at 2.

To support these arguments, the plaintiff relies upon the deposition testimony of Paul Tucker, Chief Operating Officer for the USD Defendants, who states that the USD Defendants only turn down customers for creditworthiness or safety reasons; thus, for all practical purposes, they are holding themselves out the public.[7]  Dkt. 59, Ex. E at 12–15, 64.  Additionally, the affidavit of Larry Ruple of BNSF states that "[s]taging and switching functions are a necessary part of railroad services BNSF provides to its customers.  If these services were not performed by [the USD Defendants], the BNSF, or another contractor on behalf of BNSF, would have to perform these services."[8]  Dkt. 97 at 3.  Lastly, the plaintiff argues that just because the USD Defendants have separate contracts with each customer does not absolve it of FELA liability—the private carrier analysis only applies to those companies "who do not make rail services [their] vocation."  *Id.* at 8 (citing *Ward*, 376 P. 2d at 169).

*Lone Star Steel* provides the applicable list of considerations for determining whether a defendant is a common carrier under FELA in the Fifth Circuit.  While the case is over forty years old, it has not been overruled or limited to its facts.  Therefore, the court analyzes whether the USD Defendants or Railserve are common carriers under FELA using the *Lone Star Steel* factors.

_____

[7]The deposition also mentions that customers may be turned down for availability reasons. Dkt. 59, Ex. E at 15.

[8]The USD Defendants argue that Mr. Ruple's affidavit is irrelevant based on the assumption that the plaintiff is arguing broadly that *any* company that provides rail services via contract with a railroad is *per se* a common carrier under FELA.  Dkt. 113 at 2.  The USD Defendants rightly point out that this broad proposition finds no support in case law.  *See e.g.*, *Edwards*, 390 U.S. 538; *Iverson v. S. Minn. Beet Sugar Co-op*, 62 F.3d 259 (8th Cir. 1995).  Therefore, Mr. Ruple's affidavit is relevant to the question of whether on the facts of *this* case, the USD Defendants are a common carrier.

11

1.    The USD Defendants

(a)    *Actual Performance of Rail Service*

An activity or facility related to railroading or used in conjunction to railroading is not necessarily railroading.  *See Edwards*, 390 U.S. at 540–41 (refrigerator car company not considered a common carrier under FELA); *Robinson v. Baltimore & O.R. Co.*, 237 U.S. 84, 94, 35 S.Ct. 491 (1915) (Pullman car company not considered a common carrier for purposes of the Employer's Liability Act of 1908 (predecessor to FELA)).  Switching services, however, are ordinarily considered railroading activities.  *See Nichols v. Pabtex, Inc.*, 151 F. Supp.2d. 772, 778 (E.D. Tex. 2001) ("[Activities of the defendant] included 'switching cars' . . . a practice that even [the defendant] admitted would constitute rail service."); *Iverson v. S. Minn. Beet Sugar Co-op*, 62 F.3d 259 (8th Cir. 1995) (holding that switching cars and putting them into a position for unloading at various loading docks in a factory is rail service and meets the first factor in *Lone Star Steel*).

The USD Defendants have contracts with 26 individual customers as well as the customers of PTRA and BNSF to provide storage and switching operations at the terminal.  Dkt. 59 at 2.  They do not, however, actually perform rail services at the terminal; they have contracted those operations out to Railserve.  *Id.* at 5.  On its face, these facts might seem to warrant a conclusion that the USD Defendants were not actually performing rail services.  But, to allow a companies to immunize themselves from FELA liability by the simple expedient of hiring someone else to conduct their rail operations creates too wide a loophole for this court to condone.  Accordingly, the court finds that the USD Defendants are performing actual rail services in the instant case.

>(b)    *Service Being Performed is Part of the Total Rail Service for the Public*

In *Lone Star Steel Co. v. McGee*, the plaintiff brought a FELA claim against the defendants, Lone Star and T&N, for injuries he sustained while in Lone Star's employment. *Lone Star Steel*, 380 F.2d at 641. Lone Star argued it was not a common carrier for purposes of FELA, because its primary business was to maintain a plant for the manufacture of steel and steel products, even though it admitted it was in the business of interstate commerce and was a carrier by rail. *Id.* at 641–42. Within the plant, Lone Star had a network of rail trackage for intra-plant movements. *Id.* at 642. T&N performed rail services for Lone Star. *Id.* at 642. Additionally, Lone Star both owned and had a contractual relationship with T&N, which included at times performing rail services for other customers of T&N. *Id.* at 643. Lone Star, however, insisted it was not a common carrier under FELA because it was primarily an in-plant operation and did not hold itself out the public for hire. *Id.* at 643. The Fifth Circuit disagreed and found that the service being performed by Lone Star was "a part of the total rail services which another railroad [T&N] . . . obligated itself to perform." *Id.* at 646.

In contrast, the Fifth Circuit in *McRea v. Harris County Ship Channel Navigation District*, found the services the Navigation District were providing were not part of the total rail service contracted by the public. *McRea v. Harris County Ship Channel Navigation Dist.*, 423 F.2d. 605 (5th Cir. 1970). The Navigation District was sued after an employee was killed on the job and his widow brought a FELA claim. *Id.* at 606. The Navigation District acted as intermediary between railroads and vessels in the Port of Houston; it was responsible for unloading grain from railroad cars, providing temporary storage, and moving the grain to vessels by means of a conveyor. *Id.* at 607–08. The court found the Navigation District was not a common carrier for several reasons: (1)

the unloading of inanimate cargo was not typically considered a railroad function; (2) the grain movements were performed by conveyor and not by rail; and (3) the services performed by the Navigation District were not included in the services paid by the grain shipper to a railroad—they required "independent arrangements"and shippers paid an additional charge. *Id.* at 609.

Unlike the defendant in *McRea*, the customers of PTRA and BNSF *do* receive the services of the USD Defendants by "virtue of their shipment contract with the railroad" and do not pay any additional fees to the USD defendants. *See* Dkt. 59 at 6–7, 10–11 (describing the contracts between the USD Defendants and PTRA and BNSF).  PTRA and BNSF themselves are undisputedly common carriers–they are railroads engaged in interstate commerce that carry for the public indifferently.  *See e.g.*, Dkts. 63-2 at 2 & 74-5 (PTRA tariff schedule); Dkt. 74-6 (BNSF website with information on becoming a new customer).  This assertion is further supported by testimony of several witnesses in this case.  *See* Dkt. 97 at 3 (Larry Ruple, an employee of BNSF, describing BNSF as a common carrier); Dkt. 61-4 at 9 (Paul Tucker, an employee of the USD Defendants, describing PTRA as a common carrier).  The USD Defendants have contracts with PTRA and BNSF to handle storage and switching operations for their customers.  Dkt. 59 at 2.  Furthermore, Larry Ruple's affidavit indicates these services would be performed by BNSF or another contractor if not performed by the USD Defendants.  Dkt. 97 at 3.  Thus, the court finds that the USD Defendants perform services as part of a total rail service contracted by the public.

> (c)  *The Entity is Performing as Part of a System of Interstate Rail Transportation*

A common carrier is characterized by the fact that it "undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant." *Kelly*, 110 F.Supp. at 6.  Courts have found companies that have entered into individual contracts with customers are not

holding themselves out to the public indiscriminately.  *See Home Ins. Co. v. Riddell*, 252 F.2d 1, 4 (5th Cir. 1958) ("There has been no such holding out [to the public] if, in the regular operation of that business, the carrier by act and deed, with or without words, claims to and exercises the right to fix specific rates in each individual case basing the charges not on a regular schedule (whether formally filed as tariffs or otherwise), but on contemporary judgment of the moment. For this is an effectual announcement that the carrier will discriminate, will undertake transportation differently, not indifferently.").  Additionally, mere evidence of a public advertisement is not sufficient to make someone a common carrier.  *See Mack*, 297 F.2d. at 1062 (quoting *Loveless v. Ry. Switching Serv., Inc.*, 665 N.E.2d 252, 255 (Ohio Ct. App. 1995)  ("Service providers do not change status to common carriers based on advertisements unless they undertake to carry for all people indifferently.") The USD website includes numerous references to the company providing rail services and rail logistics. Dkt. 59 at 3–4.  The website includes a section on the terminal itself, which in part, advertises the ability to store and stage cars at that location "with interchange to Union Pacific and BNSF."  Dkt. 59 at 4.

A company does not have to hold itself out to the public directly; instead, it can be considered to do so by virtue of its relationship with a common carrier (be it through common ownership or a contractual relationship).  *See Lone Star Steel,* 380 F.2d  at 647.  When a company provides services that are a necessary part of a railroad's services that are being offered indiscriminately to the public, the railroad's act of holding itself out to the public for hire is imputed to the company.  *Id.* at 646 ("By undertaking the obligations of a common carrier. . .[Lone Star] holds itself out to the public as being engaged in the business of public transportation. Moreover, since [the railroad] holds itself out to the public as performing all the duties of a common carrier, Lone Star cannot claim that the duties it performs for [railroad] are not offered indiscriminately to the public.").

Additionally, the evidence from Paul Tucker's deposition indicates that even though the USD Defendants are not bound to offer services to anyone who requests them, they have only turned down customers for reasons of safety or creditworthiness. Dkt. 59, Ex. E at 64. Moreover, based on their contractual relationship with PTRA and BNSF alone, the USD Defendants can be deemed as holding themselves out to the public– they are fully obliged to service the PTRA and BNSF customers. *See e.g.*, Dkt. 63-2 at 2 (If PTRA delivers cars to [the terminal]. . . [The USD Defendants] will provide storage, switching and blocking services . . . for such cars."); Dkt. 60-3 at 2 ("[The USD Defendants] shall make available to [BNSF] trackage within the Yard sufficient room to place up to six hundred [BNSF] . . . railcars."). Therefore, the USD Defendants are holding themselves out to the public.

### (d) Evidence of Remuneration

The USD Defendants are paid per car. Dkt. 59 at 40. Additionally, they receive further remuneration from PTRA from a profit sharing arrangement for the storage of rail cars. *See* Dkt. 59, Ex. R, § 2(b)) (the USD Defendants "shall share equally with PTRA any revenue generated from PTRA tariffs on rail car storage.") The USD defendants clearly receive remuneration for their services by a railroad.

In sum, the USD Defendants are common carriers under the *Lone Star Steel* test. Furthermore, even if the court were to use the *Kieronski* test as urged by the USD Defendants, the USD Defendants would still be a common carrier. Unlike the USD Defendants, the *Kiernoski* in-plant cases address companies that transport solely within the premises of a plant, and only the goods that *belong* to that plant. *See e.g.*, *Mack*, 297 F.Supp. 2d at 1059–62 (company that transported munitions within the plant of an army munitions company an in-plant carrier, or in the alternative, a private carrier); *Iverson*, 62 F.3d at 263–65 (company that moved beet sugar around a beet sugar

co-op plant for processing was an in-plant carrier).  The USD Defendants are moving cars, and sometimes goods, belonging to many customers; the movement of these cars is unrelated to any production of goods on the grounds of the terminal.  Therefore, under either *Lone Star Steel* or *Kieronski*, the USD Defendants are common carriers under FELA.

2.   Railserve

Railserve argues it should be considered a private carrier because it enters into individual contracts with its customers.  However, the language of *Ward* indicates that a private carrier is one who makes an initial contract with a party and does not have an obligation to carry for others.  *Ward,* 376 P.2d at 169.  This is not the case with Railserve—it switches and moves cars belonging to 26 individual customers of the USD Defendants as well as the customers of PTRA and BNSF.  Railserve also argues that since another court held that it was not a common carrier for purposes of FELA, that should bear on this court's decision in the present case.  *See* Dkt. 47 at 13 (citing *Allen v. Railserve*, No. CIV.A.00-3135, 2001 WL 1352323 (E.D. La. 2001)).  Railserve, however, has presented no case law that *Allen* is controlling here.  The determination of whether a company is considered a common carrier under FELA is a highly fact-specific analysis; such a finding should not be precluded in the present case merely because another court, with entirely different facts before it, found the same company did not meet the test for a common carrier.  *See O'Brien v. Watco Contract Switching*, 802 N.E. 2d 999, 1007 (Ind. Ct. App. 2004) ("[W]hen determining whether an entity is a common carrier for purposes of FELA, we look to [the] specific operation [in question]. . . The fact that [the defendant] is not a common carrier [in this case] is not altered by the fact that [it] performs [rail services] in other parts of the country . . . .").

Railserve provides switching and all other operational services at the terminal.  Dkt. 58 at 2, 5.  Given that this court has determined the USD Defendants are common carriers under FELA,

17

Railserve is a common carrier by virtue of its contractual relationship with the USD Defendants–each of the *Lone Star Steel* elements is imputed to Railserve. For example, the court in *O'Brien v. Watco Contract Switching*, held that the subcontractor in that case could not be considered a common carrier because the company that hired it would not be a common carrier if it had performed the in-plant rail services itself. *O'Brien,* 802 N.E.2d at 1007. Here, the facts are the opposite of those in *O'Brien*–the hiring company (the USD Defendants) is considered a common carrier. In *Sinkler v. Missouri Pacific Railroad*, the Supreme Court extended FELA liability to an independent contracting company, hired by a railroad, whose employee's negligence injured one of the railroad's employees. *Sinkler v. Mo. Pac. R.R.*, 356 U.S. 326, 78 S. Ct. 758 (1958). While this is not a case where a Railserve employee caused injury to an employee of the USD Defendants, the underlying rationale for the *Sinkler* decision is on point—the Supreme Court extended liability to further the underlying purpose of FELA. As the court stated in *Sinkler*:

> [I]t was the conception of this legislation that the railroad was a unitary enterprise, its economic resources obligated to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor. Hence a railroad worker may recover from his employer for an injury caused in whole or in part by a fellow worker, not because the employer is himself to blame, but because justice demands that one who gives his labor to the furtherance of the enterprise should be assured that all combining their exertions with him in the common pursuit will conduct themselves in all respects with sufficient care that his safety while doing his part will not be endangered.

*Id.* at 330. For the aforementioned reasons, Railserve is a common carrier under FELA.

Accordingly, both motions for summary judgment on the issue of common carrier status for the USD Defendants and Railserve are DENIED.

**B.**     **FELA Employer**

The USD Defendants also move for summary judgment alleging the plaintiff has not met his burden to show that he was their employee for purposes of his FELA claim.   Dkt. 85.

1.     Standard of Review

In *Lindsey v. Louisville & Nashville Railroad Company*, the Fifth Circuit set out two principles relevant to the analysis in this case. *Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322, 1324 (5th Cir. 1985).  First,

> under the FELA a worker can be the "employee" of a railroad even though carried on the employment rolls of another company and paid by that other company.  The test of employment is the established test in workers' compensation cases. It is whether the railroad has control of the employee or the right to control the employee.  The law does not require that the railroad have full supervisory control.  It requires only that the railroad, through its employees, plays "a significant supervisory role" as to the work of the injured employee.

*Id.* (citing *Kelley v. S. Pac. Co.,* 419 U.S. 318, 327, 95 S.Ct. 472 (1974)).   Second, the "question whether the injured worker was acting as an employee of the railroad at the time of the injury under the FELA is a question of fact for the jury."  *Id.* (citing *Baker v. Tex. & Pac. Ry. Co.*, 359 U.S. 227, 228, 79 S.Ct. 664 (1959)).  Only if reasonable jurors could not reach different opinions, is the court to take the matter from the jury.  *Lowery v. Ill. Cent. Gulf. R. Co.*, 891 F.2d 1187, 1191 (5th Cir. 1990) (citing *Baker*, 359 U.S. at 228).

2.     Analysis

The USD Defendants argue that neither Mr. Benavidez nor Mr. Stroud[9] was an employee of the USD Defendants for the purposes of the FELA claim.  Dkt. 87 at 5.  They were employees of

---

[9]  Mr. Stroud was the Railserve engineer who, according to the USD Defendants' policy, applied the regular brakes instead of the air brakes to stop the train when the plaintiff was injured. Dkt. 100 at 4.

Railserve only. *Id.* The USD Defendants did not direct or supervise the work of the Railserve employees—they only provided guidance as to which cars were to be switched and blocked each day at the terminal. *Id.* at 5-6. Specifically, the USD Defendants state they did not have the power to hire or fire Railserve employees; provide them tools for use in their work; pay the employees directly; or set their wage rates. *Id.* Furthermore, the contract between the USD Defendants and Railserve specifically provided that "[Railserve] shall retain complete control over its personnel and operations . . . . Neither [Railserve] nor any of its employees shall be, in any sense [the USD Defendants'] employees . . . ." *Id.* at 6. The USD Defendants rely heavily on the Supreme Court's opinion in *Kelly* to support their claim.[10] *Id.* at 10–14. In *Kelly*, the Supreme Court stated that there are basically three methods by which an employee can show an employment relationship for purposes of FELA: (1) the employee could be serving as a borrowed servant; (2) the employee could be deemed as acting for two masters; and (3) the employee could be subservant of a company that in turn was a servant of the railroad. *Id.* at 10–11 (citing *Kelly*, 419 U.S. at 324). Under the *Kelly* test and based on the aforementioned facts, the USD Defendants argue that the plaintiff has not met his burden to show any genuine issue of material fact. *See Id.* at 12.

The plaintiff responds that he was an employee of the USD Defendants for the purposes of FELA, and that there is enough evidence to get to the jury on this question. Dkt. 101 at 4–7. The USD Defendants created the switch lists and told Railserve which cars to move on a daily basis. *Id.* at 5. The USD Defendants told Railserve not to use air brakes as part of their procedures when making rail movements. *Id.* Railserve employees considered Brent Tucker, an employee of the

---

[10]Notably, the USD Defendants fail to mention *Lindsey* altogether in their motion, even though that case is the controlling Fifth Circuit opinion that incorporates and expands upon *Kelly*. *See* Dkt 87.

USD Defendants, their boss.  *Id.* at 6.  This evidence, argues the plaintiff, is enough to create a question of fact for the jury as to whether an employer relationship existed between the USD Defendants and himself.  *Id.*  The court agrees.

Under the *Lindsey* test, it is enough to defeat a motion for summary judgment if there is a genuine issue of material fact that the defendant played a "significant supervisory role" in directing the plaintiff.  *Lindsey*, 775 F.2d at 1324 (citing *Kelly*, 419 U.S. at 327).  In the instant case the record contains enough facts to place the USD Defendants' role into question.  There is evidence that the USD Defendants did control the day-to-day operations of the Railserve employees.  The deposition testimony of Paul Tucker, an employee of the  USD Defendants,  states that Railserve received communications as to which cars to "switch, store, and place" from the USD Defendants' customer service department.  Dkt. 6-1 at 4.  Additionally, deposition testimony from a fellow Railserve employee, John Bozant, states that he "personally witnessed, on numerous occasions, Brent Tucker [a USD employee] orally direct [another Railserve employee] and me as to the details of the rail operations that occurred at the [terminal].  Brent Tucker also orally directed me as to the rail car operations I performed and I told my crews to perform, while I was working at the [terminal]."  Dkt. 61-2 at 3.  Although the USD Defendants refute these statements (see Dkt. 87 at 6–7), "this refutation cannot serve as the basis for summary judgment.  Indeed, the disagreement created by the contradictory statements, creates the very "'genuine dispute of material fact' recognized in Rule 56(c) which must not exist if summary judgment is to be granted."  *Bradsher v. Mo. Pac. R.R.*, 679 F.2d 1253, 1257 (8th Cir. 1982).  The USD Defendants present evidence disputing the degree to which Railserve employees were under their control.  However, reasonable jurors could reach different opinions and, therefore, this is an issue of material fact precluding summary judgment.

Accordingly, the motion for partial summary judgment of the USD Defendants on the FELA employee issue is DENIED.

## II.      Common Law Negligence

The USD Defendants move the court to  limit the plaintiff to only a *Redinger* claim as the basis of his negligence claim against them.  Dkt. 85.

### A.      Standard of Review

Under Texas law, to establish a negligence claim, a plaintiff must establish: (1) a duty; (2) a breach of that duty; and (3) damages proximately caused by the breach of that duty.  *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006).  Whether such a duty exists is question of law that must be answered as a threshold matter; no liability can be imposed without such a duty.  *Id.*

### B.      Analysis

The USD Defendants contend that the plaintiff seems to base his negligence claim on two different theories: (1) master-servant relationship; and (2) a *Redinger* claim.  Dkt. 85 at 3.  Their motion requests this court to limit the plaintiff to only a *Redinger* claim as the basis of the duty owed to him; a  required element of the negligence claim.  *Redinger v. Living, Inc.*, 689 S.W.2d 415 (Tex. 1985); Dkt. 85 at 3.

In *Redinger*, Texas adopted the view of the Second Restatement of Torts, which creates an exception to the general rule that an owner does not have a duty to ensure than an independent contractor "performs work in a safe manner." *Id.* at 418.  This exception provides that "[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." *Id.*

The plaintiff's response to the USD Defendants' motion indicates that he in fact plans to pursue a *Redinger* duty as the basis of his claim.  Dkt. 101 at 8–9 (discussing *Redinger* and its progeny as the basis for the duty element of his common law negligence claim).  The plaintiff did not indicate that he intends to pursue a master-servant relationship against the USD Defendants.  *See generally* Dkt. 101.  Therefore, the USD Defendants' motion to limit Mr. Benavidez to a *Redinger* claim is GRANTED.

## III.   Motion for Leave to Designate Railserve as a Responsible Third Party

The USD Defendants also move to designate Railserve as a responsible third party pursuant to section 33.004 of the Texas Civil Practice and Remedies Code in the event Railserve is dismissed from this case..  Dkt. 105.  Because this court has found Railserve to be a common carrier, the USD Defendants' motion is DENIED AS MOOT.

### CONCLUSION

Accordingly, defendants' motions for summary judgment on the common carrier issue and the FELA employee issue are DENIED   The motion of the USD Defendants to limit the plaintiff to a *Redinger* duty is GRANTED.  And, the motion to designate Railserve as a responsible third party  is DENIED AS MOOT.

It is so ORDERED.

Signed at Houston, Texas on April 29, 2008.


_____
Gray H. Miller
United States District Judge

23